## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

KRISTIN COBBS, LYNNE
KAWAMINAMI, and LORETTA
SCHWEINSBURG, individually and on
behalf of all others similarly situated,

     *Plaintiffs*,

vs.

PETMED EXPRESS, INC.,

     *Defendant*.

Case No. 25-CV-80458-RLR/BER

**FIRST AMENDED CLASS
ACTION COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs Kristin Cobbs, Lynne Kawaminami, and Loretta Schweinsburg, individually and on behalf of all other persons similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action lawsuit for data privacy violations on behalf of all individuals who have purchased veterinary medicine on www.1800petmeds.com.

2.     Defendant PetMed Express, Inc. ("PetMeds" or "Defendant") owns and operates www.1800petmeds.com, one of the largest online pharmacies for veterinary prescriptions.

3.     As evinced through numerous statutes and regulations, Defendant has a legal obligation to keep information about veterinary care—including details about veterinary treatments or prescriptions—confidential.

4.     Despite that obligation, Defendant aids, employs, agrees with, and conspires with third parties—such as Meta Platforms, Inc. ("Meta"), Attentive Mobile, Inc., ("Attentive"), and Zeta Global Corporation ("Zeta")—to eavesdrop on communications sent and received by Plaintiffs and Class members, including communications that contain sensitive and confidential information.

5.     By assisting third parties with intercepting sensitive and confidential communications, Defendant violated state and federal anti-wiretapping laws.

6.     Plaintiffs bring this action for legal and equitable remedies resulting from these illegal actions.

## PARTIES

7.      Plaintiff Kristin Cobbs is domiciled in San Francisco, California.  On or around 2007, Plaintiff Cobbs created a Facebook account.  On October 29, 2024, Plaintiff Cobbs visited 1800petmeds.com and purchased veterinary medicine for her chihuahua mix named Kona.  While doing so, Plaintiffs Cobbs visited webpages and clicked on buttons revealing the prescription that she intended to purchase.  After adding the prescription to her cart, Plaintiff Cobbs navigated to the checkout page and entered her full name, phone number, email address, home address, and billing address.  At no point during the transaction was Plaintiff Cobbs put on notice of a terms of service or privacy policy.  Although unaware at the time, Plaintiff Cobbs is informed and believes that Defendant assisted third parties—like, for example, Meta, Attentive, and Zeta—with intercepting her electronic communications while she was navigating www.1800petmeds.com, including communications that contained veterinary information and personally identifiable information.  Given that Defendant was statutorily required to safeguard veterinary information and personally identifiable information from disclosure, Plaintiff Cobbs reasonably expected that communications revealing such information would remain confidential.

8.      Plaintiff Lynne Kawaminami is domiciled in Gardena, California.  On or around 2009, Plaintiff Kawaminami created a Facebook account.   On February 6, 2025, Plaintiff Kawaminami visited 1800petmeds.com and purchased veterinary medicine for her Savannah cat named Jabari.  While doing so, Plaintiffs Kawaminami visited webpages and clicked on buttons revealing the prescriptions that she intended to purchase.  After adding the prescriptions to her cart, Plaintiff Kawaminami navigated to the checkout page and entered her full name, phone number, email address, home address, and billing address.  At no point during the transaction was Plaintiff Kawaminami put on notice of a terms of service or privacy policy.  Although unaware at the time,

Plaintiff Kawaminami is informed and believes that Defendant assisted third parties—like, for example, Meta, Attentive, and Zeta—with intercepting her electronic communications while she was navigating www.1800petmeds.com, including communications that contained veterinary information and personally identifiable information.  Given that Defendant was statutorily required to safeguard veterinary information and personally identifiable information from disclosure, Plaintiff Kawaminami reasonably expected that communications revealing such information would remain confidential.

9.      Plaintiff Loretta Schweinsburg is domiciled in Costa Mesa, California.  On or around 2007, Plaintiff Schweinsburg created a Facebook account.  On September 18, 2024, Plaintiff Schweinsburg visited 1800petmeds.com and purchased veterinary medicine for her fourteen-year old Maine Coon Ragdoll Mix named Makenna.  While doing so, Plaintiffs Schweinsburg visited webpages and clicked on buttons revealing the prescription that she intended to purchase.  After adding the prescription to her cart, Plaintiff Schweinsburg navigated to the checkout page and entered her full name, phone number, email address, home address, and billing address.  At no point during the transaction was Plaintiff Schweinsburg put on notice of a terms of service or privacy policy.  Although unaware at the time, Plaintiff Schweinsburg is informed and believes that Defendant assisted third parties—like, for example, Meta, Attentive, and Zeta—with intercepting her electronic communications while she was navigating www.1800petmeds.com, including communications that contained veterinary information and personally identifiable information.  Given that Defendant was statutorily required to safeguard veterinary information and personally identifiable information from disclosure, Plaintiff Schweinsburg reasonably expected that communications revealing such information would remain confidential.

10.     All Plaintiffs made these online transactions from web browsers in California.

11.     PetMed Express, Inc., is a Florida corporation that is headquartered in Delray Beach, Florida.

### JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 members of the putative class, and Plaintiffs, as well as most members of the proposed class, are citizens of different states than Defendant.

13.     This Court has personal jurisdiction over Defendant because Defendant is headquartered and incorporated in Florida.

14.     Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant resides in this judicial district.

### FACTUAL BACKGROUND

**A.  The Wiretap Act and the California Invasion of Privacy Act**

15.     "In 1968, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968, which deals with wiretapping and other forms of electronic surveillance." *Scott v. United States*, 436 U.S. 128, 130 (1978).  Known today as the Wiretap Act, the statute remains "the primary law protecting the security and privacy of business and personal communications." S. Rep. 99-541 at *3.

16.     As originally enacted, the Wiretap Act only extended to surveillance techniques in which "the contents of a communication [could] be overheard and understood by the human ear." S. Rep. 99-5441, at *2.  Put differently, Congress "specifically excluded the [electronic]

transmission of data from protection against private and governmental interceptions." H.R. 99-647, at *22.  Less than two decades later, technological advancements forced Congress to modify the Wiretap Act's ambit:

> In the intervening years, data transmission and computer systems have become a pervasive part of the business and home environments. … Some of these new services permit an individual to use a keyboard and telephone to transmit electronic messages and data and to receive interactive services featuring banking and other financial services, shopping, news, messages and education.  Many of these services also record the nature of the transactions engaged in by the user.  Thus, the new technologies represent both an explosion in communication opportunities as well as surveillance possibilities.  *Id.*

17.     In 1986, Congress sought to address these "dramatic changes in new computer and telecommunications technologies" by "amend[ing] title III of the Omnibus Crime Control Safe Streets Act of 1968—the Federal wiretap law—to protect against the unauthorized interception of electronic communications."  S. Rep. 99-5441 at *1.

18.     Today, the Wiretap Act provides that "any person who intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication … shall be punished … or shall be subject to suit."  18 U.S.C. § 2511.  The term "electronic communication" broadly encompasses "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce."  18 U.S.C. § 2510(12).  That includes, for example, "computer-to-computer communications," like "the transmission of financial records or funds transfers from financial institutions, medical records between hospitals and/or physicians' offices, and the transmission of proprietary data among the various offices of a company."  S. Rep. 99-541 at *3.

