UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 25-80458-CIV-CANNON/Reinhart

**KRISTIN COBBS, LYNNE KAWAMINAMI,** and **LORETTA SCHWEINSBURG**,
*individually and on behalf of all others similarly situated*,

Plaintiffs,

v.

**PETMED EXPRESS, INC.**,

Defendant.
______________________________________/

**PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS**

# TABLE OF CONTENTS

Page


INTRODUCTION ... 1
BACKGROUND ... 2
ARGUMENT ... 3
I. PLAINTIFFS ADEQUATELY ALLEGE STANDING ... 3
A. Plaintiffs Possess Standing to Bring Claims under the Wiretap Act and CIPA ... 3
B. Plaintiffs Possess Standing to Bring Claim under CDAFA ... 4
C. Plaintiff Possess Standing to Bring Claim for Intrusion Upon Seclusion ... 5
II. PLAINTIFFS STATE A CLAIM UNDER THE WIRETAP ACT ... 6
A. Plaintiffs Adequately Allege that Defendant Facilitated the Interceptions ... 6
B. Plaintiffs Satisfy the Contemporaneity Requirement ... 6
C. Defendant's Status as a Party to Communications is Irrelevant ... 8
III. PLAINTIFFS STATE A CLAIM UNDER CIPA § 631 ... 11
A. The Intercepted Information Revealed "Contents" of Communications ... 11
B. Plaintiffs Satisfy the In-Transit Requirement ... 14
C. Defendant Never Received Plaintiffs' Consent to Assist Interceptions ... 14
D. The Rule of Lenity is Irrelevant Here ... 16
IV. PLAINTIFFS STATE A CLAIM UNDER CIPA § 632 ... 17
A. Plaintiffs' Communications with Defendant were Confidential ... 17
B. Plaintiffs Adequately Allege Mens Rea ... 17
C. Plaintiffs Never Provided Consent ... 18
V. PLAINTIFFS STATE A CLAIM UNDER CDAFA ... 18
VI. PLAINTIFFS STATE A CLAIM FOR INTRUSION UPON SECLUSION ... 19
CONCLUSION ... 20

## INTRODUCTION

The internet is many things: it's where we search for information; it's where we connect with friends; and it's where we watch funny videos, among other things. But while much of our online activity is relatively innocuous, sometimes it is not. Sometimes, the internet is where we go to access medical records, make political donations, or purchase sensitive products. In the brick-and-mortar world, state laws and regulations shield this information from disclosure. In the digital world, these laws apply with equal force, and consumers possess a reasonable expectation of privacy when they access websites to receive or convey protected information.

Defendant operates a pharmacy that dispenses veterinary medicine. As evinced by numerous statutes, industry standards, and representations on Defendant's website, Plaintiffs possessed a reasonable expectation of privacy when purchasing veterinary medicine. Despite that reasonable expectation of privacy, Defendant disclosed protected information to numerous third parties through code on its website that contemporaneously intercepted Plaintiffs' communications. By doing so, Defendant violated federal and state anti-wiretapping laws.

Defendant's attempts to dismiss these claims are meritless. As multiple courts in this Circuit have held, Plaintiffs' allegations give rise to claims under anti-wiretapping laws. *See, e.g.*, *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *1 (M.D. Fla. Mar. 6, 2025); *see also D.S. v. Tallahasee Memorial Healthcare*, 2024 WL 2318621, at *1 (N.D. Fla. May 22, 2025).

Moreover, a court in the Northern District of California has already rejected nearly all of Defendant's arguments after reviewing substantively identical allegations. *See Smith v. Rack Room Shoes, Inc.*, 2025 WL 1085169 (N.D. Cal. Apr. 4, 2025); *Smith v. Rack Room Shoes, Inc.*, 2025 WL 221002 (N.D. Cal. Aug. 8, 2025) (reviewing allegations concerning Meta and Attentive).

The same result should be reached here.

## BACKGROUND

Defendant PetMed Express, Inc., "owns and operates www.1800petmeds.com, one of the largest online pharmacies for veterinary prescriptions." *See* ECF No. 21 ("FAC") at ¶ 2. As required by state laws and regulations, online pharmacies—including those that "dispense veterinary medicine"—must refrain from disclosing information that "reveal[s] the contents of any prescription." *See* FAC ¶¶ 21–23. Moreover, "the industry standard is [also] to protect such information from disclosure." *Id.* ¶ 27. In accordance with statutory obligation and industry practice, Defendant promises on its website that "[a]ll personal and prescription information is securely managed and treated with the highest level of confidentiality." *Id.* ¶ 30. And yet, despite these "statutes, regulations, industry standards, and representations," Defendant "systematically discloses such information to numerous third parties," including "Meta Platforms, Inc. ('Meta'), Attentive Mobile, Inc. ('Attentive'), and Zeta Global Corporation ('Zeta')." *Id.* ¶¶ 4, 31–32. To do so, Defendant integrated code from those third parties into its website that "contemporaneously intercepts electronic communications." *Id.* ¶¶ 90–91, 102, 135.

