**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

KRISTIN COBBS, LYNNE
KAWAMINAMI, and LORETTA
SCHWEINSBURG, individually and on
behalf of all others similarly situated,

     *Plaintiffs,*

vs.

PETMED EXPRESS, INC.,

     *Defendant.*

Case No. 9:25-cv-80458-AMC

**DEFENDANT PETMED EXPRESS, INC.'S SUPPLEMENTAL BRIEFING**

Following the discovery conference held by this Court on January 28, 2026, Defendant PetMed Express, Inc. ("PetMeds") respectfully submits the below supplemental briefing on the outstanding discovery issues, consistent with this Court's Order [ECF No. 71].

**INTRODUCTION**

Plaintiffs have brought the present class action lawsuit against PetMeds for statutory damages as a result of certain ubiquitous analytics and advertising technology allegedly installed on PetMed's website, 1800petmeds.com. The Parties have raised two discovery issues with this Court [ECF No. 65]. First, whether Plaintiffs are entitled to discovery related to putative class members in connection with their non-party subpoenas. Second, whether Plaintiffs are entitled to discovery related to server-side "tracking" technology, which PetMeds contends is not relevant to any of Plaintiffs' remaining claims.

**I.**     **Putative Class Member Discovery From Non-Parties**

Plaintiffs have served Subpoenas to Produce Documents on non-parties, Meta and Attentive, the companies whose advertising technology Plaintiffs contend was integrated on

PetMeds' website. Through those subpoenas, Plaintiffs seek the production of documents sufficient to identify PetMed's consumers, who Plaintiffs assert may fall within a proposed class.[1]

*See* ECF No. 65-1, 65-2 (Meta Requests 5, 6, 7, 8, and 9; Attentive Requests 2, 4 (sic), 3, 4, 5, 6, and 8).[2]

### A. PetMeds Has Standing to Challenge the Non-party Subpoenas

Pursuant to Rule 45(d)(3)(A)-(B), a party to a lawsuit has standing to quash a third-party subpoena in order to protect its personal rights and privileges with respect to the subpoenaed materials. Fed. R. Civ. P. 45(d)(3)(A)-(B). As courts in this District have noted, a personal right to a defendant "includes the right to enforce discovery limitations that govern the case under Rule 26, *e.g.*, *JWD Auto., Inc. v. DJM Advisory Grp. LLC*, 317 F.R.D. 587, 588–89 (M.D. Fla. 2016) (explaining that "objections on relevance and proportionality" are permissible against a third-party subpoena), or under Rule 45 itself . . . ." *In re Lakeview Loan Servicing Data Breach Litig.*, No. 22-20955-CIV, 2025 WL 1435739, at *2 (S.D. Fla. Mar. 27, 2025). Indeed, "discovery, like all matters of procedure, has ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Here, the requests for the identities of PetMed's consumers are not

---

[1] PetMeds notes that one of the problems with prematurely allowing discovery related to putative class members is that Plaintiffs' putative class definition has not been established yet. Plaintiffs' complaint alleges it is "a class action for data privacy violations on behalf of all individuals who have purchased veterinary medicine on www.1800petmeds.com" (Compl. ¶ 1) but then defines two classes – a nationwide class of visitors to 1800petmeds.com (Compl. ¶ 120 ("[a]ll persons in the United States who accessed and navigated to www.1800petmeds.com")) and a California class of California visitors to 1800petmeds.com (Compl. ¶ 121 ("[a]ll persons in California who accessed and navigated to www.1800petmeds.com")). Yet, at the January 12 status conference in front of Judge Cannon, Plaintiffs' counsel represented to the Court that the class was "at its broadest" prescription purchasers through 1800petmeds.com.

[2] Since the discovery dispute arose, Plaintiffs have served a third subpoena on Zeta Global ("Zeta"), another third party whose technology is at issue in Plaintiffs' complaint. PetMeds has asserted a similar objection to this subpoena and the Parties agree that any ruling on this issue should apply equally to the Zeta subpoena.

relevant or proportional to the case at this stage. Therefore, PetMed has standing to object to the Subpoenas.

