**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 25-80458-CIV-CANNON/Reinhart**

**KRISTIN COBBS** and **LYNNE KAWAMINAMI**,

*individually and on behalf of all others similarly situated*,

Plaintiffs,

v.

**PETMED EXPRESS, INC.**,

Defendant.
_______________________________________/

**PLAINTIFFS' SUPPLEMENTAL BRIEFING CONCERNING DISCOVERY INTO SERVER-SIDE TRACKING AND THE IDENTITIES OF CLASS MEMBERS**

Pursuant to ECF No 71, Plaintiffs, through undersigned counsel, hereby file this supplemental brief in support of their positions concerning discovery that either relates to server-side tracking mechanisms or that reveals class members' identities.

## INTRODUCTION

Plaintiffs properly seek documents and communications that either relate to Conversions API or that incidentally reveal class members' identities. With respect to Conversions API, the Court has already rejected Defendant's arguments when resolving the motion to dismiss. Worse still, Defendant waived the ability to raise this issue by declining to lodge an objection that even arguably attempted to limit discovery into server-side code like Conversions API. For those two reasons alone, discovery into Conversions API is appropriate. More fundamentally, however, Defendant concedes that only two of the three claims here—CIPA § 631 and the Wiretap Act—

impose the "in transit" and "contemporaneous" requirements. As Defendant recognized in the joint letter, the remaining claim, CIPA § 632, neither explicitly nor implicitly mandates such a requirement. And even if Plaintiffs somehow cannot seek discovery into Conversions API unless they satisfy those temporal requirements, the 11th Circuit has made clear that "automatic routing software"—like, for example, server-side code that automatically forwards communications upon receipt—meets those requirements with ease.

With respect to discovery revealing class members' identities, Defendant is correct that courts generally forbid such discovery prior to class certification. But here, discovery into personally identifiable information for putative class members is integral and necessary to class certification. Under such circumstances, courts have carved out an exception to the general rule that Plaintiffs cannot pursue or receive such discovery before receiving class certification. That is especially true where, as here, it is Defendant—not Plaintiffs—who has raised the arguments necessitating discovery that may reveal personally identifiable information.

## **FACTUAL BACKGROUND**

Defendant is a licensed pharmacy that dispenses veterinary medicine. *See, e.g.*, FAC ¶ 2. Pursuant to "numerous statutes and regulations," Defendant possessed "a legal obligation to keep information about veterinary care—including details about veterinary treatment or prescriptions—confidential." *See id.* ¶ 3; *id.* ¶¶ 21–33. Given those legal obligations, Plaintiffs "reasonably expected that their electronic communications with Defendant would remain confidential." *Id.* ¶ 31. Despite such expectations, Defendant "aids, employs, agrees with, and conspires with third parties—such as Meta Platforms, Inc. ('Meta'), Attentive Mobile, Inc., ('Attentive'), and Zeta Global Corporation ('Zeta')—to eavesdrop on communications sent and received by Plaintiffs and Class members, including communications that contain sensitive and confidential information."

*See id.* ¶ 4. More specifically, Defendant utilizes "proprietary code" to help those third parties "intercept communications containing customers' personally identifiable information." *Id.* ¶¶ 100, 115. Defendant facilitated those interceptions "without first receiving authorization or consent." *Id.* ¶ 148. By failing to receive prior consent, Defendant "violated state and federal anti-wiretapping laws," including the Wiretap Act, CIPA § 631, and CIPA § 632. *Id.* ¶ 5, 130–58.

## ARGUMENT

### I. DEFENDANT FAILS TO DEMONSTRATE THAT DISCOVERY INTO SERVER-SIDE TRACKING IS IRRELEVANT OR DISPROPORTIONAL

Defendant seeks to limit discovery into server-side tracking tools because they purportedly transmit information "via a separate 'communication' once the information is received at the website server." *See* ECF No. 65 at 3. Defendant's argument should be rejected for five reasons.

*First*, Defendant could have—and should have—raised this issue in its responses and objections to Plaintiffs' requests for production. *See* Ex. A. By failing to do so, Defendant waived objections concerning Conversions API.[1] *See, e.g.*, *Woodward v. Hoffman-La Roche, Inc.*, 2007 WL 9747859, at *2 (S.D. Fla. Nov. 5, 2007) ("Objections not timely raised are waived.").