19.     Shortly before and after Congress enacted the Wiretap Act, state legislatures enacted their own prohibitions against eavesdropping on communications.  In 1967, for example,

California enacted an anti-wiretapping statute—the California Invasion of Privacy Act—to address concerns "that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630. Two years later, the Florida legislature enacted its own anti-wiretapping statute—the Florida Security of Communications Act—to "safeguard the privacy of innocent persons." Fla. Stat. § 934.01(4). Like the Wiretap Act, the FSCA and CIPA prohibit intercepting "electronic communications." *See, e.g.*, Cal. Penal Code § 638.50; Fla. Stat. § 934.03(1)(a). All three statutes also prohibit "procur[ing] any other person" to effectuate such interceptions. *See, e.g.*, Fla. Stat. § 934.03(1)(a); 18 U.S.C. § 2511(1)(a) (same); Cal. Penal Code § 631(a) (providing liability against "[a]ny person who … aids, agrees with, employs, or conspires with any person or persons" to intercept electronic communications).

20.     Though largely coextensive with the Wiretap Act, CIPA not only prohibits intercepting electronic communications but also outlaws "us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication." Cal. Penal § 632. The term "confidential communications" means "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes … circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." Cal. Penal § 632(c).

**B. Veterinary Information is Sensitive and Confidential**

21.     As evinced through numerous state statutes and regulations, veterinary information is sensitive and confidential.

22.     In California, for example, state law prohibits veterinarians from "disclos[ing] any information concerning an animal receiving veterinary services, the client responsible for the animal receiving veterinary services, or the veterinary care provided to an animal." Cal. Bus. & Prof. Code § 4857(a).  Similarly, in Florida, where Defendant is headquartered, state law provides that "information disclosed to a veterinarian by a client in the course of the care and treatment of the patient is confidential and may be disclosed only to other veterinarians involved in the care or treatment of the patient, or if permitted by written authorization from the client."  Fla. Stat. § 474.2165(5).  At least ten other states have enacted similar prohibitions. *See, e.g.*, Ala. Admin Code r. 930-X-1.10(15); 24 Del.C. §3316(a)(7); O.C.G.A. § 50-18-72(a)(2); 225 ILCS 115/25.17(a); IC 25-38.1-4-5.5; K.S.A. 47-839; KRS 321.185; Okla. Stat. tit. 59 § 698.16a(D); 22 Tex. Admin. Code § 573.28(a); U.C.A. 1953 § 58- 28-605.

23.     These confidentiality requirements extend to pharmacies that dispense veterinary medicine.  In California, the State Board of Pharmacy regulates any company that processes or fulfills "prescriptions," including those from "a physician, dentist, optometrist, …[or] veterinarian." Cal. Bus. & Prof. § 4040(2).  Through those regulations, the Board has made clear that "[n]o pharmacist shall exhibit, discuss, or reveal the contents of any prescription, the therapeutic effect thereof, the nature, extent, or degree of illness suffered by any patient or any medical information furnished by the prescriber with any person other than the patient or his authorized representation, the prescriber or other licensed practitioner then caring for the patient, another licensed pharmacist serving the patient, or a person duly authorized by law to receive such information."  Cal. 16 CCR § 1764.

24.     In Florida, where Defendant is headquartered, state law likewise requires pharmacies—including those that dispense veterinary medicine—"to preserve the confidentiality of such records."  Fla. Stat. § 465.017(1)(b).

25.     Defendant knows it must comply with these regulations.  In California and Florida, for example, Defendant sought and obtained a license to operate as a pharmacy.

Figures 1 and 2





26.     Without these licenses, Defendant cannot dispense veterinary medications.[1]

27.     Beyond state statutes and regulations, the industry standard is to protect such information from disclosure.  As the American Veterinary Medical Association put it: "The information within veterinary records is confidential."

28.     Defendant recognizes that the industry standard is to keep veterinary information confidential.  At the bottom of its homepage, for example, Defendant touts its accreditation with the National Association of Boards of Pharmacy:

Figure 3



29.     That badge is intended to assuage consumers that Defendant will "[c]omply with privacy laws and ensure patient confidentiality."[2]

30.     Defendant also places a hyperlink on the checkout page entitled "Additional Information About Your Prescription."  There, Defendant makes the following representation: "All personal and prescription information is securely managed and treated with the highest level of confidentiality, regardless of the processing location."

Figure 4

> • Data Privacy: All personal and prescription information is securely managed and treated with the highest level of confidentiality, regardless of the processing location.

---

[1] https://www.sec.gov/Archives/edgar/data/1040130/000143774921013213/pets20210331_10k.htm (noting that, "[i]f for any reason our license to operate a pharmacy … should be suspended or revoked, or if it is not renewed, our ability to sell prescription medications … would cease.")
[2] https://safe.pharmacy/buy-safely/

31.     As reflected through statutes, regulations, industry standards, and representations on Defendant's website, Plaintiffs reasonably expected that their electronic communications with Defendant would remain confidential.

32.     Despite that reasonable expectation, Defendant systematically discloses such information to numerous third parties.

33.     Defendant's disclosures to three companies—Meta, Attentive, and Zeta—serve as useful exemplars.

### C.  Meta's Platform and its Business Tools

34.     Meta describes Facebook as a "real identity platform,"[3] meaning users are allowed only one account and must share "the name they go by in everyday life."[4] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[5]

35.     In 2023, Meta generated $134 billion in revenue.[6] Roughly 95% of that came from selling advertising space.[7]

36.     Meta sells advertising space by highlighting its ability to target users.[8]

37.     Meta can target users so effectively because it surveils user activity both on and off its site.[9]

---

[3] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[4] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[5] FACEBOOK, SIGN UP, https://www.facebook.com/
[6] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2023 RESULTS, https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx
[7] Derek Saul, *Meta Earnings: Record Profits, Sales As Ads Stay Robust During Zuckerberg's 'Year Of Efficiency'*, Forbes (Oct. 25, 2023), https://www.forbes.com/sites/dereksaul/2023/10/25/meta-earnings-record-profits-sales-as-ads-stay-robust-during-zuckerbergs-year-of-efficiency/
[8] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[9] FACEBOOK, ABOUT FACEBOOK PIXEL,

38.     By targeting users on and off its sites, Meta can make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[10] Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[11]

39.     Advertisers can also build "Custom Audiences."[12] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[13] With Custom Audiences, advertisers can target existing customers directly, and they can also build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[14] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Meta's "Business Tools."[15]

40.     As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook,

---

https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[10] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.
[11] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences.
[12] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[13] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.
[14] Facebook, About Lookalike Audiences,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[15] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook,
Create a Website Custom Audience,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[16] Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

41.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[17] Meta's Business Tools can also track other events. Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[18] Advertisers can even create their own tracking parameters by building a "custom event."[19]

42.     One such Business Tool is the Meta Pixel. Meta offers this piece of code to advertisers, like Pet Meds, to integrate into their websites. As the name implies, the Meta Pixel "tracks the people and type of actions they take."[20] When a user accesses a website hosting the Meta Pixel, Meta's software script surreptitiously directs the user's browser to send a separate message to Meta's servers.