Plaintiffs are consumers who "visited 1800petmeds.com and purchased veterinary medicine." *Id.* ¶¶ 7–9. While doing so, they "visited webpages and clicked on buttons revealing the prescription [medicine] that [they] intended to purchase." *Id.* "After adding the prescription [medicine] into [their] cart," Plaintiffs "navigated to the checkout page and entered [their] full name[s], phone number[s], email address[es], and billing address[es]." *Id.* "Although unaware at the time," Plaintiffs are "informed and believe[] that Defendant assisted third parties—like, for example, Meta, Attentive, and Zeta—with intercepting their electronic communications." *Id.*

"By assisting third parties with intercepting sensitive and confidential communications, Defendant violated state and federal anti-wiretapping laws." *Id.* ¶ 5.

# ARGUMENT

## I. PLAINTIFFS ADEQUATELY ALLEGE STANDING

Defendant argues that Plaintiffs lack standing because "they fail to allege an actual, concrete injury." MTD at 3. As an initial matter, Defendant ignores the Supreme Court's admonition that "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021). Consistent with that guidance, Plaintiffs analyze each claim separately.

### A. Plaintiffs Possess Standing to Bring Claims under the Wiretap Act and CIPA

For their related claims under the federal Wiretap Act and the California Invasion of Privacy Act (CIPA), Plaintiffs allege that Defendant assisted third parties with intercepting "sensitive and confidential communications," including communications that contained their "personally identifiable information." These allegations plainly establish Article III standing.

As the Supreme Court has recognized, the "disclosure of private information" constitutes an intangible harm "traditionally recognized as providing a basis for lawsuits in American courts." 594 U.S. 413, 425 (2021). For wiretapping allegations that involve confidential communications or personally identifiable information, courts routinely find Article III standing. *See, e.g.*, *In re Nickelodeon Cons. Priv. Litig.*, 827 F. 3d 262, 274 (3d Cir. 2016) (holding that "[t]he purported injury here is clearly particularized," and that "the harm is also concrete in the sense that it involves a clear *de facto* injury, *i.e.*, the unlawful disclosure of legally protected information"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F. 3d 589, 599 (9th Cir. 2020) (holding that the Wiretap Act and California Invasion of Privacy Act "codify a substantive right to privacy, the violation of which gives rise to a concrete injury sufficient to confer standing").

For good reason, Defendant fails to cite a single anti-wiretapping case in which a court has

found that Article III standing was absent. *See* MTD 3–6. That is not because there are none; it is because each one distinguishes itself from cases that involve personal or sensitive information. *See, e.g.*, *Cook v. GameStop, Inc.*, --- F. 4th ----, 2025 WL 2250261, at *5 (3d Cir. Aug. 7, 2025) ("[N]one of the information Cook entered on Gamestop's website was personal or sensitive."); *Adams v. PSP Group, LLC*, 691 F. Supp. 3d 1031, 1041 (E.D. Mo. 2023) ("Plaintiff has not alleged that Pet Supplies Plus intercepted her private communications or personal information."); *Lightoller v. Jetblue Airways Corp.*, 2023 WL 3963823, at *4 (S.D. Cal. June 12, 2023) ("Plaintiff does not allege that she disclosed any personal information when she visited the website.").[1]

Because the communications here are confidential and involve personally identifiable information, Plaintiffs possess Article III standing to pursue their anti-wiretapping claims.

### B. Plaintiffs Possess Standing to Bring Claim under CDAFA

To establish standing to pursue their CDAFA claim, Plaintiffs allege "an entitlement to profits earned" from Defendant unlawfully commoditizing their personal information. *See* FAC ¶¶ 108–13. As courts have uniformly held, these allegations establish economic loss and concrete injury. *In re Facebook, Inc.*, 956 F. Supp. 3d at 599 ("Because California law recognizes a legal interest in unjustly earned profits, Plaintiffs have adequately pleaded an entitlement to Facebook's profits from users' personal data sufficient to confer Article III standing."); *Rodriguez v. Google LLC*, 772 F. Supp. 3d 1093, 1109 (N.D. Cal. 2025) (holding that "Plaintiffs' disgorgement theory is compatible with *TransUnion*"); *Doe v. Microsoft Corp.*, 2023 WL 8780879, at *4 (W.D. Wash. Dec. 19, 2023) (finding concrete injury where "Plaintiff alleges economic loss … [from] the unlawful taking and use of her private data, which is inherently valuable").

Defendant cites four cases to suggest otherwise, all of which involve attempts to establish

[1] Defendant seems to suggest that consumers' electronic communications were neither sensitive nor confidential, but as explained in Section III.B, that argument is incorrect.

concrete injury by alleging "diminution in value of PII." *See, e.g.*, *Everhart v. Colonial Pipeline Co.*, 2022 WL 3699967, at *2 (N.D. Ga. July 22, 2022). That caselaw is irrelevant here. Plaintiffs never allege that they lost value in their personally identifiable information; they allege "an entitlement to profits earned from their personal data." *See* FAC ¶ 113. These two concepts—diminution in value and disgorgement—are wholly distinct. For the former to establish concrete injury, consumers must allege "that their personal information has an independent monetary value that is now less than it was before." *See In re 21st Century Oncology Customer Data Security Breach Litig.*, 380 F. Supp. 3d at 1257. By contrast, "California law requires disgorgement of unjustly earned profits regardless of whether … a defendant's actions directly caused the plaintiff's property to become less valuable." *In re Facebook*, 956 F. 3d at 600. That same principle also holds true under Florida law. *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 698 (Fla. 3d DCA 2018) ("The equitable remedy of disgorgement is measured by the defendant's ill-gotten profits or gains rather than the plaintiff's losses.").