**B.  The Subpoenas Are Improper Because They Seek Information Relating To Putative Class Members Before A Class Has Been Certified**

Plaintiffs' requests for documents from Meta and Attentive seek information related to the identities of PetMed's consumers. But this attempt to obtain information relating to putative class members before a class has been certified has long been held improper.

In fact, the Supreme Court in *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) addressed a similar issue. There, the Court held that information relating to the putative class does not fall "within the scope of legitimate discovery," *id.* at 354, and that it did not "perceive any other 'potential' issues that could bring respondents' request within the scope of legitimate discovery." *Id.*, n. 20. Several other courts have noted this principle. *See Dubin & Dubin LLP v. Mayorga*, 2013 WL 3989550, *4–5 (W.D.N.Y. 2013) (quashing subpoena served by plaintiff seeking names and contact information of putative class members prior to class certification); *Bilek v. Nat'l Congress of Employers, Inc.*, 2022 WL 523108, at *1 (N.D. Ill. Feb 22, 2022) (denying motion to compel production of putative class information, holding that the information "is not relevant or proportional discovery within the meaning of Federal Rule of Civil Procedure 26(b)(1) at this stage of the case when Plaintiff is looking for information to support her anticipated motion for class certification and before a class has been certified"); *Drossin v. Nat'l Action Fin. Servs., Inc.*, 2008 WL 5381815, *3 (S.D. Fla. Dec. 19, 2008) ("While discovery regarding information necessary to address class certification requirements under [Rule 23] falls within the realm of permissible discovery, the Supreme Court has rejected pre-class certification discovery of identifying information of potential class members when such information is sought merely for the purpose of identifying such individuals for notice of a class action, as opposed to for reasons

of discovering information 'relevant to the subject matter involved in the pending action.'")
(internal citations omitted).

Here, Plaintiffs seek precisely what *Oppenheimer* prohibits at this stage—identifying information of potential class members.

Plaintiffs have attempted to argue that such information is necessary for them to satisfy their class certification burden.  However, it is well-recognized that names and addresses are not necessary for numerosity or ascertainability.[3] *See e.g., Hankinson v. R.T.G. Furniture Corp.*, 2016 WL 1182768, *2 (S.D. Fla. Mar. 28, 2016) ("Plaintiffs have not articulated a legitimate need for customer identities at this stage of the litigation; indeed, the names and addresses of the customers would add nothing to the argument for class certification."). Likewise, such information is not needed to establish commonality, typicality, or predominance.  Such requirements can and should be addressed without getting to the granular level of class member by class member detail; indeed, such an inquiry would be antithetical to the very idea of class certification.  Plaintiffs must simply establish what data elements they believe were "intercepted" under various settings and configurations during various periods of time and that such interception occurred uniformly across the class (the definition of which remains to be seen); the identifying information of putative class members (or the specific "intercepted" information) adds no value to this analysis.[4]  To the extent this Court is inclined to allow discovery, PetMeds requests that any "intercepted" information be

---

[3] As discussed at the hearing, PetMeds is not likely to challenge numerosity.  PetMeds needs to know Plaintiffs' final class definition to determine its position on ascertainability.  However, Plaintiffs agreed not to seek this same class-identifying information from PetMeds at this time, and PetMeds has acknowledged that it can identify prescription purchasers.

[4] PetMeds notes that Plaintiffs have twice failed to disclose class certification experts, and instead intend to simply rebut PetMeds' class certification expert whose report highlights the myriad individualized issues that arise.

anonymized  or that a protective order be established that would prevent Plaintiffs' improper use of any class member identifying information, for example to solicit additional clients or class representatives.