*Second*, Defendant has already asserted—and the Court has already considered—the arguments raised here. As noted, Plaintiffs specifically allege that "Defendant uses other Business Tools, like Conversions API, to assist Meta with intercepting its users' communications." *See* FAC ¶ 64; *see also* Figures 15–18. In its motion to dismiss, Defendant cited that allegation when defining the term "Website Technologies." *See* ECF No. 23 at 2. Referencing that defined term

[1] Defendant's objections to server-side code like Conversions API would limit non-party and party discovery alike. The acronym "API" in "Conversions API" stands for "application programming interface," and Plaintiffs' RFPs specifically define the "Relevant Tracking Technologies" as including "application programming interfaces." *See* Ex. A at 4. None of Defendant's objections even arguably attempt to limit discovery into APIs and other server-side code. Defendant thus attempts to use the subpoenas as a basis for raising an objection it should have lodged months ago.

throughout its analysis, Defendant then argued that Plaintiffs' allegations fail to satisfy the "in transit" and "contemporaneous" requirements because "it is only *after* the response is received by the visitor's browser that the data is copied and separately transmitted." *Id.* at 7 (emphasis in the original). Rejecting that argument, the Court held that "Defendant's surreptitious, instant separate messages to the third parties (using data-capturing electronic tools) are close enough to the Eleventh Circuit's premonition of 'some type of automatic routing software' for Plaintiffs to at least plausibly establish that Defendant contemporaneously intercepted their electronic communications under the ECPA." *See* ECF No. 59 at 11 (internal quotations and brackets omitted). After arriving at that conclusion, the Court then noted that "Defendant can re-raise this argument on summary judgment based upon a developed factual record." *See id.* at 11. Against that backdrop, Defendant now seeks to circumvent the Court's directive by recycling arguments that the Court has already rejected to limit discovery into server-side tracking mechanisms.[2]

*Third*, Defendant has already acknowledged that the "contemporaneity" requirement only applies to "two of the three claims" at issue here. *See* ECF No. 65 at 2. Those two claims are CIPA § 631 and the Wiretap Act. As background, "[s]ection 631 of CIPA is the state-corollary to the Wiretap Act." *See Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 848 (N.D. Cal. 2014). Because they "are both wiretapping statutes prohibiting the unauthorized interception of

---

[2] Defendant's reliance upon an expert declaration further reinforces the point. In effect, the expert declaration operates as the factual basis for summary judgment on contemporaneity, and Defendant asks the Court to foreclose Plaintiffs from seeking discovery that could contradict or undermine the expert's averments. That approach, if accepted, would fatally undermine the truth-seeking process. As an example, Mr. Vint describes Conversions API as "a server-side alternative to the Facebook Pixel." *See* ECF No. 66-1 at 2. That description is misleading at best. Rather than serving as a "server-side alternative," Meta publicly recommends that companies "use the Conversions API *in addition* to the Meta Pixel," and that they "share the same events using both tools." *See* https://developers.facebook.com/docs/marketing-api/conversions-api/best-practices/. That averment's veracity—or lack thereof—underscores the danger of allowing unverified and untested *ipse dexit* to foreclose further discovery.

communications," claims brought under CIPA § 631 and the Wiretap Act usually arise "from a common nucleus of fact and have similar legal underpinnings." *See Matera v. Google Inc.*, 2016 WL 8200619, at *17 (N.D. Cal. Aug. 12, 2016). Indeed, for many elements, "the analysis … is the same." *Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945, 956 (N.D. Cal. 2024) (internal brackets omitted). Unlike CIPA § 631 and the Wiretap Act, however, CIPA § 632 prohibits "unauthorized electronic eavesdropping on confidential communications." *In re Google Inc.*, 2013 WL 5423918, at *15 (N.D. Cal. Sept. 26, 2013). Although "[a] claim under § 632 bears many similarities to a claim under the federal Wiretap Act," there are substantive differences between "wiretapping" and "eavesdropping" on electronic communications. *See In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 828 (N.D. Cal. 2020). As relevant here, for example, the term "eavesdrop," as used in CIPA § 632, refers expansively to "secretly listening to a conversation between two other parties." *Thomasson v. GC Services Ltd. Partnership*, 321 Fed. App'x. 557, 559 (9th Cir. 2008). By contrast, CIPA § 631 prohibits interceptions "while in transit." *See D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1199 (S.D. Cal. 2024) (quoting Cal. Penal Code § 631). Similarly, the Wiretap Act requires that the interception occur "contemporaneous" with transmission. *See United States v. Steiger*, 318 F. 3d 1039, 1048–49 (11th Cir. 2003). As Defendant has recognized, nothing within CIPA § 632 explicitly or implicitly imports the "contemporaneous" or "in transit" requirements. ECF No. 65 at 2; *L.B. v. LinkedIn*, 2025 WL 2899514, at *17 (N.D. Cal. Oct. 10, 2025) (denying "motions to dismiss Plaintiffs' Section 632 claims" despite finding that "Plaintiffs' allegations do not satisfy … the 'in transit' requirement of CIPA § 631's second clause").