---

[16] FACEBOOK, THE FACEBOOK BUSINESS TOOLS,
https://www.facebook.com/help/331509497253087.
[17] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST
PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK,
APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.
[18] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[19] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also*
FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.
[20] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

43.     This second, secret transmission contains the original GET request[21] sent to the host website along with additional data that the Pixel is configured to collect. This transmission is initiated by Meta's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and Meta's embedded code.

44.     After collecting and intercepting this information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

**D.  Defendant and the Meta Pixel – Interception of Prescription Information**

45.     Defendant intentionally integrates the Meta Pixel into its website.

Figure 5



---

[21] "A GET request is an HTTP request used to retrieve data from a specific web page.  For example, when you type in a URL into your browser and click enter, your browser sends a GET request to the server hosting that URL, requesting to retrieve the associated HTML code."  *See* OXYLAB, WHAT IS A GET REQUEST, https://oxylabs.io/blog/curl-get-requests

46.     Defendant's Pixel captures event data called "PageView."

Figure 6



47.     The "PageView" event transmits the URL for each webpage accessed.   On Defendant's website, the URLs contain the name of the website, the folders and sub-folders on the web-server, and the name of the precise file requested.

Figure 7

1800petmeds.com/nexgard+chewables-10372.html

48.     As shown above, the URLs reveal the name of the prescription that a consumer has clicked on.

49.     The URLs also reveal a user's search queries.

14

Figure 8

1800petmeds.com/search?searchType=products&q=renal+medication&search-button

50.     Defendant's Pixel also captures events called "ViewContent" and "AddToCart."

Figures 9–10





51.     The "ViewContent" event reveals the prescription that a user has clicked on.

52.     Once a user browses for a certain medication, the "AddToCart" event reveals when a user clicks on the "Add To Cart" button.

53.     Defendant's Pixel pairs that event data with a user's personally identifiable information.

54.     When a user accesses Defendant's websites while logged into Facebook, the Pixel will compel the user's browser to transmit the c_user cookie, which contains the user's unencrypted Facebook ID:

Figure 11

| c_user | 100035966074568 | .facebook.c... |
|---|---|---|
| datr | XgTbZ8DtXsFCFYD... | .facebook.c... |
| wd | 1029x944 | .facebook.c... |
| sb | XgTbZ0JwXkHMv7... | .facebook.c... |
| xs | 41%3Akn_YglPKPy... | .facebook.c... |
| ps_n | 1 | .facebook.c... |
| fr | 0Dj4v9DznRi6VA8... | .facebook.c... |
| presence | C%7B%22t3%22%... | .facebook.c... |
| ps_l | 1 | .facebook.c... |

55.     A Facebook ID is personally identifiable information.  To find the account associated with the Facebook ID, one need only open a web browser and enter the following: www.facebook.com/[Facebook ID].

56.     When a visitor's browser has recently logged out of an account, Meta compels the visitor's browser to send a small set of cookies:

Figure 12

| datr | XgTbZ8DtXsF... | .facebook.com |
|---|---|---|
| wd | 1029x944 | .facebook.com |
| sb | XgTbZ0JwXkH... | .facebook.com |
| ps_n | 1 | .facebook.com |
| fr | 0Dj4v9DznRi6... | .facebook.com |
| ps_l | 1 | .facebook.com |

57.     No matter the circumstances, Meta receives at least one cookie from a user's browser:

Figure 13

| _fbp | fb.1.17411860... | .1800petmeds.co... |
|---|---|---|

58.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.

59.     The _fbp cookie contains, at least, an unencrypted value that uniquely identifies the browser.

60.     Meta, at a minimum, uses the c_user, fr and _fbp cookies to link to Facebook IDs and corresponding Facebook profiles.

61.     Defendant also enables "Automatic Matching for Partner Integrations," meaning its Pixel captures the identifiers that a user submits through form fields:

Figure 14

```
fbq.loadPlugin("cookie");
instance.optIn("987731814572377", "FirstPartyCookies", true);
fbq.loadPlugin("automaticmatchingforpartnerintegrations");
instance.optIn("987731814572377", "AutomaticMatchingForPartnerIntegrations", true);
```

62.     Put together, Defendant's Pixel pairs event data with personally identifiable information and sends that bundle to Meta so the social media site can match the website activity to a specific user.

63.     Once received and processed by Meta, Defendant knowingly uses the intercepted communications to build Custom Audiences and run targeted advertisements.

64.     Upon information and belief, Defendant uses other Business Tools, like Conversions API, to assist Meta with intercepting its users' communications.[22]

Figures 15–18

| Request URL: | https://www.1800petmeds.com/on/demandware.store/Sites-1800petm eds-Site/default/FacebookConversion-SendEvent |
|---|---|
| Request Method: | POST |
| Status Code: | ● 200 OK |
| Remote Address: | 104.16.135.104:443 |
| Referrer Policy: | strict-origin-when-cross-origin |

---

[22] This is evinced by, among other things, incorporating an "Event ID" into the transmissions. *See, e.g.*, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/server-event/.

▼Form Data      view source      view URL-encoded

   eventID: HwrnX9Np2-dzcZQoX-aVIAsCyVxvOkV-DxM=-1730930404878-PageView
   eventName: PageView
   eventSourceUrl: https://www.1800petmeds.com/reconcile+chewable+tablets-prod10982.html

▼Form Data      view source      view URL-encoded

   eventID: HwrnX9Np2-dzcZQoX-aVIAsCyVxvOkV-DxM=-1730932736890
   eventName: AddToCart
   eventSourceUrl: https://www.1800petmeds.com/reconcile+chewable+tablets-prod10982.html
   customData: {"new_customer":"NEW","content_type":"product","content_ids":10982,"value":"15.99","currency":"USD"}

▼Form Data      view source      view URL-encoded

   eventID: HwrnX9Np2-dzcZQoX-aVIAsCyVxvOkV-DxM=-1730930404883
   eventName: ViewContent
   eventSourceUrl: https://www.1800petmeds.com/reconcile+chewable+tablets-prod10982.html
   customData: {"new_customer":"NEW","content_type":"product","content_ids":"10982"}

**E. Neither Defendant nor Meta Receive Consent from Consumers to Intercept Confidential Communications**

65.     At no point during the transaction does Defendant put consumers on notice of a privacy policy or terms of service.  Even if there were such notice, Defendant's privacy policy makes the following affirmative representation: "Protecting your personal information is important to us. … To protect your personal information, we take reasonable precautions and follow generally accepted industry practices to make sure it is not inappropriately lost, misused, accessed, disclosed, altered or destroyed."

66.     Meta also never receives consent from users to intercept electronic communications containing sensitive and confidential information.  In fact, Meta expressly warrants the opposite.

67.     When creating a Facebook account, a user assents to four agreements: the Terms of Service, the Data Policy, the Privacy Policy, and the Cookies Policy. For California Residents, Meta also publishes a California Privacy Policy.