Because Plaintiffs possess the right to recover profits unjustly earned, they properly allege economic injury sufficient to establish Article III standing to pursue their CDAFA claim.

### C. Plaintiff Possess Standing to Bring Claim for Intrusion Upon Seclusion

Defendant does not explain how Plaintiffs lack standing to assert their claim for intrusion upon seclusion. *See* MTD 3–5. That is because there is no basis for such an argument. As the Supreme Court has recognized, "intrusion upon seclusion" vindicates an intangible injury "with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC*, 594 U.S. at 425. Because "standing is jurisdiction," the analysis ends there. *See Stalley v. Orlando Regional Healthcare Sys, Inc.*, 524 F. 3d 1229, 1232 (11th Cir. 2008).

## II. PLAINTIFFS STATE A CLAIM UNDER THE WIRETAP ACT

### A. Plaintiffs Adequately Allege that Defendant Facilitated the Interceptions

Defendant begins by asserting that "PetMed cannot have 'intercepted' the same transmission that it also received." *See* MTD at 6. That argument ignores Plaintiffs' allegations. Plaintiffs advance three bases to establish their claim under the Wiretap Act:

- Defendant "engaged in violations of the Wiretap Act by closely assisting third parties with intercepting Plaintiffs' and Class members' confidential communications." *See* FAC ¶ 133.
- Defendant "engaged in violations of the Wiretap Act by possessing and assembling the wiretapping devices while simultaneously playing an active role in the use of the computer code to intercept Plaintiffs' and Class members' electronic communications." *Id.* ¶ 134.
- Defendant "unlawfully used … intercepted communications." *Id.* ¶ 141.

None of the three bases rely on Defendant intercepting transmissions that it received. *See Smith II*, 2025 WL 2210002, at *10 (reviewing substantively identical allegations and holding that "Plaintiffs have adequately stated a claim under the Wiretap Act").

### B. Plaintiffs Satisfy the Contemporaneity Requirement

Defendant argues that "[c]ourts generally recognize that tracking technologies like those at issue here do not intercept communications while they are in transit." *See* MTD at 6. The opposite is true, and Plaintiffs satisfy the in-transit and contemporaneity requirement with ease.[2]

In passing the Wiretap Act, "Congress did not intend for 'intercept' to apply to 'electronic communications' when those communications are in 'electronic storage.'" *Steve James Games, Inc. v. United States*, 36 F. 3d 457, 462 (5th Cir. 1994). Instead, "a contemporaneous interception—*i.e.*, an acquisition during 'flight'—is required to implicate the Wiretap Act with

[2] The "in transit" language comes from CIPA; the Wiretap Act, by contrast, requires that the interceptions occur "contemporaneously with transmission." *Benessere Investment Group, LLC v. Swider*, 2024 WL 4652090, at *5 (S.D. Fla. Oct. 21, 2024). In general, courts treat these concepts as coextensive, and Plaintiffs do the same here. *See, e.g.*, *Pena v. GameStop, Inc.*, 670 F. Supp. 3d 1112, 1120 (S.D. Cal. 2023) (noting that "courts look to cases analyzing the FWA in applying CIPA's 'in transit' requirement").

respect to electronic communications." *United States v. Steiger*, 318 F. 3d 1039, 1048–49 (11th Cir. 2003); *see also Luis v. Zang*, 833, F. 3d 619, 627 (6th Cir. 2016) (noting that courts "have uniformly concluded that an intercept requires contemporaneity").

To meet the contemporaneity requirement, Plaintiffs make the following allegation:

> [W]hen consumers access and navigate 1800.petmeds.com, Attentive's software script surreptitiously directs the user's browser to send a separate message to Attentive's server. This second, secret transmission contains the original GET request sent to the host website along with additional data that Attentive's code is configured to collect. This transmission is initiated by Attentive's code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's website—Defendant's own code, and Attentive's embedded code.

FAC ¶ 88; *see also id.* ¶¶ 42–43, 101–02 (alleging the same process for Meta and Zeta).

These allegations easily meet the contemporaneity requirement. As the Eleventh Circuit has noted, "duplicate" communications sent by "automatic routing software" can constitute a contemporaneous interception. *Steiger*, 318 F. 3d at 1048–49. Relying on the Eleventh Circuit's analysis in *Steiger*, the First Circuit found that the same technology at issue here—*i.e.*, a "clear GIF" that "automatically duplicated part of the communication"—was "effectively an automatic routing program" that acquired communications "contemporaneous with the transmission." *In re Pharmatrak*, 329 F. 3d 9, 22 (1st Cir. 2003). This is not a close question; "[s]eparate, but simultaneous and identical, communications satisfy even the strictest real-time requirement." *Id.* Faced with identical or similar allegations as those made here, multiple courts have reached the same conclusion. *See, e.g.*, *Smith I*, 2025 WL 1085169, at *4 (reviewing identical allegations and finding that "Plaintiffs have … adequately alleged, in detail, that the interception occurred 'in transit'"); *see also St. Aubin v. Carbon Health Technologies, Inc.*, 2024 WL 436975, at *6 (N.D. Cal. Oct. 1, 2024) (reviewing the same allegations and finding "the alleged interception occurred while the communications were in transit").