## II.   Discoverability of CAPI (server-side technology)

The second issue heard by the Court relates to whether Plaintiffs are entitled to discovery related to server-side technology, in particular Conversions API (aka CAPI).[5]   Plaintiff's Complaint contains one allegation related to such technology.  *See* Compl. ¶ 64.   While acknowledging that sole allegation (out of 176 such paragraphs), Defendants argue discovery related to CAPI is inappropriate because such technology cannot support the only claims that survived dismissal - Plaintiffs' ECPA claim, Plaintiffs' § 631 CIPA claim, and Plaintiffs' § 632 CIPA claim.  Alternatively, to the extent relevant, PetMeds argues that discovery related to CAPI is not proportional to the needs of the case considering that the bulk of Plaintiffs' Complaint focuses on client-side technology.

### A. ECPA and CIPA § 631

As discussed with the Court during the January 28 hearing, Plaintiffs' claims are premised on a theory that a website visitor (in this case, a PetMeds customer or prospective customer) engages in communications with PetMeds while navigating its website, 1800petmeds.com. Further, Plaintiffs posit that advertising technology running on PetMeds' website "intercepts" those "communications" and shares them with third parties.

An interception for ECPA purposes must occur "during flight." *United States v. Steiger*, 318 F.3d 1039, 1048–49 (11th Cir. 2003); *see also, e.g.*, *Glob. Pol'y Partners, LLC v. Yessin*, 686

---

[5] For clarity, this issue is not limited to the non-party subpoenas but rather the scope of discovery sought from PetMeds. PetMeds has objected to producing information related to server-side technology and Plaintiff seeks to compel that information.

F. Supp. 2d 631, 638 (E.D. Va. 2009) (explaining that the term "intercept" is "best understood through a football analogy. In American football, a ball can only be intercepted when it is 'in flight'"). This means a communication "must be acquired during transmission, not while it is in electronic storage." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002).

Likewise, in order to establish liability under CIPA section 631, Plaintiffs much prove that such "interception" occurs "in transit." "[T]he only commonsense meaning of transit, at least in the context of this statute, is the transit from the person sending the communication to its intended recipient." *Doe v. Eating Recovery Ctr. LLC*, No. 23-cv-05561-VC, 2025 WL 2971090, at *5 (N.D. Cal. Oct. 17, 2025).

Under both the ECPA and CIPA section 631, once the communication is received at its intended destination (here, PetMeds' website server) it becomes "stored" and can no longer be "intercepted" "in transit." *See NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 938, 952 (N.D. Cal. 2014) (explaining that reading emails that have been received in an email account's inbox does not constitute 'intercept[ion]' under the statute"); *Bunnell v. Mot. Picture Ass'n of Am*. 567 F.Supp.2d 1148, 1154 (C.D. Cal. 2007) (holding that if the communication reached the destination server, even if it was forwarded within milliseconds, it was not intercepted in transmission).[6]

---

[6] In *Bunnell*, the Court explained:

> In the instant case, [the alleged hacker] Anderson's actions necessarily fall outside the scope of the Wiretap Act. Anderson configured the [Plaintiffs'] email server software so that all Plaintiffs' messages were copied and forwarded from the server to his Google email account. If the emails had not been stored on the server, Anderson would not have acquired copies of them.

*Bunnell*, 567 F.Supp.2d at 1153.

The Declaration of Jim Vint, submitted by PetMeds, explains from a technical perspective how server-side technology simply does not meet the in-transit interception criteria. [ECF No. 66-1]. Indeed, even without the benefit of expert explanation, the Northern District of California recently dismissed a CIPA 631 claim based on server-side technology, finding that the complaint failed to plead that interception occurred in transit.

> Rack Room argues that Plaintiffs fail to state a section 631 claim based on the server-side technology because they have not alleged a contemporaneous interception. The Court agrees. Although the TAC alleges that the server-side tracker "directly forward[s]" communications and does so on an "automatic" basis, there is no information about how soon this forwarding occurs or whether it is contemporaneous with the receipt.

*Smith v. Rack Room Shoes, Inc.*, 2026 WL 183852, at *3 (N.D. Cal. Jan. 23, 2026).