*Fourth*, even if Defendant attempts to argue that CIPA § 632 contains some sort of "contemporaneity" requirement, Plaintiffs still satisfy that standard with ease. As the 11th Circuit noted in *Steiger*, "automatic routing software"—like, for example, server-side code that forwards

the content of communications immediately upon receipt—causes an interception to occur "contemporaneous with transmission." *See Steiger*, 318 F. 3d at 1050. That interpretation also aligns with decisions by federal courts reviewing analogous technology and arriving at the same conclusion. *See, e.g.*, *United States v. Councilman*, 418 F. 3d 67, 85 (1st Cir. 2005) (*en banc*) ("[E]ven under a reading of the ECPA narrower than ours, automatic routing software that automatically forwarded duplicate copies of a user's message would qualify as an interception of E-mail within the prohibition of the ECPA."); *Luis v. Zang*, 833 F. 3d 619, (6th Cir. 2016) (finding that an interception occurred contemporaneous with transmission where the plaintiff alleged that his "instant messages, emails, and other electronic communications were allegedly forwarded to Awareness's own servers in California"); *United States v. Szymuszkiewicz*, 622 F. 3d 701, 706 (7th Cir. 2010) (holding that interceptions by such automatic routing software are "contemporaneous by any standard"); *Klumb v. Goan*, 844 F. Supp. 2d 644, 661 (E.D. Tenn. 2012) (finding that "[p]rogramming a computer, either through the use of spyware or legitimate means, to automatically forward an e-mail upon receipt" was "contemporaneous"); *Zaratzian v. Abadir*, 2014 WL 4467919, at *6 (S.D.N.Y. Sept. 2, 2014) ("Assuming, without deciding, that an interception must be contemporaneous with the communication at issue here—the auto-forwarding of emails received by Zaratzian's email account to Abadir's email account—satisfies that standard.").

*Fifth*, and finally, even assuming CIPA § 632 has a contemporaneity requirement and Conversions API fails to meet that requirement, the server-side code would still satisfy the "in transit" requirement under CIPA § 631. For CIPA § 631, an interception must occur while the underlying communication "is in transit … **or** is being sent from, or received at any place within this state." *See* Cal. Penal Code § 631 (emphasis added). As evinced by the statutory text, CIPA § 631 contemplates and regulates interceptions that occur "after a communication reaches its

destination" so long as "the technology has the effect of permitting real-eavesdropping on electronic communications." *See Smith v. Rack Room Shoes*, 3:24-cv-06709-RFL, ECF No. 163 at 5-6 (N.D. Cal. Jan. 23, 2026); *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (noting that CIPA § 631 was likely intended to proscribe "attempts to circumvent other aspects of the Privacy Act, e.g., by requesting a secretary to secretly transcribe a conversation over an extension").[3]

## II. DEFENDANT FAILS TO SUPPORT ITS OBJECTIONS TO NON-PARTY DISCOVERY REVEALING THE IDENTITY OF CLASS MEMBERS

Defendant objects to Plaintiffs receiving non-party discovery that reveals "the identities of (or private information about) putative class members." *See* ECF No. 65. At first blush, there is some support for Defendant's position. Indeed, for pre-certification discovery, courts tend to follow the general rule that "[d]iscovery of class members' identities prior to class certification is not favored" because "plaintiffs' attorneys may be seeking the information to solicit new clients, rather than to establish the propriety of certification." *See Hankinson v. Class Action R.T.G. Furniture Corp.*, 2016 WL 1182768, at *2 (S.D. Fla. Mar. 28, 2016). But as courts have also noted, "[t]his general rule does not apply … when the personally identifying information becomes relevant to class certification issues." *SASB Corp. v. Medical Sec. Card. Co.*, 2023 WL 2924868, at *1 (S.D. Fla. Apr. 13, 2023). And here, as outlined below, the "personally identifying information" may prove integral to establishing predominance, manageability, and typicality.