68.     Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[23] The Terms of Service then prohibit anyone from using Facebook's platform in a manner that is "unlawful, misleading, discriminatory or fraudulent."[24]

69.     Facebook's Data Policy describes how Meta collects information from its "Meta Business Tools," including "the Meta pixel."[25] Specifically, Meta acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[26] Meta then offers an express representation: "We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us."[27]

70.     Facebook's Privacy Policy says Meta "require[s] partners to have the right to collect, use and share [consumers'] information before giving it to us."[28]

71.     Facebook's Cookies Policy ratifies those representations, stating "the Privacy Policy will apply to our processing of the data that we collect via cookies."[29]

72.     For California residents, Meta reiterates that promise: "We require each of these partners to have rights to collect, use, and share your data before providing any data to us."[30]

---

[23] https://www.facebook.com/legal/terms/update..
[24] *Id.*
[25] https://www.facebook.com/help/155833707900388/
[26] *Id.*
[27] *Id.*
[28] https://www.facebook.com/privacy/policy/version/5601719079934335
[29] www.facebook.com/policies/cookies/.
[30] https://www.facebook.com/legal/policy/ccpa.

73.    Facebook's other representations reinforce these warranties. In an article titled, "How does Meta work with data providers?," Meta states that "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[31] Under the Custom Audience Terms, businesses must "represent and warrant … that [they] have all necessary rights and permissions and a lawful basis to disclose and use the Hashed Data in compliance with all applicable laws, regulations, and industry guidelines."[32]

***

74.    Based on these representations and omissions, neither Defendant nor Meta received consent from Plaintiffs and Class members to intercept their communications while on Defendant's website.

### F.  Attentive and its Tracking Tools

75.    Attentive operates one of the largest marketing platforms in the country, with "over 27% of the top 1,000 retailers in North America" utilizing its product, "including 40% of the top apparel brands, 40% of the top jewelry brands, [and] 33% of the top health and beauty brands."[33] Given Attentive's ubiquity, the company has collected more than "1.8 billion email and phone numbers" and "1.4 trillion customer data points."[34]

76.    To unlock the "full advantage" of its platform, Attentive requires retailers to integrate the "Attentive Tag" into their websites.[35]  The Attentive Tag captures "behavioral data, page view, product view, add to cart, and purchase events."[36]

---

[31] https://www.facebook.com/help/494750870625830?ref=dp.
[32] https://www.facebook.com/legal/terms/customaudience
[33]
[34] https://www.attentive.com/audience-segmentation-manager
[35] https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag
[36] *Id.*

77.     Through the Attentive Tag, Attentive "analyze[s] behaviors across the entire customer life cycle."[37]   In exchange for that information, Attentive provides retailers with "a treasure trove of insights about [their] customers' shopping habits, like their browsing and purchasing history."[38]

78.     Attentive collects and assimilates personal information into its "Identity Graph," which is "a web of data built with multiple unique identifiers (e.g. cookies, phone numbers, email, on-site shopping behavior, device information, first name, last name, etc.) with the customer at the center."[39]   Through the Identity Graph, Attentive offers retailers "a comprehensive customer profile."

Figure 19



---

[37] https://www.attentive.com/sms-analytics-and-reporting
[38] https://www.attentive.com/blog/web-traffic-optimization
[39] https://www.attentive.com/blog/attentive-signal-faq#:~:text=The%20short%20answer%20is%20our%20Attentive%20Identity%20Graph.,name%2C%20etc.%29%20with%20the%20customer%20at%20the%20center.

79.     These profiles show various data points, like a consumer's "activities," "preferences," [f]avorite products," and "[d]evices."

Figure 20



80.     Each profile also contains tabs for "Subscriptions," "Activities," "Attributes," and "Offers."[40]

Figure 21



_____
[40] https://help.attentivemobile.com/hc/en-us/articles/4412398776724-View-subscriber-profiles#h_01HMHNE64DY37DDMX49SGNHDPX

81.     Upon information and belief, the "Activities" tab reveals the content of the consumer's electronic communications.

**G. Attentive Intentionally Circumvents Privacy Controls**

82.     To maintain its market share, Attentive constantly innovates to address "signal loss." Signal loss "refers to the diminishing strength of pixel fires on important signals or data points (such as purchase events), which were once reliably tied to campaigns and individual users."[41] To mitigate that loss, Attentive developed "Attentive Signals." Attentive's Chief Strategy Officer, Eric Miao, best explains the innovation:

> Attentive Signal is our identity product. It's at the core of our platform. It powers everything you can do with it—from optimizing your customer segmentation strategy to triggering top-performing journeys. It collects and attributes a vast amount of shopper data directly to Attentive subscribers. This includes everything from zero-party data, like shopping preferences, to enrichment data, like device information.

83.     Put differently, "Attentive Signal is an identity solution that enables marketers to understand who's shopping on their site, identify specific habits, and build personalized experiences."[42] According to Attentive, it's so effective "that no matter where or how someone chooses to shop, all of their data can be linked back to their unique profile."[43] It's so effective, in other words, that Attentive can eliminate the "three key factors that contribute to signal loss": "evolving privacy requirements," "advanced ad-blockers," and "savvy customers."[44]

---

[41] https://www.forbes.com/councils/forbesagencycouncil/2023/07/19/how-to-overcome-signal-loss-in-digital-marketing-campaigns/
[42] https://www.attentive.com/signal-identity-solution
[43] https://www.attentive.com/blog/attentive-signal-faq#:~:text=Attentive%20Signal%20is%20our%20identity,data%20directly%20to%20Attentive%20subscribers..
[44] https://www.attentive.com/blog/attentive-signal-faq#:~:text=This%20includes%20everything%20from%20zero,personalized%20experiences%20that%20customers%20want.

**H. Defendant's Knowledge of Attentive's Platform and Practices**

84.    Defendant knows that Attentive uses identifiers and online activity for its own commercial purposes.  Among other things, Attentive makes prominent representations on its website about how it leverages personal information to enhance its platform.  Attentive claims, for example, that it can send more triggered emails than its competitors because it "recognizes over 1 [billion] email addresses and phone numbers across devices":

Figure 22



> **Triggered Email**
>
> **Identify and engage more of your on-site browsers**
>
> Increase the email identification rate of your website traffic. Attentive recognizes over 1b email addresses and phone numbers across devices, resulting in a 100% increase in triggered email sends.

85.    Moreover, over the last two years, Attentive has incorporated artificial intelligence into several new products—"AI Journeys," "Audiences AI," and "Identity AI"—that were trained using the "1.4 trillion datapoints" in Attentive's possession.[45]  Since rolling those products out, Attentive has aggressively pitched them to existing customers, stating that their products will soon "help marketers deliver the sorts of truly 1:1 personalized experiences they have always dreamt of (and can deliver without any additional manual work)."[46]  Those pitches have paid off; as of December 2023, "80% of Attentive customers [were] using AI."[47]  Whether Pet Meds counts among the 80% or not, Defendant knows that Attentive created these products by, in part, leveraging personal information from customers who accessed Defendant's website.

---

[45] https://www.attentive.com/blog/attentive-ai#:~:text=Trained%20on%20over%201.4%20trillion,planning%2C%20testing%2C%20and%20sending%20high

[46] https://www.attentive.com/blog/attentive-signal-faq

[47] https://www.businesswire.com/news/home/20231213790998/en/Attentive-Drives-Strong-Momentum-with-80-of-Customers-Now-Using-Its-AI-Solutions

86.     Finally, for all retailers that use Attentive's platform, they must provide Attentive with a license to "copy, process and transmit the data, information and other materials transmitted to or through the Platform," including "Customer Data" like "telephone numbers" and "email addresses." [48]   That license also allows Attentive to use Customer Data "to provide and improve the Services." [49]   From that contract alone, Defendant knew that Attentive would use Customer Data to enhance its platform.