Defendant emphasizes that the interception occurs through "a second, and independent, transmission," *see* MTD at 7, but "even the circuits adopting a narrow reading of the Wiretap Act merely require that the acquisition occur at the same time as the transmission; they do not require that the acquisition somehow constitute the same communication as the transmission." *In re Pharmatrak*, 329 F. 3d at 12. Defendant's caselaw says no differently. Defendant cites to *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, (N.D. Cal. 2017), but that case never mentions—let alone analyzes—the contemporaneity requirement. Defendant also cites to *Global Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 631 (E.D. Va. 2009), but even the author of that decision, Judge Ellis, would find that case "clearly distinguishable," having since confirmed that an interception occurs "contemporaneously with transmission" when "software" causes "automatic duplication and forwarding of electronic communications." *Centre Law and Consulting, LLC v. Axiom Resource Management, Inc.*, 456 F. Supp. 3d 765, (E.D. Va. 2020). That leaves an unpublished decision from a state court in California, *Barbour v. John Muir Health*, 2023 WL 261897 (Cal. Super. Ct. 2023), which lacks such persuasive value that the California Rules of Court would prohibit its citation if Defendant were filing this motion before the same tribunal. *See, e.g.*, *Barriga v. 99 Cents Only Stores LLC*, 51 Cal. App. 5th 299, n. 8 (2020).

**C. Defendant's Status as a Party to Communications is Irrelevant**

Defendant asserts that "Plaintiffs' claims fail because PetMed was an intended party to the communication and therefore has done nothing unlawful under the ECPA." *See* MTD at 7. That is wrong. To be sure, Plaintiffs agree that "PetMed was an intended party to the communication," and that PetMed consented to the alleged interception. *Id.* Indeed, Plaintiffs' allegations would make little sense otherwise. But the analysis does not end there; Plaintiffs establish their claim under the Wiretap Act by properly invoking the crime-tort exception.

### D. Plaintiffs Establish the Crime-Tort Exception

Defendant asserts that Plaintiffs fail to establish the crime-tort exception because "they do not allege that the intended *use* or *purpose* of those interceptions was criminal or tortious." *See* MTD at 8 (emphasis in the original). Plaintiffs plead precisely as much, and Defendant's decision to ignore those allegations is telling and dispositive.

Where a person or entity is "a party to the communication" or "has given prior consent" to the alleged interception, the Wiretap Act "can only be violated … if the interception was 'for the purpose of committing any criminal or tortious act.'" *Lucas v. Fox News Network, LLC*, 248 F. 3d 1180, 1180 (11th Cir. 2001) (quoting 18 U.S.C. § 2511(2)(d)). In other words, even where a participant to a communication provides prior consent, an interception remains actionable under the Wiretap Act "when done for the purpose of facilitating some further impropriety." *Planned Parenthood Federation of America, Inc. v. Newman*, 51 F. 4th 1125, 1135 (9th Cir. 2022) (internal quotations omitted). That analysis turns "not upon whether the interception itself violated another law," but "upon whether the purpose for the interception—its intended use—was criminal or tortious." *Sussman v. American Broadcasting Co.*, 186 F. 3d 1200, 1202 (9th Cir. 1999).

Plaintiffs establish the crime-tort exception. As alleged, "Defendant and the third parties—including but not limited to Meta, Attentive, and Zeta—intercepted Plaintiffs' and Class members' electronic communications for unlawful or tortious purposes." FAC ¶ 140. "Those purposes include": 1) "associating the content of electronic communications with preexisting consumer profiles"; 2) "exploiting the confidential communications for targeted advertisements and direct marketing"; and 3) "using the intercepted communications in a manner that violates state privacy law, including those that mandate keeping information about veterinary care confidential." *Id.*

As courts have repeatedly held, all three purposes satisfy the crime-tort exception. *See,*

*e.g.*, *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1064 (N.D. Cal. 2021) ("The association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies this exception."); *Smith II*, 2025 WL 2210002, at *5 ("Rack Room's alleged disclosure and use of Plaintiffs' personally identifiable information for advertising ... can plausibly constitute a further invasion of privacy beyond the act of intercepting the information alone."); *Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025) (noting "[c]ourts from coast to coast have recognized that a violation of HIPAA can give rise to the crime-tort exception").

Defendant neither addresses nor discusses Plaintiffs' allegations establishing the crime-tort exception. *See generally* MTD at 8. At best, Defendant advances two generalized arguments. *First*, Defendant contends that Plaintiffs cannot establish the crime-tort exception by asserting that the interception itself—as opposed to a further use of the intercepted communications—"violated various laws." MTD at 8. This principle is uncontested and irrelevant; Plaintiffs' allegations solely concern a "further use" that independently amounts to criminal and tortious misconduct. FAC ¶¶ 60, 63, 73–83, 93, 107, 140, 156, 161, 174 (detailing how Defendant and third parties violated state law, including CDAFA, by "using" intercepted communications to build "customer profile[s]" and run "targeted advertisements").