Plaintiffs previously cited dicta in *US v. Steiger* in support of their argument that server-side technology can support their claims. Not only is the cited support dicta, as discussed during the hearing, *Steiger* is distinguishable in two ways: first, the hypothetical addressed in *Steiger* contemplated automatic forwarding "before" "a newly composed message is saved to any temporary location following a send command," which does not occur with server-side technology; and, second, the information at issue in *Steiger* was undoubtedly a communication (an email), whereas the information here is not (particularly once stored after-the-fact). *See Steiger*, 318 F.3d at 1050. To the contrary, *Steiger* supports the ultimate conclusion that the ECPA cannot apply to server-side technology:

> In this case, there is nothing to suggest that any of the information provided in the source's e-mails to the MPD was obtained through contemporaneous acquisition of electronic communications while in flight. Rather, the evidence shows that the source used a Trojan Horse virus that enabled him to access and download information stored on Steiger's personal computer. This conduct, while possibly tortious, does not constitute an interception of electronic communications in violation of the Wiretap Act.

*Id.*

Thus, server-side technology cannot support an ECPA or CIPA 631 claim and therefore is not relevant to the claims or defenses in this case and is outside the scope of discovery.

## B. CIPA § 632

Plaintiffs argue that, even if server-side technology is irrelevant for their ECPA and section 631 claims, it remains relevant and discoverable because their claims under CIPA section 632 do not expressly contain an "in transit" requirement.   While such language may not be explicit in the statute, such a requirement is inherent in the nature of the claim. Section 632 prohibits unauthorized electronic eavesdropping on confidential conversations.  *See* Cal. Penal Code 632(a). Merriam-Webster defines "eavesdrop" as "to listen secretly to what is said in private."  Implicit in this definition then, is the concept that the "eavesdropping" is occurring at the time the communication is being made (here, under Plaintiffs' theory, while the website visitor is navigating the website).  Indeed, the California Supreme Court has explained (in the context of clarifying the "confidential" requirement of section 632) that the focus of section 632 is on "simultaneous dissemination, not secondhand repetition." *See Flanagan v. Flanagan,* 41 P.3d 575 (Cal. 2002) (recognizing the "critical distinction between eavesdropping upon or recording a conversation and later disseminating its contents").  Indeed, in *Flanagan*, the California Supreme Court noted that differing lines of case law had developed: one which held that a conversation is confidential if a party to the conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded; and, a second which held that a conversation is confidential only if the party has an objectively reasonable expectation that the content will not later be divulged to third parties. *See Kight v. Cashcall, Inc.*, 200 Cal. App. 4th 1377, 1390 (Cal. App. 4th Div. 2011) (citing *Flanagan v. Flanagan,* 41 P.3d 575 (Cal. 2002)).  The California

Supreme Court adopted the former interpretation – a recognition that "the crux of section 632 is the right to prevent a simultaneous dissemination to an unannounced listener." *Id.* Thus, while section 632 does not contain an explicit "in transit" requirement, eavesdropping under section 632 must occur while the communication is being made, not once the communication has reached its intended destination (PetMeds' server) and is stored, as is the case with server-side technology.

Indeed, as discussed during the January 28 hearing, the information stored by PetMeds' server (for example a URL, as alleged in Plaintiffs' Complaint) is no longer a communication (to the extent it ever was) and instead is simply a record of what occurred. Analogizing this to an in-person shopping experience, a shopper may make communications with store representatives during an in-store visit but the shopper's receipt reflecting their purchase or other record of their visit is not a communication.

## C. Rule of Lenity

Finally, as to all three statutes, the rule of lenity counsels against the broad interpretation urged by Plaintiffs here. As the Northern District of California aptly explained in the context of a CIPA case similar to that at issue here (though involving client-side technology):

> The language of CIPA is a total mess. It was a mess from the get-go, but the mess gets bigger and bigger as the world continues to change and as courts are called upon to apply CIPA's already-obtuse language to new technologies. Indeed, we have reached the point where it's often borderline impossible to determine whether a defendant's online conduct fits within the language of the statute.
>
> This is such a case. The plaintiff seeks to impose CIPA liability on a website operator for using a third party to perform data analytics and targeted advertising. In particular, liability here turns on whether the third party "read" or "attempt[ed] to read" or attempted "to learn" the contents of an internet communication between the plaintiff and the website operator while that communication was "in transit." If so, the website operator could be liable to the plaintiff under CIPA for enabling the third party to engage in that conduct.