At present, Plaintiffs will likely seek to certify some variation of the following nine classes:

1. **Purchaser Class – Meta**: All individuals who purchased veterinary medicine on PetMeds' website while located in California from October 2021 to present.

[3] During the hearing last week, the Court requested an update on meet and confer efforts with Meta. On January 29, 2026, Plaintiffs met and conferred with Meta on the search for responsive materials concerning Plaintiffs and whether they intended to search and produce event data sent using Conversions API and associated with the Pixel IDs that Plaintiffs identified. Meta confirmed its agreement "to search for event data received via both the Meta Pixel and Conversions API."

2. **Purchaser Class – Attentive**: All individuals who purchased veterinary medicine on PetMeds' website while located in California from September 2023 to present.
3. **Purchaser Class – Zeta**: All individuals who purchased veterinary medicine on PetMeds' website while located in California from January 2021 to present.
4. **Interception Class – Meta**: All individuals whose event data was received by Meta Platforms, Inc., while purchasing veterinary medicine on PetMeds' website from October 2021 to present.
5. **Interception Class – Attentive**: All individuals whose event data was received by Attentive Mobile, Inc., while purchasing veterinary medicine on PetMeds' website from September 2023 to present.
6. **Interception Class – Zeta**: All individuals whose event data was received by Zeta Global, Inc., while purchasing veterinary medicine on PetMeds' website from January 2021 to present.
7. **Interception Class – Meta, California Sub-Class**: All individuals whose event data was received by Meta Platforms, Inc., while in California and while purchasing veterinary medicine on PetMeds' website from October 2021 to present.
8. **Interception Class – Attentive, California Sub-Class**: All individuals whose event data was received by Attentive Mobile, Inc., while in California and while purchasing veterinary medicine on PetMeds' website from September 2023 to present.
9. **Interception Class – Zeta, California Sub-Class**: All individuals whose event data was received by Attentive Mobile, Inc., while in California and while purchasing veterinary medicine on PetMeds' website from January 2021 to present.

As relevant here, Plaintiffs served the subpoenas to primarily support the "interception" classes, collectively representing six of the nine classes that they will seek to certify. To support those classes, Plaintiffs served subpoenas seeking relevant information—i.e., event data, identifiers, location information, and consent settings—for themselves and putative class members alike. To be sure, Plaintiffs believe—and, if necessary, will argue—that responsive information concerning themselves is more than sufficient to support class certification. As explained below, it is Defendant, not Plaintiffs, asserting otherwise and rendering non-party discovery that incidentally yet necessarily identifies class members both appropriate and highly relevant.

To start, Plaintiffs allege that they are California residents who "purchased veterinary medicine." *See* FAC ¶¶ 7, 8. Plaintiff Cobbs, for example, alleges she visited PetMed's website

"[o]n October 29, 2024," and "purchased veterinary medicine for her Chihuahua mix named Kona." *See id.* ¶ 7. Similarly, Plaintiff Kawaminami alleges that, "[o]n February 6, 2025," she "purchased veterinary medicine for her Savannah cat named Jabari." *See id.* ¶ 8. During those visits, Plaintiffs allege that "Defendant assisted third parties—including, for example, Meta, Attentive, and Zeta—with intercepting [their] electronic communications," including "communications that contained veterinary information and personally identifiable information." *See id.* ¶¶ 7, 8. On January 29, 2026, Plaintiffs produced a trove of documents verifying their purchase and demonstrating that one of the alleged interceptors, Meta Platforms, Inc., received the content of their communications while they navigated Defendant's website. To establish the latter, Plaintiffs produced parts of their "Off-Facebook Activity Report," which sets forth "a summary of information Facebook receive[d] about [their] activity" on PetMeds' website. Although far from comprehensive in scope, the OFA Report offers a glimpse at the information that Meta received through the Pixel and Conversions API, revealing, for example, that Meta intercepted the content of Plaintiff Cobbs' communications while purchasing veterinary medicine on October 29, 2024. *See* Figure 1, *infra*. Similarly, the OFA report for Plaintiff Kawaminami confirms that Meta intercepted the content of her communications while purchasing veterinary medicine on September 4, 2024. *See* Figure 2, *infra.* Defendant has also produced documents demonstrating that the company maintains customer records—like, for example, phone numbers, email addresses, home addresses—along with location information that Defendant can associate with a purchase.