### I.  Defendant's Website and Attentive's Tracking

87.      Defendant integrated into its website code from Attentive—including but not limited to the Attentive Tag—for the purpose of "capturing behavioral data" and linking it to personally identifiable information.

88.     As with the Meta Pixel, when consumers access and navigate 1800petmeds.com, Attentive's software script surreptitiously directs the user's browser to send a separate message to Attentive's servers.  This second, secret transmission contains the original GET request [50] sent to the host website along with additional data that Attentive's code is configured to collect. This transmission is initiated by Attentive's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and Attentive's embedded code.

89.     When consumers purchase products on Defendant's website, they must input their phone numbers and email addresses:

---

[48] https://www.attentive.com/legal/msa
[49] https://www.attentive.com/legal/msa
[50] "A GET request is an HTTP request used to retrieve data from a specific web page.  For example, when you type in a URL into your browser and click enter, your browser sends a GET request to the server hosting that URL, requesting to retrieve the associated HTML code."  *See* OXYLAB, WHAT IS A GET REQUEST, https://oxylabs.io/blog/curl-get-requests

Figure 23



Figure 24



90.    When consumers click "continue," Defendant assists Attentive with contemporaneously receiving an unencrypted version of the email address:

Figure 25



| __attentive_pv | 13 |
| __attentive_dv | 1 |
| __attentive_ut... | 1800petmeds%2520com |
| __attentive_ut... | 711135815999 |
| __attentive_cco | 1730915198707 |
| _attn_ | eyJ1ljoie1wiY29cljoxNzMwOTE1MTk4Nz... |
| __attentive_ut... | cpc |
| __attentive_ut... | Search-Brand-Sol8(NewCustomers)-Sol8 |
| attntv_mstore... | chrisreillyfl@gmail.com:0 |
| __attentive_ss_... | https://www.google.com/ |
| __attentive_id | ba725d5962de4a929149ba1461342e69 |
| __attentive_ut... | google |

91.    Attentive also pairs those direct identifiers with event data, like "page views and purchases."[51]   By way of example, if a consumer clicks on "Reconcile Chewable Tablets," Attentive contemporaneously receives the following information:

Figure 26



```
▼Query String Parameters      view source      view URL-encoded
  v: 4.37.39_294aceac66
  pd: https://www.1800petmeds.com/reconcile+chewable+tablets-prod10982.html
  u: 96bbb5c9d30344cdb244534e8f0ca831
  c: petmeds
  ceid: YAV
  lt: 1730930049312
  tag: modern
  cs: 3789256325
  t: c
  r: https://www.1800petmeds.com/anxiety-cat75.html
  m: {"source":"oe","email":"chrisreillyfl@gmail.com","image":"https://www.1800petmeds.com/dw/image/v2/BDKX_PRD/on/demandware.static/
  -/Sites-main/default/dw5f53b97c/images/large/10982.jpg?sw=178&sh=178&sm=fit&q=80","name":"Reconcile Chewable Tablets 8 mg Dogs 8.8-
  17.6 lbs 30 ct | 1800PetMeds"}
  cb: 1730932608600
  evs: [{"vendor":9,"id":"bceEmOa6uTKVgdw7exkp3MBCR1"}]
```

---

[51] https://help.attentivemobile.com/hc/en-us/articles/10905920909460-The-Attentive-tag#h_01J5R88CY3M5K3XP1XDSYWEQV7

92.      As shown in the above figure, Attentive obtains: the full URL string; the name of the product; and the customer's email address. This information easily enables Attentive to identify consumers and understand the content of their electronic communications.

93.      Once received and processed by Attentive, Defendant knowingly uses the intercepted communications to run marketing campaigns that target consumers based on their activity on Defendant's website.

94.      Defendant never received consent from Plaintiffs and class members to work with Attentive to intercept their electronic communications, including those that contained their personally identifiable information.

95.      Upon information and belief, Defendant can export a spreadsheet from Attentive showing all customers who input their phone numbers and email addresses into the sign-up unit on Defendant's website.

Figure 27

**J.  Defendant and Zeta**

96.  Zeta is a well-known and registered data broker that providers retailers with "AI-powered recommendations in real time based on proprietary signals, market and competitive intelligence, unique deterministic identifiers, and much more."[52]

97.  Zeta touts its ability "to consolidate scattered customer identifiers into a persistent profile," thereby allowing retailers to "recognize customers, gain a complete view of each customer relationship, analyze behavioral trends, action insights, and reach them at moments they are most likely to engage."[53]

98.  In 2023, Zeta acquired another data broker, LiveIntent, to supercharge its ability to "build more robust customer profiles and sustain them with continuous data collection and profile enrichment."[54]

99.  Through LiveIntent, Zeta "runs a first-of-its-kind Identity Graph."[55] "An identity graph is an online database"; it "stores all identifiers tied to individual customers and prospects,"[56] and it "captur[es] customer behavior and preferences across devices and marketing channels."[57]  By "unifying disparate audience data points and attributing them to a single profile," an identity graph creates "a comprehensive view of each customer or prospect," allowing companies to "understand exactly who their customers are, how they behave on each platform, and activate that data and insights to drive engagement."[58]

---

[52] https://zetaglobal.com/platform/
[53] https://zetaglobal.com/solutions/data-identity/
[54] https://zetaglobal.com/zeta-data/
[55] https://www.liveintent.com/blog/personalization/
[56] https://www.liveintent.com/blog/li-weekly-whats-an-identity-graph/
[57] https://www.liveintent.com/blog/build-your-customer-identity-graph-with-liveintent/
[58] https://www.liveintent.com/blog/personalization/

100.    Zeta's Identity Graph "has over 900 million active email addresses tied to over 25 billion identifiers."[59] Through its Identity Graph, companies "can build a comprehensive view of their users, understand their customers' behavior across properties and platforms, monetize yield, enrich their customer database, and supercharge their marketing efforts."[60] To funnel online activity and personally identifiable information into the Identity Graph, Defendant integrates Zeta's proprietary code—including but not limited to the "LiveConnect Tag"—into its website.

101.    As with the Attentive Tag and the Meta Pixel, when a user accesses a website hosting Zeta's proprietary code, the Zeta's software script used by Defendant surreptitiously directs the user's browser to send a separate message to Zeta's servers. This second, secret transmission contains the original GET request sent to the host website along with additional data that Zeta's code is configured to collect. This transmission is initiated by Zeta's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and Zeta's embedded code.

102.    Through its code on Defendant's website, Zeta contemporaneously intercepts electronic communications—including but not limited to full-string URLs and button clicks—alongside a hashed version of the consumer's email address.