*Second*, Defendant asserts that "PetMed's intent was merely for its own financial benefit." MTD at 8. To be sure, "[s]ome courts have found that the crime-tort exception is inapplicable where a defendant's primary motivation is to make money rather than to injure plaintiffs tortiously or criminally." *R.S. v. Prime Healthcare Services, Inc.*, 2025 WL 103488, at *7 (C.D. Cal. Jan. 13, 2025). But that minority view runs headlong into common sense and authority from the Eleventh Circuit. An unlawful or tortious purpose can include "blackmail," for example, which is undeniably motivated by the desire to make money. *See Lucas*, 248 F. 3d at 1180 (quoting *Sussman*

parenthetically). Under Defendant's interpretation, a blackmailer could escape criminal and civil liability under the Wiretap Act by demonstrating that his primary motivation was to gain profit. *See, e.g.*,*Smith II*, 2025 WL 2210002, at *5 (rejecting identical argument because "the crime-tort exception applies when a party uses intercepted communications to blackmail someone, even if the primary motivation for engaging in blackmail is to make money"). More fundamentally, "the existence of a lawful purpose does not mean that the interception is not also for a tortious or unlawful purpose." *Sussman*, 186 F. 3d at 1202. In other words, "even where a defendant is arguably motivated by monetary gain, the crime-tort exception may nonetheless apply if plaintiffs have adequately alleged that the defendant's conduct violated state law, including state law privacy claims." *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

## III. PLAINTIFFS STATE A CLAIM UNDER CIPA § 631

### A. The Intercepted Information Revealed "Contents" of Communications

Defendant argues that "[t]he information Plaintiffs allege was intercepted by third[] parties is 'non-content' or 'record information.'" *See* MTD at 10. That argument disregards Plaintiffs' allegations demonstrating that three types of information—"form field entries," "the text of buttons clicked," and "full-string URLs"—revealed the "contents" of their electronic communications. *See, e.g.*, FAC ¶¶ 7–9, 48, 52, 92, 102, 135, 138. [3]

"[T]he term 'contents' refers to the intended message conveyed by the communication, and does not include record information that is generated in the course of the communication." *In re*

[3] Defendant dedicates a section of its motion to analyzing the first clause of section 631(a). *See* MTD at 9. That section is irrelevant; Plaintiffs do not seek to establish a claim through the first clause. Defendant also dedicates a section of its motion to making the uncontested observation that Plaintiffs' claims against Defendant under the third and fourth clause of section 631(a)—aiding and abetting interceptions and intentionally using intercepted communications—hinge on whether Plaintiffs could hold the third-party interceptors directly liable under the second clause. *See* MTD at 12. Because that section is redundant, Plaintiffs focus their analysis exclusively on whether they properly allege the contested elements of the second clause.

*Zynga Priv. Litig.*, 750 F. 3d 1098, 1106 (9th Cir. 2014). "For instance, information about a telephone call's origination, length and time have been found to be non-content record information." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1083 (N.D. Cal. 2015) (internal quotations omitted). Similarly, "identification and address information"—when "automatically generated by the web browser"—also constitute "record information about a user's communication, not the communication itself." *In re Zynga Priv. Litig.*, 750 F. 3d at 1108. Notwithstanding that, "record information may constitute 'contents' where the record is the subject of a communication." *Price v. Carnival Corp.*, 712 F. Supp. 3d 1347, 1360 (S.D. Cal. 2024). That includes, for example, inputting information—including contact information, like "email addresses" and "telephone numbers"—"into a form provided by a website." *In re Zynga Priv. Litig.*, 750 F. 3d 1098, 1107 (9th Cir. 2014); *see also In re Pharmatrak*, 329 F. 3d at 16 (finding the "contents" of communications includes "personal information entered into an online form").

Here, Plaintiffs allege that Defendant assisted third parties with intercepting the following information: 1) "form field entries"; 2) "the text of buttons clicked"; and 3) "full-string URLs" that reveal "a user's search queries" and "the precise file requested." *See, e.g.*, FAC ¶¶ 7–9, 48, 52, 92, 102, 135, 138. All three types of information revealed the "contents" of communications.

Starting with the most obvious, words that consumers manually type and send on the internet constitute an "electronic communication," and information revealing the message conveyed—even when that message concerns contact information—reveals the "contents" of that communication. *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 795 (N.D. Cal. 2022) ("[C]ontact information provided as part of a sign-up process constitutes 'content' because this information is the subject of the communication."); *see also In re Pharmatrak*, 329 F. 3d at 18 ("Transmission of completed online forms … constitute electronic communications.").

The same holds true for information revealing "the name of the button clicked." *See In re Pixel Healthcare Litig.*, 647 F. Supp. 3d at 795. By way of analogy, consider a person who drafts and transmits a text message by clicking buttons on a cell phone; that message—once the send button is clicked—indisputably constitutes an "electronic communication," and its "substance" is protected from interception. *See, e.g.*, 18 U.S.C. § 2510(10)–(11). Similarly, a button on a website labelled "add to cart," once clicked, is on the same footing as a text message, once sent, containing identical words; the only difference is the number of buttons clicked to convey the same communication. *See, e.g.*, FAC ¶ 52; *see also Lamonaco v. Experian Info. Solutions, Inc.*, 141 F. 4th 1343, 1347 (11th Cir. 2025) (noting consumers can communicate "assent to terms" by "click[ing] a 'submit' button"); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1052 (S.D. Cal. 2023) ("Information about particular activity conducted and search terms used on an app qualify as the 'contents' of communication.").