9

As discussed in this ruling, the statutory language at issue here is ambiguous. One could imagine an interpretation under which the website operator would be liable. But CIPA is a criminal statute. When courts are called upon to interpret ambiguous criminal statutes in California, the rule of lenity applies—even when the statute is being invoked in a civil action. *Harrott v. County of Kings*, 25 Cal. 4th 1138, 1154, 108 Cal.Rptr.2d 445, 25 P.3d 649 (2001). Courts are also supposed to narrowly construe civil statutes that impose punitive civil penalties. *See Hale v. Morgan*, 22 Cal. 3d 388, 401, 149 Cal.Rptr. 375, 584 P.2d 512 (1978). So the Court will adopt a narrower but equally reasonable interpretation of CIPA—one that does not encompass the conduct at issue in this case.

The state of affairs with CIPA is untenable. Courts are issuing conflicting rulings, and companies have no way of telling whether their online business activities will subject them to liability. That seems particularly true of Penal Code Section 631(a), the CIPA provision at issue here. The California Legislature needs to step up. It would be bad enough if CIPA were merely a civil statute that allowed plaintiffs to recover actual damages for violations. But CIPA imposes criminal liability and punitive civil penalties. Under these circumstances, it is imperative for the Legislature to bring CIPA into the modern age and to speak clearly about how the kinds of activities at issue in this case should be treated. Until that happens, courts should generally resolve CIPA's many ambiguities in favor of the narrower interpretation.

*Doe v. Eating Recovery Ctr. LLC*, No. 23-CV-05561-VC, 2025 WL 2971090, at *1 (N.D. Cal. Oct. 17, 2025) (granting summary judgment on a CIPA section 631 claim where the third party did not read or learn contents of a communication while "in transit"); *see also McEwan v. OSP Grp., L.P.*, 2015 WL 13374016, at *4 (S.D. Cal. July 2, 2015) (dismissing civil complaint by "[a]pplying the rule of lenity to [CIPA] section 632" to construe "telephone" in a way "most favorable to [defendant]"); *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134 (9th Cir. 2009) (explaining that any "ambiguity" in a criminal statute "should be resolved in favor of lenity" where the case is brought under the statute in "a civil context"); *Romero v. Sec'y, U.S. Dep't of Homeland Sec.*, 20 F.4th 1374, 1383 (11th Cir. 2021) ("The rule [of lenity] mandates that penal statutes be construed strictly . . .   Accordingly, when Congress speaks in unclear or indefinite terms about

10

what conduct is criminal, such that the governing statute is genuinely ambiguous, we construe that statute in favor of criminal defendants.")

For these reasons, Plaintiffs should not be allowed discovery related to Conversions API or other server-side technology.

Dated: February 4, 2026                    Respectfully Submitted,

/s/ Jennifer McLoone
Jennifer A. McLoone (FL Bar No.: 29234)
E-Mail: jmcloone@shb.com
Melissa N. Madsen (FL Bar. No.: 65416)
E-mail: mmadsen@shb.com
SHOOK, HARDY & BACON L.L.P.
Citigroup Center, Suite 3200
201 South Biscayne Blvd.
Miami, FL 33131
Tel: (305) 358-5171

Ara K. Ayvazian (FL Bar No.: 1004407)
E-Mail: aayvazian@shb.com
SHOOK, HARDY & BACON L.L.P.
100 N. Tampa St., Suite 2900
Tampa, Florida 33602
Tel: (813) 202-7100

**Counsel for PetMed Express, Inc.**

11