**<u>Figure 1-2 (OFA Report)</u>**

**PetMeds**

Events

| | |
|---|---|
| ID | 987731814572377 |
| Event | PAGE_VIEW |
| Received on | Feb 03, 2025 1:11:00 pm |
| ID | 987731814572377 |
| Event | PAGE_VIEW |
| Received on | Oct 29, 2024 1:51:00 pm |

| | |
|---|---|
| ID | 987731814572377 |
| Event | PURCHASE |
| Received on | Sep 04, 2024 7:10:00 pm |
| ID | 987731814572377 |
| Event | VIEW_CONTENT |
| Received on | Sep 04, 2024 6:50:00 pm |
| ID | 987731814572377 |
| Event | ADD_TO_CART |
| Received on | Aug 04, 2024 12:43:00 pm |

On the merits, the subpoenas will provide Plaintiffs with more granular insight into the information that the third parties received, thereby identifying with precision the instances in which the third parties intercepted "form field entries, the text of buttons clicked, [or] full-string URLs." *See* MTD Order at 13 (quotations omitted); *compare* Figure 1-2, *supra*, *with* FAC ¶¶ 45–53. After receiving such information, Plaintiffs will have much of what they need to support individual claims. Plaintiffs also contend that this information is sufficient to support class certification. As made clear through an expert report and discovery responses, however, Defendant disagrees with that conclusion. Both the report and responses, for example, seek to establish that the configuration for the tracking technologies—in other words, what Defendant has designed them to collect—can change over time and create "variability" impacting what information the third parties ultimately receive for each putative class member. Put differently, Defendant seeks to argue that changes in configuration foreclose Plaintiffs from extrapolating their interceptions to other putative class members. To be sure, Plaintiffs intend to challenge those conclusions and ultimately move to exclude Mr. Vint's opinion. But still, Defendant cannot raise an argument here—i.e., that Plaintiffs cannot certify a class because changes to the configurations introduces

too many differences between transmissions—and then seek to exclude non-party discovery disproving precisely as much. And because Plaintiffs specifically allege that the interceptions "contained their personally identifiable information," this is exactly the scenario in which discovery revealing class members' identities is appropriate. *See* FAC ¶ 106. Put together, because "th[e] defense strategy necessarily implicates the identities of absent class members," Defendant cannot use the "general rule" against revealing class members' identities as both sword and shield. *See SASB Corp.*, 2023 WL 2924868, at *1. Accordingly, Plaintiffs properly seek discovery that may incidentally reveal personally identifiable information for putative class members because such information is highly relevant to class certification.[4]

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to discovery that concerns server-side tracking tools or that incidentally reveals personally identifiable information.

Dated: February 4, 2026

Respectfully submitted,

MARCUS RASHBAUM PINEIRO & MEYERS LLP
By: ***Christopher R. Reilly***
Christopher R. Reilly, Esq.
Florida Bar No. 1025097
creilly@mrpfirm.com
Michael A. Pineiro, Esq.
Florida Bar No. 41897
mpineiro@mrpfirm.com

One Biscayne Tower
2 S. Biscayne Blvd., Ste. 2530
Miami, Florida 33131
Telephone: (305) 400-4260

LEVIN LAW, P.A.
Brian Levin

[4] If helpful or necessary, Plaintiffs are more than amenable to filing the expert report and interrogatory responses under seal for the Court's consideration.

Florida Bar No. 26392
brian@levinlawpa.com
Jacob Polin*
jpolin@levinlawpa.com
2665 S Bayshore Dr., Ph. 2B
Miami, Florida 33133
Telephone: (305) 402-9050

*Attorneys for Plaintiffs*
**Pro Hac Vice Forthcoming*