---

[59] https://www.liveintent.com/blog/build-your-customer-identity-graph-with-liveintent/
[60] https://www.liveintent.com/blog/build-your-customer-identity-graph-with-liveintent/

Figures 28–29



103.     Although the email addresses are hashed, they still constitute personally identifiable information.  As the FTC has explained, "hashes aren't 'anonymous' and can still be used to identify users," so "[c]ompanies should not act or claim as if hashing personal information renders it anonymized."[61]

104.     More generally, the email addresses are hashed through a cryptographic protocol, "MD5," that experts have long considered "severely compromised."[62] Indeed, "[t]he MD5 hash algorithm was declared 'not safe' by its own creator in 2012 after research showed how susceptible it was to brute-force attacks."[63] In 2016, for example, "a crew of hobbyist crackers" reviewed a leaked database of "15.26 million passwords obscured using MD5," and, within ten days, they

---

[61] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous
[62] https://www.okta.com/identity-101/md5/
[63] https://www.bleepingcomputer.com/news/security/cracked-logins-of-570-000-mortal-online-players-sold-on-forums/

"deciphered more than 11 million of the passwords."[64]   Given the exponential increase in computing power, it would take "a crew of hobbyist crackers" much less time to do the same thing today.

105.    Because Zeta is a well-known and registered data broker, Defendant knew that the company would use intercepted communications for its own commercial purposes.

106.     As with Meta and Attentive, Defendant never received consent from Plaintiffs and class members to work with Zeta to intercept their electronic communications, including those that contained their personally identifiable information.

107.    Once received and processed by Zeta, Defendant knowingly uses the intercepted communications to run marketing and advertising campaigns that target consumers based on their activity on Defendant's website.

**K.  Defendant's Conduct Caused Plaintiffs and Class Members to Suffer Economic Injury**

108.    Plaintiffs' and Class members' online activity—including the browsing history and purchase history generated by navigating Defendant's website—has financial value.  As a leading expert in data privacy, Professor Paul Schwartz at UC Berkeley, explained in an article published by the Harvard Law Review:

> Personal information is an important currency in the new millennium.  The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend.  Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[65]

109.    Numerous studies support Professor Schwartz's conclusion.  In one such study, for

---

[64] https://arstechnica.com/information-technology/2015/09/once-seen-as-bulletproof-11-million-ashley-madison-passwords-already-cracked/
[65] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 HARV. L. REV. 2055, 2056 (2005)

example, researchers studied the value that 180 consumers placed on keeping personal data secure. As relevant here, consumers valued contact information at approximately $4.20 per year; they valued their online purchase history at $5.70 per year; and they valued their browsing history at $52 per year.[66]

110.    Moreover, numerous companies offer products through which consumers can receive payment in exchange for a license to track their data.  Meta itself, for example, ran a "Facebook Research" app in 2019 through which it paid $20 for a license to collect browsing history and other communications from consumers between the ages of 13 and 35.[67]

111.    Defendant's conduct caused numerous third parties—including Meta, Attentive, and Zeta—to profit from Plaintiffs' and Class members' personal information and their activity on Defendant's website.  Directly and indirectly, for example, Defendant paid these third parties to collect and analyze that information so Defendant could better target advertisements and marketing materials. [68]    Moreover, through services like "Lookalike Audiences,"[69] those third parties also

---

[66] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND (Jan. 18, 2011)

[67] Josh Constine, *Facebook pays teens to install VPN that spies on them*, TECHCRUNCH (Jan. 29. 2019), *available at* https://techcrunch.com/2019/01/29/facebook-project-atlas/

[68] *See, e.g.*, Derek Saul, *Meta Earnings: Record Profits, Sales As Ads Stay Robust During Zuckerberg's Year of Efficiency*, FORBES (Oct. 25, 2023) (noting that "Meta generates more than 95% of revenue from advertising"), *available at* https://www.forbes.com/sites/dereksaul/2023/10/25/meta-earnings-record-profits-sales-as-ads-stay-robust-during-zuckerbergs-year-of-efficiency/ Attentive, *Attentive's AI Marketing Innovations and Business Milestones Set New Standards Heading into 2025* (Jan. 15, 2025) (noting that Attentive made more than $500 million in "annual recurring revenue" by using customer data to "personalize consumer engagement"), *available at* https://www.attentive.com/press-releases/attentives-ai-marketing-innovations-and-business-milestones-set-new-standards-heading-into-2025; Zeta, News Details (Oct. 8, 2024) (announcing Zeta Marketing Company's acquisition of LiveIntent for $250 million and noting LiveIntent's "people-based marketing" relies on "proprietary technology … to identify, unlock, engage, and monetize audiences"), *available at* https://investors.zetaglobal.com/news/news-details/2024/Zeta-Global-to-Acquire-LiveIntent-in-a-Highly-Accretive-Transaction/default.aspx;

[69] *See, e.g.*, META, ABOUTLOOKALIKE AUDIENCES (describing a lookalike audience as a ways advertisers "can reach new people who are likely to be interested in [their] business" by

received payment from companies other than Defendant to leverage Plaintiffs' and Class members'

personal information and online activity for that same purpose.

112.    Put another way, Defendant and other companies paid the third parties here—

including Meta, Attentive, and Zeta—for services and products that relied on analyzing or

otherwise exploiting Plaintiffs' and Class members' personal information and their activity on

Defendant's website.

113.    Because California law recognizes a legal interest in unjustly earned profits,

Plaintiffs and Class members have an entitlement to profits earned from their personal data.

### **TOLLING, CONCEALMENT, AND ESTOPPEL**

114.    The applicable statutes of limitations have been tolled by Defendant's knowing and

active concealment and denial of the facts alleged herein.

115.    Defendant has never disclosed that it would or could disregard those representations

and instead helps third parties intercept communications containing customers' personally

identifiable information.    Defendant affirmatively hid its true actions and knowingly made

statements that were misleading and concealed the true nature of their conduct and operation. The

circumstances of third-party trackers employed on and with respect to Defendant's website would

---

leveraging information collected on other websites), available at
https://www.facebook.com/business/help/164749007013531?id=401668390442328; *see also*
LIVEINTENT, LIVEINTENT'S LOOKALIKE AUDIENCES: THE AUDIENCE SOLUTION DESIGNED FOR
CUSTOMER ACQUISITION (describing a lookalike audience as one that "acquire[s] net new
customers and drive[s] revenue" by taking customers' online activity on other website "to predict
the likelihood that a group of prospective customers will convert"), *available at*
https://www.liveintent.com/blog/liveintents-lookalike-audiences-the-audience-solution-designed-
for-customer-
acquisition/#:~:text=Lookalike%20Audiences%20represent%20everything%20we%20love%20a
bout%20advertising,of%20people%20who%20are%20similar%20to%20that%20seed.

lead reasonable users to believe third parties were not collecting their personally identifiable information or that Defendant was facilitating disclosure of the same.

116.    Moreover, Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

117.    Furthermore, under the circumstances Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiffs. Defendant therefore is estopped from relying on any statute of limitations.

118.    All applicable statutes of limitation also have been tolled by operation of the discovery rule. Specifically, Plaintiffs and other Class members could not have learned through the exercise of reasonable diligence of Defendant's conduct as alleged herein.

119.    Accordingly, Plaintiffs and the Class could not have reasonably discovered the truth about Defendant's practices until shortly before this class litigation was commenced.

## CLASS ALLEGATIONS

120.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated and seek to certify the following class (the "Nationwide Class"): All persons in the United States who accessed and navigated to www.1800petmeds.com.