Unlike button clicks and form-field entries, URLs can constitute record information, but they can also reveal the "contents" of electronic communications where, as here, they "contain folder and file names" or disclose "search terms." *See Katz-Lacabe v. Oracle America, Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023) (finding "full-string detailed URLs that might contain folder and file names" or URLs that reveal "search terms" constitute "contents of communications").

Here too, Defendant's caselaw says no differently. Defendant cites to *Graham v. Noom*, 533 F. Supp. 3d 828, 833 (N.D. Cal. 2021) and *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1062 (N.D. Cal. 2012), but those decisions stand for the uncontroversial proposition that "personally identifiable information **<u>that is automatically generated by the communication</u>** … is not covered." *In re iPhone*, 844 F. Supp. At 1062 (emphases added). Neither case disputes nor addresses the principle that underpins Plaintiffs' argument here:

> Whether information is "content" or "record information" can depend in part on the manner in which the information is generated, as information that would otherwise be considered "record information"—such as names, addresses, telephone numbers, and email addresses—may be "contents" of a communication where the user communicates with a website by entering this information into a form provided by the website.

*Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 517 (C.D. Cal. 2021).

Defendant also cites to *In re Zynga* for the proposition that "URLs potentially disclosed to third parties are simply record information which are generated in the course of the communication." *See* MTD at 10. But there, the Ninth Circuit explicitly recognized that URLs could constitute "the contents of a communication" where alleged to reveal "a search term or similar communication made by the user." *In re Zynga*, 750 F. 3d at 1109.

Most glaringly, Defendant fails to address—and thus concedes—that "the text of button clicks" revealed the content of Plaintiffs' communications. *See* FAC ¶ 138; *id.* ¶¶ 7–9, 52, 102.

**B. Plaintiffs Satisfy the In-Transit Requirement**

Defendant argues that "Plaintiffs' allegations regarding contemporaneity are simply too conclusory to adequately state a claim." MTD at 11. Once again, at least two courts—faced with the exact same allegations and the exact same argument—have disagreed. *See, e.g.*, *St. Aubin*, 2024 WL 4369675, at *6 ("Plaintiff's allegations are more than threadbare recitals of a cause of action's elements, supported by mere conclusory statements.") (internal quotations omitted); *Smith*, 2025 WL 1085169, at *5 (holding the same); *see also* Section II.B.

**C. Defendant Never Received Plaintiffs' Consent to Assist Interceptions**

Defendant argues that "Plaintiffs consented to PetMed's use of the Website Technologies by accepting PetMed's Privacy Policy." *See* MTD at 14. That is incorrect. Plaintiffs never assented to the privacy policy, and, even if they did, Defendant specifically represented that it would comply with industry standards and keep information about their prescription confidential.

As with any online contract, "the mere existence of a privacy policy is not dispositive because users might lack actual or constructive notice of the policy." *Hart v. TWC Product and Technology LLC*, 526 F. Supp. 3d 592, 601 (N.D. Cal. 2021).[4] Actual notice means "actual knowledge of the agreement." *Nguyen v. Barnes & Noble Inc.*, 763 F. 3d 1171, 1171 (9th Cir. 2014). Constructive notice, on the other hand, "turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 863 (2016) (quotations and brackets omitted). To show inquiry notice, courts consider "the visual design of the webpages," including "whether an advisal is displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Godun v. JustAnswer LLC*, 135 F. 4th 699, 709 (9th Cir. 2025).

Plaintiffs explicitly disclaim actual or constructive notice, alleging that "[a]t no point during the transaction does Defendant put consumers on notice of a privacy policy or terms of service." *See* FAC ¶ 65; *id.* ¶¶ 7–9. Even with the extrinsic evidence that Defendant improperly attempts to submit, nothing in the record comes close to allowing the Court to review "the full context of the transaction," including whether the "font size and format" for any textual notice was sufficient to put consumers on inquiry notice of the privacy policy. *See Serrano v. Open Road Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089, 1095 (C.D. Cal. 2023). That omission is dispositive. Because "an online contract must put a website user on actual or inquiry notice of its terms," *see Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 585 (N.D. Cal. 2020), Defendant never received consent to assist third parties with intercepting confidential communications.

Even with actual or constructive notice, Defendant still fails to properly establish consent.

[4] Because Plaintiffs were in California when accessing Defendant's website, California law applies to this analysis. *See, e.g.*, *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F. 3d 1089, 1091 (11th Cir. 2004) ("Under Florida's choice-of-law rules, *lex loci contractus* applies in contract matters, unless a statute modifies or abrogates a choice-of-law rule.") (internal citations omitted).