121.    Plaintiffs also seek to certify the following sub-class (the "California Class"): All persons in the state of California who accessed and navigated to www.1800petmeds.com.

122.    Plaintiffs reserve the right to modify the class definitions, including by using additional subclasses, as appropriate based on further investigation and discovery obtained in the case.

123.    Numerosity of the Class: The Class is composed of many thousands of individuals, the joinder of which in one action would be impracticable.  The disposition of their claims through this class action will benefit both parties and the Court.

124.    Existence and Predominance of Common Questions of Fact and Law:  There is a well-defined community of interest in the questions of law and fact affecting proposed Class members.  The questions of law and fact common to the proposed class predominate over questions affecting only individual members.  Such questions include, but are not limited to, the following:

    a.    whether Defendant facilitated or procured the unlawful actions of third parties, including Meta, Attentive, and Zeta;

    b.    whether Defendant obtained express consent for their conduct;

    c.    whether Defendant's conduct violated the California Invasion of Privacy Act, Cal. Penal Code § 631;

    d.    whether Plaintiffs and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgement interest and costs of this suit; and

    e.    whether Defendant should be enjoined from similar conduct in the future.

125.    Typicality: Plaintiffs are asserting claims that are typical of the proposed Class members' claims because they have accessed and browsed Defendant's website, www.1800petmeds.com.  Plaintiffs and the proposed Class members have similarly suffered harm arising from Defendant's violations of the law, as alleged herein.

126.    Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy-protection cases. Plaintiffs do not have any interests antagonistic to those of the Classes.

127.    Superiority: A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' and the proposed Class members' claims.  Plaintiffs and Class

members have suffered irreparable harm as a result of Defendant's unfair, unlawful, and unconscionable conduct.  Because of the size of the individual Class members' claims, few, if any, proposed Class members could afford to seek legal redress for the wrongs complained of herein. Absent the class action, the proposed Class members will continue to suffer losses and the violations of law described herein will continue without remedy, and Defendant will be permitted to retain the proceeds of its misdeeds.  Defendant continues to engage in the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint.

128.    Injunctive Relief: Plaintiffs also satisfy the requirements for maintaining a class under Rule 23(b)(2). Defendant acted on grounds that apply generally to the proposed Classes, making final declaratory or injunctive relief appropriate with respect to the proposed Classes as a whole.

129.    Particular Issues: Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

## CAUSES OF ACTION
### COUNT I
**Violation of the Wiretap Act**
**18 U.S.C. § 2510, *et. seq.***
**(Nationwide Class)**

130.    Plaintiffs repeat the allegations contained in paragraphs 1 through 129 as if fully set forth herein.

131.    The Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, provides that "any person who … intentionally intercepts, endeavors to intercept, or procures

any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication … shall be subject to suit."  18 U.S.C. § 2511(1)(a).

132.    The Wiretap Act also provides that, "[e]xcept as provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate."  18 U.S.C. § 2520(a).

133.    Defendant engaged in violations of the Wiretap Act by closely assisting third parties with intercepting Plaintiffs' and Class members' confidential communications.  As part of that enterprise, Defendant customized, configured, deployed, and intentionally integrated the computer code that intercepted electronic communications from Plaintiffs and Class members while they accessed and navigated Defendant's website.  Defendant took these actions to run marketing and advertising campaigns that target consumers based on their activity on Defendant's website. Indeed, Defendant paid the third parties here—Meta, Attentive, and Zeta Marketing—for services and products that relied on analyzing or otherwise exploiting Plaintiffs and Class members' personal information and their activity on Defendant's website.

134.    Defendant also engaged in violations of the Wiretap Act by possessing and assembling the wiretapping devices while simultaneously playing an active role in the use of the computer code to intercept Plaintiffs' and Class members' electronic communications.

135.    By knowingly integrating code into its website, Defendant intentionally caused third parties—including but not limited to Meta, Attentive, and Zeta—to intercept electronic communications.  The interceptions were done contemporaneously with Plaintiffs' and Class

members' sending and receiving communications.  The intercepted communications included the "contents" of electronic communications, including detailed URL requests.

136.    The transmission of data between Plaintiffs and Defendant constitute "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetics, photoelectronic, or photooptical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

137.    The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.    The computer codes and programs used by third parties— including but not limited to Meta, Attentive, and Zeta—to track Plaintiffs' and Class members' communications while they were navigating Defendant's website;

    b.    Plaintiffs' and Class members' browsers or mobile applications;

    c.    Plaintiffs' and Class members' computing and mobile devices;

    d.    The web and ad servers of third parties, including but not limited to Meta, Attentive, and Zeta;

    e.    The web and ad-servers from which third parties—including but not limited to Meta, Attentive, and Zeta—tracked and intercepted Plaintiffs' and Class members' communications while they were using a web browser or mobile application to navigate Defendant's website;

    i.    The computer codes and programs used by third parties— including but not limited to Meta, Attentive, and Zeta—to effectuate their tracking and intercepting of Plaintiffs' and Class members' communications while they were navigating Defendant's website; and

    j.    The plan that third parties—including but not limited to Meta, Attentive, and Zeta—carried out to effectuate their tracking and intercepting of Plaintiffs' and Class members' electronic communications.

138.    Plaintiffs and Class members were unaware that third parties—including but not limited to Meta, Attentive, and Zeta—were redirecting full-string URLs, form field entries, or the text of buttons clicked.

139.     Plaintiffs and Class members never provided third parties—including but not limited to Meta, Attentive, and Zeta—with consent to intercept or collect their electronic communications.

140.     Defendant and the third parties—including but not limited to Meta, Attentive, and Zeta—intercepted Plaintiffs' and Class members' electronic communications for unlawful or tortious purposes.   Those purposes include: 1) associating the content of electronic communications with preexisting consumer profiles; 2) exploiting the confidential communications  for targeted advertisements and direct marketing; and 3) using the intercepted communications in a manner that violates state privacy laws, including those that mandate keeping information about veterinary care confidential.

141.     After third parties intercepted Plaintiffs' and Class members' electronic communications, Defendant knowingly and unlawfully used those intercepted communications to guide its advertising and marketing efforts.  When, for example, third parties—including Meta, Attentive, and Zeta—received and processed Plaintiffs' and Class members' electronic communications, Defendant used those communications to run targeted advertisements and personalized marketing campaigns.

142.     As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiffs and Class members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably incurred.

**COUNT II**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**
**(California Class)**

143.    Plaintiffs repeat the allegations contained in paragraphs 1 through 129 as if fully set forth herein.

144.    Plaintiffs bring this claim individually and on behalf of the members of the putative class against Defendant.

145.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  The Act begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping on private communications and the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

146.    California Penal Code § 631(a) provides in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

147.    A defendant must show it had the consent of all parties to the communication.

148.    At all relevant times, Defendant aided, agreed with, and conspired with third parties to track and intercept Plaintiffs' and Class members' internet communications exchanged with Defendant while accessing Defendant's website.  Defendant assisted these interceptions without first receiving authorization or consent from Plaintiffs and Class members.

149.    The third parties—including but not limited to Meta, Attentive, and Zeta—intercepted these communications without consent from all parties to the communications.