*First*, the privacy policy explicitly represents that Defendant "follow[s] generally accepted industry practices to make sure [personal information] is not inappropriately misused, accessed, disclosed, altered or destroyed." *See* MTD at Ex. A, p. 5. That representation is false. *See* FAC ¶ 27. *Second*, the privacy policy generally notes that "third parties" may use "personal information" for "analysis purposes," *see* MTD at Ex. A, p. 4, but here, Plaintiffs allege that Defendant disclosed such information "to run marketing and advertising campaigns." *See* FAC ¶ 107. *Third*, this general disclaimer cannot trump the specific promise to treat "personal and prescription information … with the highest level of confidentiality." *Id.* ¶ 30; *see also Robertson v. Willis*, 77 Cal. App. 3d 358, 365 (1978) ("When specific language conflicts with the general, the specific provisions will prevail.").

Defendant also argues that "Plaintiffs consented to the alleged interceptions through their use of Facebook." MTD at 15. Plaintiffs allege, however, that Meta "never receives consent from users to intercept electronic communications containing sensitive and confidential information." *See* FAC ¶ 66. In fact, "Meta expressly warrants the opposite," promising consumers that "partners" like Defendant cannot use Meta's tools without "hav[ing] lawful rights to collect, use and share [consumers'] data." *See* FAC ¶¶ 66–73 (quoting the Data Policy, the Privacy Policy, the Cookies Policy, and the California Privacy Policy); *see also Castillo v. Costco Wholesale Corp.*, 2024 WL 4785136, at *12 ("[T]he 'generalized notice' in Meta's data-collection policies is insufficient to establish consent to collect personal health data.").

**D. The Rule of Lenity is Irrelevant Here**

Defendant asserts that "the rule of lenity applies in PetMed's favor and requires dismissal given that CIPA is a criminal statute with civil application." MTD at 16. The rule of lenity is an interpretive principle, not a basis for dismissal. In any event, "the touchstone of the rule of lenity

is statutory ambiguity." *Moskal v. United States*, 498 U.S. 103, 107 (1990). Here, there is none.

## IV. PLAINTIFFS STATE A CLAIM UNDER CIPA § 632

### A. Plaintiffs' Communications with Defendant were Confidential

Defendant argues that Plaintiffs "have failed to plausibly plead that their activity on PetMed's website involved a 'confidential communication.'" *See* MTD at 13. That is wrong. "[A] conversation is confidential under section 632 if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." *Flanagan v. Flanagan*, 27 Cal. 4th 766, 777 (2002). Here, Plaintiffs allege that Defendant operates as a licensed pharmacy and that state law prohibits pharmacies—including those "that dispense veterinary medicine"—from "exhibit[ing], discuss[ing], or reveal[ing] the contents of any prescription, the therapeutic effect thereof, the nature, extent, or degree of illness suffered by any patient or any medical information furnished by the prescriber." *See* FAC ¶¶ 23–25 (quoting Cal. Code Regs. Tit. 16, § 1764 and Cal. Bus. & Prof. § 4040(2)). "Beyond state statutes and regulations," Plaintiffs also allege that "the industry standard is to protect such information from disclosure." *Id.* ¶¶ 27–29. More still, Defendant promises consumers on its website that "[a]ll personal and prescription information is securely managed and treated with the highest level of confidentiality, regardless of the processing location." *Id.* ¶ 30. Accordingly, "[a]s reflected through statutes, regulations, industry standards, and representations on Defendant's website, Plaintiffs reasonably expected that their electronic communications with Defendant would remain confidential." *Id.* ¶ 31; *See, e.g.*, *St. Aubin*, 2024 WL 4369675, at *12 (finding reasonable expectation of privacy "based on the laws and regulations protecting the confidentiality of medical information").

### B. Plaintiffs Adequately Allege Mens Rea

Defendant contends that Plaintiffs fail to plead the requisite *mens rea* because the FAC

purportedly "does little more than explain that the Website Technologies were offered to PetMed to help it analyze and track user interactions." *See* MTD at 13. Not true. Plaintiffs allege that "Defendant customized, configured, deployed, and intentionally integrated the computer code that intercepted electronic communications from Plaintiffs and Class members while they accessed and navigated Defendant's website." *See* FAC ¶ 133; *id.* ¶¶ 40, 42, 45, 76, 87, 100, 135. Defendant's misconduct was no mistake; instead, "Defendant took these actions to run marketing and advertising campaigns," and Defendant "paid the third parties here—Meta, Attentive, and Zeta Marketing—for services and products that relied on … exploiting Plaintiffs['] and Class members' personal information and their activity on Defendant's website." *Id.* ¶ 133; *id.* ¶¶ 86, 93, 107, 141. These allegations more than suffice to establish *mens rea* here. *See Smith I*, 2025 WL 1085169, at *4 (analyzing identical allegations and finding that "Plaintiffs have adequately alleged intent").

### C. Plaintiffs Never Provided Consent

As Defendant tacitly recognizes by addressing consent under CIPA § 631 and CIPA § 632 together, the analysis is the same for both. *See* MTD at 14. As set forth in Section III.C, Defendant never received consent to assist third parties with recording confidential communications.