150.    The third parties—including but not limited to Meta, Attentive, and Zeta—intended to learn, and did learn, some meaning of the content in the communications including without limitation in the URLs, search queries, and other content described herein exchanged between Class members and Defendant on Defendant's website.

151.    Defendant, when aiding and assisting third parties' eavesdropping, intended those third parties to learn certain content of the visitor's communications.

152.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and, even if they do not, the tracking technology by third parties—including but not limited to Meta, Attentive, and Zeta—falls within the broad catch-all category of "any other manner":

a. The computer codes and programs that third parties—including but not limited to Meta, Attentive, and Zeta—used to track Plaintiffs' and the Class members' communications while they navigated Defendant's website;
b. Plaintiffs' and Class members' browsers;
c. Plaintiffs' and Class members' computing and mobile devices;
d. The web and ad servers of third parties, including but not limited to Meta, Attentive, and Zeta;
e. The web and ad-servers from which third parties—including but not limited to Meta, Attentive, and Zeta—tracked and intercepted Plaintiffs' and Class members' communications while they were using their web browser to access or navigate Defendant's website;
f. The computer codes and programs that third parties—including but not limited to Meta, Attentive, and Zeta—used to track and intercept the Plaintiffs' and Class members' communications while they were using a browser to visit Defendant's website.
g. The plan that third parties—including but not limited to Meta, Attentive, and Zeta—carried out to effectuate its tracking and interception of Plaintiffs' and Class members' communications while they were using a web browser or mobile application to visit Defendant's website originated in and was executed in California.

153.    Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violation of California Penal Code § 631 and each seek damages for the greater of $5,000 or three times the actual amount of damages, as well as injunctive relief.

<u>COUNT III</u>
**Violation of California Invasion of Privacy Act**

**Cal. Penal Code § 632**
**(California Class)**

154.     Plaintiffs repeat the allegations contained in paragraphs 1 through 129 above as if fully set forth herein.

155.     Plaintiffs bring this Count individually and on behalf of the members of the putative Class.

156.     The data collected on Defendant's websites constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of private with respect to veterinary information and personally identifiable information.

157.     Defendant is liable for aiding and abetting violations of 632 by third parties, including but not limited to Meta, Attentive, and Zeta.

158.     Pursuant to Cal. Penal Code § 637.2, Plaintiffs and class members have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT IV
**Violation of the Comprehensive Computer Data and Access and Fraud Act ("CDAFA")**
**Cal. Penal Code § 502, *et. seq.***
**(California Class)**

159.     Plaintiffs repeat the allegations contained in paragraphs 1 through 129 above as if fully set forth herein.

160.     Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

161.     Defendant aided and abetted the third parties with violating Cal. Penal Code §
502(c)(2) by helping Meta, Attentive, and Zeta Marketing knowingly access and without
permission take, copy, analyze, and use Plaintiffs' and Class members' data.

162.     Defendant and the third parties effectively charged Plaintiffs and Class members
by taking, copying, analyzing, and using their valuable personal information without permission
and exploiting that information for financial benefit.  Plaintiffs and Class members retain a stake
in the profits that Defendant and third parties earned from their personal information and other
data because, under the circumstances, it is unjust for Defendant and the third parties to retain
those profits.

163.     As a direct and proximate result of unlawful conduct within the meaning of Cal.
Penal Code § 502, Defendant and the third parties caused loss to Plaintiffs and Class members and
have been unjustly enriched in an amount to be proven at trial.

164.     It would not be equitable to allow Defendant and the third parties to keep those
profits, which were generated by violating Plaintiffs' privacy interests.

165.     Plaintiffs, on behalf of themselves and Class members, seek compensatory damages
and/or disgorgement in an amount to be proven at trial, and declaratory, injunctive, or other
equitable relief.

166.     Plaintiffs and Class members are entitled to punitive damages because Defendant's
violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud,
or malice.

167.     Plaintiffs and Class members are also entitled to recover their reasonable attorneys'
fees pursuant to Cal. Penal Code § 502(e).

**COUNT V**
**Intrusion Upon Seclusion**
**(Nationwide Class)**

168.    Plaintiffs hereby incorporate Paragraphs 1 through 129 as if fully stated herein.

169.    As described herein, Defendant has intruded upon the following legally protected privacy interests:

      a.    The Wiretap Act as alleged herein;
      b.    The California Invasion of Privacy Act as alleged herein;
      c.    Statutory and regulatory protections for veterinary information as alleged herein;

170.    Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances in that Plaintiffs and Class members could not reasonably expect Defendant would commit acts in violation of federal and state civil and criminal law.

171.    Plaintiffs and Class members also had a reasonable expectation of privacy under the circumstances in that Defendant affirmatively promised users (including Plaintiffs and Class members) that it would not procure third parties to track their online activity and personally identifiable information while they were using Defendant's website.

172.    Defendant's actions constitute a serious invasion of privacy in that it:

      a.    Violated several criminal laws, including the Wiretap Act;
      b.    Invaded the privacy rights of millions of Americans (including Plaintiffs and Class members) without their consent; and
      c.    Constituted the unauthorized taking of valuable information from millions of Americans through deceit.

173.    Committing criminal acts against millions of Americans constitutes an egregious breach of social norms that is highly offensive.

174.    The surreptitious and unauthorized tracking of the internet communications of millions of Americans—particularly where, as here, such communications are sensitive and confidential—constitutes an egregious breach of social norms that is highly offensive.

175.    The disclosure of personally identifiable information of millions of Americans through deceit is highly offensive behavior.

176.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation and injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a. For an order certifying the putative class and naming Plaintiffs as the representatives of the putative Class and Plaintiffs' attorneys as Class Counsel to represent the putative Class members;

b. For an order declaring that the Defendant's conduct violates the statutes referenced herein;

c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiffs and the putative Class on all counts asserted herein;

e. For the statutory damages in amounts to be determined by the Court and/or jury;

f. For prejudgment interest on all amounts awarded;

g. For injunctive relief as pleaded or as the Court may deem proper; and

h. For an order awarding Plaintiffs and the putative Class their reasonable attorneys' fees and expenses and cost of suit.

## JURY DEMAND

Plaintiff requests a trial by jury for all issues so triable on its claims pursuant to FED R. CIV. P. 38(b) and 38(c).

Dated: July 11, 2025                        Respectfully submitted,

                                            MARCUS NEIMAN RASHBAUM & PINEIRO LLP
                                            By: *Christopher R. Reilly*

Michael A. Pineiro, Esq.
Florida Bar No. 41897
mpineiro@mnrlawfirm.com
Brandon S. Floch, Esq.
Florida Bar No. 125218
bfloch@mnrlawfirm.com
Christopher R. Reilly, Esq.
Florida Bar No. 1025097
creilly@mnrlawfirm.com
One Biscayne Tower
2 S. Biscayne Blvd., Ste. 2530
Miami, Florida 33131
Telephone: (305) 400-4260

LEVIN LAW, P.A.
Brian Levin
Florida Bar No. 26392
brian@levinlawpa.com
Jacob Polin*
jpolin@levinlawpa.com
2665 S Bayshore Dr., Ph. 2B
Miami, Florida 33133
Telephone: (305) 402-9050

*Attorneys for Plaintiffs*
*\*Pro Hac Vice Forthcoming*