## V. PLAINTIFFS STATE A CLAIM UNDER CDAFA

Defendant argues that "Plaintiffs voluntarily provided their data (*e.g.*, names, addresses) during transactions on PetMed's website, negating any claim of unauthorized access." MTD at 16 (internal citations omitted). Plaintiffs may have agreed to convey personal information to Defendant through its website, but they never assented to Defendant helping third parties "access and without permission take, copy, analyze, and use Plaintiffs' and Class members' data." *See* FAC ¶ 161. Because Plaintiffs' allegations hinge on derivative liability, they adequately state a claim under CDAFA by alleging that Defendant "inserted third-party code into its website that

allowed third parties to use technical means to access [their personally identifiable information] without permission." *Smith I*, 2025 WL 1085169, at *6.

Defendant also argues that "Plaintiffs do not allege a cognizable loss, such as economic harm or data corruption, as required by [CDAFA]." *See* MTD at 17. But here, Plaintiffs allege that "Defendant's conduct caused numerous third parties—including Meta, Attentive, and Zeta—to profit from Plaintiffs' and Class members' personal information and their activity on Defendant's website." FAC ¶ 111; *see also* ¶¶ 108–13. Plaintiffs also allege that they "have an entitlement to profits earned from their personal data." *See id.* ¶ 113. Accordingly, the FAC "plausibly pleads that Plaintiffs suffered compensable 'damage or loss' under the meaning of CDAFA." *See, e.g.*, *Smith II*, 2025 WL 2210002, at *3; *see also In re Facebook*, 956 F. 3d at 600 (finding "injury sufficient to establish standing to bring … claims for CDAFA" by alleging that "browsing history has financial value" and that "Facebook profited from this valuable data").

## VI. PLAINTIFFS STATE A CLAIM FOR INTRUSION UPON SECLUSION

Defendant begins by arguing that "Florida law applies" to Plaintiffs' claim for intrusion upon seclusion. *See* MTD at 17. That is incorrect. "Generally, in tort cases, the location where the injury occurred is the decisive consideration in determining the applicable choice of law." *Lambert v. Melia Hotels Int'l S.A.*, 526 F. Supp. 3d 1207, 1224 (S.D. Fla. 2021). Here, the place of injury is California, where Defendant intruded upon Plaintiffs' seclusion by causing their browsers to transmit confidential information to third-party interceptors. *See* FAC ¶ 10; *Popa v. Harriet Carter Gifts, Inc.*, 52 F. 4th 121, (3d Cir. 2022) (holding that Navistone intercepted electronic communications "at the point where it routed those communications to its own servers," which was "Popa's browser, not where the signals were received at NaviStone's servers").

Defendant then argues that "tracking technologies like those at issue in this case" cannot

create "an intrusion into one's private quarters under Florida law." MTD at 26. Under California law, the opposite is true. *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 801 (noting that intrusion upon seclusion can be established by intrusion "into a … conversation … as to which the plaintiff has a reasonable expectation of privacy").

Defendant next argues that Plaintiffs cannot establish that "PetMed's alleged disclosure of their information was an intrusion" because "Plaintiff voluntarily disclosed information to PetMed." MTD at 19. But here, Defendant "procure[d] third parties to track their online activity and personally identifiable information while they were using Defendant's website." *See* FAC ¶ 171. By providing those third parties with "substantial assistance," Plaintiffs can properly hold Defendant liable for intrusion upon seclusion. *See M.H. v. Done Global Inc.*, 2025 WL 629613, at *3 (N.D. Cal. Feb. 26, 2025) (rejecting identical argument and holding the plaintiff could plead intrusion upon seclusion where the website operator "'permitted unauthorized third parties to intrude' on Plaintiff's affairs by purposefully embedding tracking tools facilitating that intrusion").

Defendant also argues that Plaintiffs fail to plead the requisite intent, *see* MTD at 19, but for the reasons expressed in Section IV.B, that argument is incorrect. *See* FAC ¶¶ 86, 93, 107, 133.

Defendant ends by arguing that Plaintiffs "fail to allege facts" supporting the conclusion that "PetMed's actions constitute an egregious breach of the social normal that is highly offensive." *See* MTD at 19. That is incorrect. *See, e.g.*, FAC ¶¶ 173–75. In any event, this inquiry "is not susceptible to determination at the pleadings stage." *Smith I*, 2025 WL 1085169, at *5. Accordingly, Plaintiffs adequately state a claim for intrusion upon seclusion.

## **CONCLUSION**

Defendant's motion to dismiss should be denied in full.

Dated: August 24, 2025

Respectfully submitted,

MARCUS RASHBAUM PINEIRO & MEYER LLP
By: ***Christopher R. Reilly***
Christopher R. Reilly, Esq.
Florida Bar No. 1025097
creilly@mrpfirm.com
Michael A. Pineiro, Esq.
Florida Bar No. 41897
mpineiro@mrpfirm.com
One Biscayne Tower
2 S. Biscayne Blvd., Ste. 2530
Miami, Florida 33131
Telephone: (305) 400-4260

LEVIN LAW, P.A.
Brian Levin
Florida Bar No. 26392
brian@levinlawpa.com
Jacob Polin*
jpolin@levinlawpa.com
2665 S Bayshore Dr., Ph. 2B
Miami, Florida 33133
Telephone: (305) 402-9050

*Attorneys for Plaintiffs*
**Pro Hac Vice Forthcoming*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 24, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which caused a copy to be served upon all counsel of record.

*/s/ Christopher R. Reilly*
Christopher R. Reilly