UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 25-80458-CIV-CANNON/Reinhart

**KRISTIN COBBS** and
**LYNNE KAWAMINAMI,**
,
*individually and on behalf of all others similarly situated*,

Plaintiffs,

v.

**PETMED EXPRESS, INC.**,

Defendant.
______________________________________/

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

STATEMENT OF FACTS AND LEGAL THEORIES ..... 2

I. OVERVIEW & THEORY OF LIABILITY: CIPA § 631 ..... 2

LEGAL STANDARD ..... 11

ARGUMENT ..... 11

I. PLAINTIFFS ADEQUATELY ALLEGE STANDING ..... 11

A. Plaintiffs Possess Standing to Bring Claims under the Wiretap Act ..... 12

B. Plaintiffs Possess Standing to Bring Claims Under CIPA § 631 & CIPA § 632 ..... 17

II. PLAINTIFFS ESTABLISH ASCERTAINABILITY ..... 18

III. PLAINTIFFS ESTABLISH NUMEROSITY ..... 19

IV. PLAINTIFFS ESTABLISH THE COMMONALITY REQUIREMENT ..... 20

V. PLAINTIFFS ESTABLISH THE TYPICALITY REQUIREMENT ..... 21

VI. PLAINTIFFS ESTABLISH ADEQUACY OF REPRESENTATION ..... 23

VII. PLAINTIFFS ESTABLISH PREDOMINANCE ..... 23

CONCLUSION ..... 27

# INTRODUCTION

PetMeds is a direct-to-consumer pet pharmacy and online provider of prescription and non-prescription medications. Beginning in 2021, PetMeds integrated tracking technology into its website that was designed to intercept the content of consumers' communications, including what they clicked on and what they purchased. As a licensed pharmacy, PetMeds was legally prohibited from disclosing this information. And yet, despite those legal obligations, PetMeds expanded their surveillance efforts between 2021 and 2025, integrating and activating numerous other tracking technologies into its website, including the Attentive Tag and Zeta Pixel.

As set forth below, Plaintiffs have alleged and established that PetMeds engaged in a concerted and systemic pattern of assisting third parties with eavesdropping and intercepting the contents of Plaintiffs' and class members' confidential communications. Because this conduct extends across individuals who purchased veterinary medications on PetMeds' website, Plaintiffs seek to appoint their attorneys as class counsel and certify the following classes:

> **Nationwide Class**: All individuals in the United States who purchased prescription medication through 1800petmeds.com from October 25, 2021, to April 10, 2025.
> **Meta Nationwide Subclass:** All individuals in the United States who: 1) purchased prescription medication through 1800petmeds.com from October 21, 2021 to April 10, 2025; 2) completed the purchase using a first name, last name, and email address that is associated with a Facebook account; and 3) appears in Meta's records with a purchase event for a Content ID associated with prescription medication.
> **California Class:** All individuals who purchased prescription mediation through 1800petmeds.com with a shipping address in California from October 21, 2021, to April 10, 2025.
> **Meta California Subclass**: All individuals who: 1) purchased prescription medication through 1800petmeds.com with a shipping address in California from October 21, 2021 to April 10, 2025; 2) completed the purchase using a first name, last name, and email address that is associated with a Facebook account; and 3) appears in Meta's records with a purchase event for a Content ID associated with prescription medication.

## STATEMENT OF FACTS AND LEGAL THEORIES

Before outlining the elements for class certification, Plaintiffs will begin by first describing the facts and legal theories that they will present at summary judgment and trial.

### I. OVERVIEW & THEORY OF LIABILITY: CIPA § 631

CIPA § 631 contains "four clauses," all of which are relevant here. *See Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021). The first clause reads as follows:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electronically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument … is punishable … by imprisonment.

By its plain terms, the first clause "forbids all unauthorized connections whether made for the purpose of intercepting communications or not." *See Electronic Surveillance in California: A Study in State Legislative Control*, 57 Cal. L. Rev. 1189, 1201 (1968).[1] Although this categorical ban on "unauthorized connections" seeks in part to serve a "property protection role," it "also serves a privacy interest" by operating as a prophylactic prohibition that "prevents the surreptitious interception of telephone conversations." *See id.* As courts have noted, however, the first clause "expressly requires that the unauthorized 'connection' be made with 'any telegraph or telephone wire, line, cable, or instrument.'" *See In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 825 (N.D. Cal. 2020) (quoting Cal. Penal Code § 631(a)). For that reason, "the first clause of Section 631(a) does not apply to internet communications." *See Heiting v. Taro Pharmaceuticals USA, Inc.*, 728 F. Supp. 3d 1112, 1123 n. 8 (C.D. Cal. 2024) (collecting cases).

[1] Attached hereto as Exhibit A. California courts routinely draw from this academic paper when construing the California Invasion of Privacy Act. *See, e.g.*, *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985) (*en banc*); *Flanagan v. Flanagan*, 27 Cal. 4th 766, 768 (2002); *Halpin v. Superior Court*, 6 Cal. 3d 885, 899 n. 16 (1972) (*en banc*); *Tavernetti v. Superior Court*, 22 Cal. 3d 187, 190 (1978 (*en banc*); *Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021); *Warden v. Kahn*, 99 Cal. App. 3d 805, 810 (1979); *Gruber v. Yelp Inc.*, 55 Cal. App. 5th 591, 608 (2020); *Friddle v. Epstein*, 16 Cal. App. 4th 1649, 1661 (1993); *Knight v. CashCall, Inc.*, 200 Cal. App. 4th 1377, 1389 (2011).

The second clause of CIPA § 631(a) reads as follows:

> Any person who … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit … or is being sent from or received at any place within this state … is punishable … by imprisonment.

*See* Cal. Penal Code § 631(a). By its plain terms, the second clause "applies whether or not there is a connection of any kind involved." *See* Note, *Electronic Surveillance in California: A Study in State Legislative Control*, 57 Cal. L. Rev. 1189, 1201–02 (1968). As a corollary, unlike with the first clause of CIPA § 631, "courts have applied the second clause to internet communications." *See Rodriguez v. Ford Motor Co.*, 722 F Supp. 3d 1104, 1116 (S.D. Cal. 2024) (cleaned up). What is more, the second clause not only prohibits "read[ing]" and "learn[ing]" any "message, report, or communication," but also prohibits "attempt[ing] to read" and "attempt[ing] … to learn" any "message, report, or communication." *See* Cal. Penal Code § 631(a). In other words, like the ban on "all unauthorized connections," the second clause serves a prophylactic function by "proscrib[ing] any attempt"—whether successful or not—"to learn the contents of … a communication without the consent of the conversing parties." *See* Note, *Electronic Surveillance in California: A Study in State Legislative Control*, 57 Cal. L. Rev. 1189, 1201 (1968).

The third clause regulates those who receive information through violations of the first or second clause, providing that: "Any person who … uses, or attempts to use, in any manner, or for any purpose, or in any way, any information so obtained … is punishable by a fine … or by imprisonment." *See* Cal. Penal § 631(a). Like the first and second clauses of CIPA § 631, the plain text of the third clause not only prohibits "us[ing] … any information so obtained," but also "attempt[ing] to use … any information so obtained." *Id.* Here too, in other words, the third clause imposes prophylactic protections that serve "a privacy interest." *See Electronic Surveillance in*

*California: A Study in State Legislative Control*, 57 Cal. L. Rev. 1189, 1201 (1968).

The fourth and final clause of CIPA § 631 relates back to all three clauses, extending criminal liability to anyone "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above." Cal. § 631(a). Accordingly, by its plain terms, CIPA § 631(a) extends liability to those who "aid[]," "employ[]," or "conspire[] with" any person or entity who: 1) "makes an unauthorized connection"; 2) "attempts to read, or to learn, the contents or meaning of any message"; or 3) "attempts to use, in any manner, or for any purpose, … any information so obtained." *Id.*

Through a civil action brought pursuant to CIPA § 637.2, Plaintiffs intend to hold Defendant liable under the fourth clause of CIPA § 631 for aiding and abetting certain third parties—Meta, Attentive, and Zeta—with violating the second clause of CIPA § 631. Because liability under the fourth clause hinges on establishing the second clause, Plaintiffs must prove that those third parties: 1) "read[] … the content of any … communication"; 2) "learn[ed] … the content of any … communication"; or 3) "attempt[ed] to read, or to learn, … the content of any … communication." *See* Cal. Penal Code § 631(a). That analysis, in turn, depends on understanding the meaning of three terms—"read," "learn," and "attempts"—that CIPA § 631 leaves undefined. Looking to the ordinary meaning for those terms, the term "read" means "[t]o comprehend or taking the meaning of (something written or printed)." *See American Heritage Dictionary of the English Language*, p. 1085 (1st ed. 1969). The term "learn" means "[t]o become informed of; to find out." *Id.* at 744. And the term "attempts" means "[a]n effort or endeavor to accomplish a crime, amounting to more than mere preparation or planning for it, which, if not prevent, would have resulted in the full consummation of the act attempted, but which, in fact, does not bring to pass the party's ultimate design." *See Black's Law Dictionary* 859 (4th Rev. 1968).

Putting these terms together, CIPA § 631 prohibits a person from endeavoring to comprehend or to find out the "contents" of a communication "while the same is in transit … or is being sent from, or received at any place within this state." *See* Cal. Penal Code § 631(a).

## II. OVERVIEW & LEGAL THEORY OF LIABILITY: CIPA § 632

CIPA § 632 provides as follows:

> A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine … or imprisonment.

Cal. Penal Code § 632(a) (underline added).

The underlined language—i.e., "uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication"—substantially defines CIPA § 632's ambit. *See United States v. Gyetvay*, 149 F. 4th 1213, 1226–27 (11th Cir. 2025) (quotations omitted). Like CIPA § 631, the legislature left key terms undefined. Here too, then, courts must look to their "ordinary or natural meaning[s]." *F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994). The term "uses" is "variously defined as '[t]o convert to one's service,' 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or action by means of.'" *See Dubin v. United States*, 599 U.S. 110, 119 (2023) (quotations omitted). "These various definitions of 'use' imply action and implementation." *See Bailey v. United States*, 516 U.S. 137, 145 (1995). Those definitions have also remained consistent for "over 100 years." *Smith v. United States*, 508 U.S. 223, 229 (1993). The term "eavesdrop," in turn, ordinarily means "to listen secretly to the private conversation of others." *American Heritage Dictionary of the English Language*, p. 411 (1st ed. 1969). That includes, for example, "the secret monitoring of conversation by third parties." *See Ribas v. Clark*, 38 Cal. 3d 355, 640 (1985). The term "record," by contrast, ordinary means "[t]o set down for

preservation in writing or other permanent form." *American Heritage Dictionary of the English Language*, p. 411 (1st ed. 1969). That includes, for example, "transcrib[ing] the message as it is being received." *See Rogers v. Ulrich*, 52 Cal. App. 3d 894, 897 (1975). And with respect to the term "electronic amplifying or recording device," courts have held that "software qualifies as a device under Section 632." *Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945, 955 (N.D. Cal. 2024).

"Words are to be given the meaning that proper grammar and usage would assign to them." *United States v. Gyetvay*, 149 F. 4th 1213, 1227–28 (11th Cir. 2025) Applying that principle here, the words "to eavesdrops upon or record" function as an adverbial infinitive phrase. Importantly, "[w]here," as here, "an infinitive phrase is used as an adverb modifying a verb, the infinitive phrase is most often understood as conveying the purpose or reason for the action expressed by the verb." *See American Heritage Window Fashions, LLC v. Dep't of Revenue*, 191 So. 3d 516, 520 (Fla. 2d DCA 2016) (parentheticals omitted); *compare* Mark Lester & Larry Beason, *The McGraw–Hill Handbook of English Grammar and Usage*, 107 (2d ed. 2013) ("A particularly easy and reliable test for adverb infinitive phrases that modify verbs is to put *in order* in front of the infinitive.") *with Madaio v. United States*, 2026 WL 835775, at *6 (S.D. Fla. Mar. 26, 2026) (noting that the "ordinary meaning" for "the phrase 'in order to'" was one that "'express[es] a purpose: so as to do or achieve' an 'end or outcome'") (quoting Oxford English Dictionary)

Because "[a]n infinitive phrase expresses purpose," *Tejero v. Portfolio Recovery Associates, L.L.C.*, 993 F. 3d 393, 396 (5th Cir. 2021), the California legislature intended for CIPA § 632 to prohibit a person from "us[ing] an electronic amplifying or recording device" for the purpose of eavesdropping or recording a private communication. And where, as here, "the element involves the nature of his conduct or a result thereof," a person "acts purposely" when "it is his conscious object to engage in conduct of that nature or to cause such a result." *See* Model Penal

Code § 2.02(a)(i). CIPA § 632 thus prohibits a person from "us[ing] an electronic amplifying or recording device" when it is his conscious object to cause that device "to eavesdrop upon or record the confidential communication." *See* Cal. Penal Code § 632.

Critically, there is neither an express nor implied requirement that the intended result—i.e., eavesdropping upon or recording the confidential communication—comes to fruition. In other words, CIPA § 632 "does not make proof of that result a prerequisite to its violation." *See Wilson v. Superior Court*, 227 Cal. App. 4th 579, 593 (2014). Accordingly, whether successful or not, CIPA § 632 prohibits employing a device for the purpose of either listening secretly to a confidential communication or registering such communication on something in reproducible form. *See Wilson*, 227 Cal. App. 4th at 593 (noting that "the phrase 'to procure' is not used as a verb, but as an … adverbial phrase," and that "Subdivision (a) is violated by the employment of others with that objective; it does not make proof of that result a prerequisite to its violation"); *Allison Engine Co. v. Sanders*, 553 U.S. 662, 669 (2008) (analyzing "the infinitive phrase 'to get'" and holding that "'[t]o get' denotes purpose" and that "a subcontractor violates § 3792(a)(2) if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim").

## III. OVERVIEW & THEORY OF LABILITY: THE WIRETAP ACT

The Wiretap Act criminally prohibits "any person" from "intercept[ing] … any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). The Wiretap Act also provides a limited private right of action for "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used." *See* 18 U.S.C. § 2520(a). As evinced by the plain text, a person cannot bring a civil claim under the Wiretap Act without alleging and proving that their communications were "intercepted, disclosed, or intentionally used." *Id.* Put differently,

unlike CIPA § 631 and CIPA § 632, the Wiretap Act requires Plaintiffs to plead and prove "the actual interception of conversations." *See Walker v. Darby*, 911 F. 2d 1573, 1578 (11th Cir. 1990). Notwithstanding that, because "[t]he success of a wiretap ultimately depends upon secrecy and concealment," the Eleventh Circuit has recognized that "[d]irect evidence may not be available." *Scutieri v. Paige*, 808 F. 2d 785, 790 (11th Cir. 1987). For that reason, the 11th Circuit permits litigants to establish an interception "with circumstantial evidence" and "without proving the contents of specific conversations allegedly intercepted." *See Walker*, 911 F. 2d at 1573.

## IV. FACTUAL BACKGROUND & EVIDENTIARY RECORD

Three languages—HyperText Markup Language (HTML), Cascading Style Sheets (CSS), and JavaScript—serve as essential ingredients for a modern website. HTML is a markup language that creates the foundational structure and core content for a website. CSS is a stylesheet language that defines the website's design, including its colors, fonts, and layout. JavaScript is a programming language that enables a website to act interactively and dynamically. When a browser sends a request to a server for a particular website, the server responds by sending the HTML document. *See* Ex. B (hereinafter "Good Report") ¶ 78. Once received, the browser reads the HTML document and then makes a series of additional requests to the server for linked resources—like, for example, images, CSS files, and JavaScript files—where instructed. *See id.* ¶¶ 69–82. Once that process is complete, the website is fully rendered. *See id.*

To monitor consumers across the internet, third-party marketers and advertisers offer proprietary snippets of JavaScript—also known as tags, pixels, or beacons—that companies can configure and integrate into their websites. *See id.* At a commercial level, the *quid pro quo* is straightforward. By developing the base code for pixels and tags, advertisers and marketers create the vehicle for ingesting and dissecting the raw materials that they rely on to ascertain a person's

intent and interests. *See id.* ¶ 108–15. By customizing and activating those snippets of JavaScript, companies can pay those third parties to run advertising and marketing campaigns that target customers—both existing and prospective—with unsettling precision. *Id.* This basic, symbiotic arrangement is why online advertising revenue has grown from $21.2 billion to $300 billion in less than two decades. *See* Ex. C, D.

As online advertising has exploded in popularity, so too has the number of tags and pixels that companies now deploy. Many companies—[redacted]—organize and control these pixels and tags through Google Tag Manager. *See* Ex. E. Like the pixels and tags themselves, Google Tag Manager is also a snippet of JavaScript. *See* Ex. F. Once integrated into a website, companies no longer need to directly link pixels and tags within their HTML documents. *See* Ex. E. Instead, companies place those pixels and tags within a web-based interface for Google Tag Manager. *See id.* Through that interface, companies dictate how and when the pixels and tags will operate, including whether to pause or activate them. *See* Ex. F. From the browser's perspective, this sequence looks akin to a nested doll: 1) a browser requests the HTML document for a particular webpage; 2) the responding server sends the HTML document; 3) the browser follows instructions within the HTML document to request the JavaScript file for Google Tag Manager; 4) the responding server sends the JavaScript file; 5) the browser follows the instructions within that file and requests additional JavaScript files for pixels and tags; 6) the server sends those JavaScript files; and 7) the browser follows instructions within those files and sends information to the servers for the third-party marketers and advertisers. *See, e.g.*, Good Report ¶ 80, Figure 4.

Three of the four tracking technologies here—the Meta Pixel, the Attentive Tag, and the Zeta Pixel—are pieces of JavaScript that PetMeds integrated into its website [redacted] *See* Exs. G, H, I, J, K. Attentive, Zeta, and Meta designed these tracking technologies

to bundle information about a user's activities with identifiers enabling the third parties to target that consumer on an individual level. *See* Good Report ¶¶ 85–119. PetMeds also configured these tracking technologies to collect specific pieces of event data, including information that revealed "what a user viewed, selected, added to cart, and purchased." *See id.* ¶ 107. Once configured, PetMeds deployed and activated those snippets of JavaScript [redacted] As a result, each time a browser requested and received one of PetMeds' webpages, the HTML document for that webpage [redacted] and triggered a chain reaction that ultimately instructed the browser to fetch the JavaScript for the Meta Pixel, Attentive Tag, and Zeta Pixel. Those tracking technologies then instructed the browser to pair event data with identifying information—including any identifying information within certain first- or third-party cookies—and to send that package to the third parties for targeted advertisements and marketing campaigns.

The fourth and final tracking technology, Conversions API, worked in tandem with the Meta Pixel, collecting the same information about a consumer's activities—including information that revealed the substance of communications—along with identifiers that enabled Meta to target that consumer on an individual level. Unlike client-side tracking tools like the Meta Pixel, however, Conversions API relies on a software layer that creates a direct connection between PetMeds' servers and Meta's servers, thereby "increasing reliability and data completeness" by being "more resilient to browser limitations and ad blockers." *See* Ex. L.

Plaintiffs served subpoenas on Meta, Attentive, and Zeta and supplied them with the contact information within Defendant's records. On February 14, 2026, Meta produced a spreadsheet with event data that it collected from PetMeds' website through the Meta Pixel and Conversions API. *See* Exs. M, N. Attentive and Zeta disclaimed the ability to locate records for any class members—not just Plaintiffs—using contact information.

## LEGAL STANDARD

At the outset, "the district court must determine that at least one named representative has Article III standing to raise each class subclaim." *See Prado-Steiman ex rel. Prado v. Bush*, 221 F. 3d 1266, 1279 (11th Cir. 2000). After making that determination, "[a] district court must conduct a rigorous analysis of the rule 23 prerequisites." *Vega v. T-Mobile USA, Inc.*, 564 F. 3d 1256, 1266 (11th Cir. 2009) (quotations omitted). "Ascertainability is an implied prerequisite of Rule 23." *See Cherry v. Domestic Corp.*, 986 F. 3d 1296, 1302 (11th Cir. 2021). If the class definitions satisfy the ascertainability requirement, courts next evaluate "the prerequisites of numerosity, commonality, typicality, and adequacy of representation specified in Rule 23(a)." *See Murray v. Auslander*, 244 F. 3d 807, 810 (11th Cir. 2001). "In addition to the requirements of Rule 23(a), before a class can be certified, at least one of the alternative requirements of Rule 23(b) must be satisfied." *Piazza v. Ebsco Industries, Inc.*, 273 F. 3d 1341, 1346 (11th Cir. 2001). "Rule 23(b)(3) has two elements: (1) predominance, and (2) superiority." *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 694 (S.D. Fla. 2014). "The Rule 23(b)(3) predominance inquiry tests whether proposes classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "Superiority is determined where the moving party can demonstrate increased efficiency through the class mechanism." *C-Mart, Inc. v. Metropolitan Life Ins.*, 299 F.R.D. 679, (S.D. Fla. 2014) (quotations omitted). "The burden of proof to establish the propriety of class certification rests with the advocate of the class." *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F. 3d 1181, 1187 (11th Cir. 2003).

## ARGUMENT

### I. PLAINTIFFS ADEQUATELY ALLEGE STANDING

"Any analysis of class certification must begin with the issue of standing." *Prado-Steiman*,

221 F. 3d at 1279 (quotations and brackets omitted). "[A]t the class certification stage only the named plaintiffs need have standing." *Green-Cooper v. Brinker Int'l, Inc.*, 73 F. 4th 883, 888 (11th Cir. 2023). "[T]he irreducible constitutional minimum of standing contains three elements: injury in fact, causation, and redressability." *Diamond Alternative Energy, LLC v. Environmental Protection Agency*, 606 U.S. 100, 111 (2025) (quotations omitted). "The foremost standing requirement is injury in fact." *Trichell v. Midland Credit Mgmt, Inc.*, 964 F. 3d 990, 996 (11th Cir. 2020) (quotations omitted). "A plaintiff has injury in fact if he suffered an invasion of a legally protected interest that is concrete, particularized, and actual or imminent." *Nicklaw v. Citimortgage, Inc.*, 839 F. 3d 998, 1002 (11th Cir. 2016). "To be concrete, the injury must be real, and not abstract." *See Sierra v. City of Hallandale Beach, Florida*, 996 F. 3d 1110, 1113 (11th Cir. 2021) (quotations omitted). "The most obvious concrete harm is a physical injury or financial loss." *See Hunstein v. Preferred Collection and Mgmt Services, Inc.*, 48 F. 4th 1236, 1243 (11th Cir. 2022). "[I]ntangible harms may also be concrete." *Polelle v. Florida Secretary of State*, 131 F. 4th 1201, 1209 (11th Cir. 2025). "Intangible harms are concrete if they bear a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Santos v. Healthcare Revenue Recovery Group, LLC*, 90 F. 4th 1144, 1151 (11th Cir. 2024) (quotations omitted). "Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

**A. Plaintiffs Possess Standing to Bring Claims under the Wiretap Act**

"Intrusion upon seclusion consists of an (i) intentional intrusion (ii) into another's solitude or seclusion, (iii) which would be highly offensive to a reasonable person." *See Drazen v. Pinto*, 74 F. 4th 1336, 1345 (11th Cir. 2023). When determining "whether an asserted intangible injury can satisfy Article III's concreteness requirement," courts "consider only whether the asserted

harm is 'similar in kind' to the traditional harm; the injuries need not be of the same 'degree' or severity." *See Polelle*, 131 F. 4th at 1209. Applying that principle here, courts in the Eleventh Circuit and elsewhere "have declined to consider the *degree* of offensiveness required to state a claim for intrusion upon seclusion at common law." *Drazen*, 74 F. 4th at 1334 (collecting cases from "seven of our sister Circuits"). As a corollary, "a plaintiff whose Article III standing is analogized to the common law tort of intrusion upon seclusion need not establish that the intrusion is 'highly offensive' to a reasonable person." *See Cobbs*, 2026 WL 905375, at *3.

Through direct evidence, Plaintiffs and class members have adequately established four allegations that collectively support their standing to bring claims under the Wiretap Act. [2]

*First*, Plaintiffs and class members have established that "Defendant customized, configured, deployed, and intentionally integrated the computer code that intercepted electronic communications … while they accessed and navigated Defendant's website." *See* FAC ¶ 133; Good Report ¶ 68–82 (describing how tracking technologies "are embedded by the website operator into the page source" and how "PetMeds actively configured and deployed [the] third-party trackers"); Exs. H, G, O, P (showing source code for the relevant tracking technologies); Ex. I (establishing that the Attentive Tag and Zeta Pixel were among the "234 tags in GTM" in March 2025); Exs. J, K [redacted] Ex. Q (establishing that PetMeds never "deleted," "paused," or "removed" the Meta Pixel, Attentive Tag, or Zeta Pixel during the applicable class periods).

[2] Although only Plaintiffs must demonstrate standing at this juncture, the Supreme Court has also recognized that ultimately "[e]very class member must have Article III standing in order to recover individual damages." *See TransUnion v. Ramirez*, 594 U.S. 413, 430–31 (2021). Moreover, "whether absent class members can establish standing may be exceedingly relevant to the class certification analysis required by Federal Rule of Civil Procedure 23." *Cordoba v. DirectTV, LLC*, 942 F. 3d 1259, 1273 (11th Cir. 2019). For purposes of efficiency, Plaintiffs collectively analyze Article III standing for themselves and putative class members.

*Second*, Plaintiffs and class members have established that Defendant configured the tracking technologies to collect the content of their communications, including "full-string URLs, form field entries, [and] the text of buttons clicked." *See* FAC ¶ 138; Good Report ¶ 18 (noting that PetMeds "configured and deployed" the tracking technologies to intercept the content of their communications, including "what a user viewed, selected, added to cart, and purchased"); *id.* ¶¶ 118 (noting that "the data transmitted to Meta, Zeta, and Attentive includes structured event data tied to user activity," like "Page views," "Product identifiers and product names," "Item price and brand," "Add-to-cart events," and "Purchase Events"); Exs. H, G (showing the source code for the Meta Pixel, Attentive Tag, and Zeta Pixel); Ex. O (showing current version of Conversions API).

*Third*, Plaintiffs and class members have established that PetMeds "paid the third parties here—Meta, Attentive, and Zeta Marketing—for services and products that relied on analyzing or otherwise exploiting Plaintiffs' and Class members' personal information and their activity on Defendant's website." *See* FAC ¶ 133; *see* Ex. R [redacted]; Ex. S (showing that PetMeds spent about $35,000 to $40,000 each week—i.e., about $1.8 million to $2.1 million annually—on advertising through Meta); Ex. T [redacted]

*Fourth*, Plaintiffs and class members have established that they "reasonably expected that their communications with Defendant would remain confidential." *See* FAC ¶ 32; Ex. U (analyzing the "[t]op values & drivers" for their target audience and finding that "[o]beying laws and fulfilling obligations" was number one); Ex. V (describing 25% of their target audience as "[e]mpty nesters who see pets as children and spend accordingly" and another 17% as individuals

who likewise view themselves as "Parent/Guardian"); Ex. W (finding that "nearly all U.S. pet owners (97%) say their pets are part of their family" and "[a]bout half of pet owners (51%) not only consider their pets to be a part of their family but say they are as much a part of their family as a human member"); Cal. Bus. & Prof. § 4040(2) (providing that the State Board of Pharmacy regulates any company that processes or fulfills "prescriptions," including those from a "veterinary"); Cal. Code Regs. Tit. 16, § 1764 (forbidding pharmacists from "exhibit[ing], discuss[ing], or reveal[ing] the contents of any prescription").

Put together, Plaintiffs and class members—i.e., all individuals who purchased prescription medicine through PetMeds' website during the applicable time periods—have established through circumstantial evidence that PetMeds "engaged in violations of the Wiretap Act by closely assisting third parties with intercepting [their] confidential communications." *See* FAC ¶ 133. At this stage, "[n]o more is required" to demonstrate "that they have suffered an injury-in-fact sufficient to confer Article III standing." *See Cobbs*, 2026 WL 905375, at *4.

As previewed through an affirmative defense, Defendant will likely assert that Plaintiffs and class members "have not suffered any injury-in-fact that is fairly traceable to the conduct of PetMeds." *See* ECF No. 76 at 22. To support that conclusion, Defendant will likely raise one of two arguments. *First*, Defendant may argue that Attentive and Zeta have indicated that they cannot use direct identifiers—like, for example, an email address or phone number—to determine whether they intercepted the content of confidential communications. *Second*, Defendant may likely point to its expert, James Vint, who opines that variables can prevent the interception from being effectuated. Both arguments would attempt to dispute Plaintiffs' ability to circumstantially prove an interception on the merits and an intrusion for purposes of Article III standing. Both arguments would also run headlong into a decision from the Northern District of Georgia holding otherwise.

In *Awbrey v. Great Atlantic & Pac. Tea Co.*, 505 F. Supp. 604 (N.D. Ga. 1980), the court reviewed and rejected arguments similar to those that Defendant may raise for Attentive and Zeta:

> Defendant strenuously argues that after (up to) twenty-nine months of discovery, plaintiffs have produced no evidence that any of them has ever had a wire communication intercepted, disclosed or used. That contention, along with argument in the motion and the brief, is somewhat misleading. It would be more accurate to say that plaintiffs have not produced evidence of a single specific phone call which was overheard by means of a wiretap. However, there is evidence in the record that wiretaps were installed on store business phones by defendant's employees in stores where plaintiffs worked, at the time they worked; that most if not all of the plaintiffs made personal phone calls on a daily basis from the tapped telephones during the period the tap was in place; and that, at times, at least, phone calls were tapped, recorded, and replayed later on an indiscriminate basis. … That the [Wiretap Act] provides for liquidated damages 'at the rate of $100 a day for each day of violation' clearly contemplates the sort of continued, indiscriminate wiretapping of private telephone conversations plaintiffs have alleged here.

*Id.* at 605–7. Here, as in *Awbrey*, Plaintiffs and class members have established that PetMeds assisted third parties with intercepting the content of their confidential communications "on an indiscriminate basis." *Id.* Just like in *Awbrey*, then, Plaintiffs have adequately alleged and established "the sort of continued, indiscriminate wiretapping" that properly supports an actual interception under the Wiretap Act and an actual intrusion for purposes of Article III standing. *Id.*; *Walker*, 911 F. 2d at 1578 (noting that the 11th Circuit has "adopted the *Awbrey* reasoning" and "held that plaintiffs could establish a wiretapping claim with circumstantial evidence"); *Scutieri*, 808 F. 2d at 790 (citing *Awbrey* for the proposition that "[d]irect evidence may not be available based on the stealthiness of the invasion," especially where there exists "a closely-knit group of individuals … who conspired in [the] illegal wiretapping"); *McCann v. Iroquois Memorial Hosp.*, 622 F. 3d 745, 752 (7th Cir. 2010) ("[T]he plaintiffs need not produce direct evidence of the intentional interception; for often the only way to prove that a stealthy interception occurred is through circumstantial evidence."); *DirecTV Inc. v. Robson*, 420 F. 3d 532, 537 (5th Cir. 2005) ("Circumstantial evidence can support a finding that a communication was intercepted, even

absent direct evidence."); *DirecTV, Inc. v. Gaeta*, 2005 WL 8155328, at *2 (S.D. Fla. Aug. 8, 2005) ("[P]roof of actual, personal interception is not required.")

Even if direct evidence was necessary to state a claim, Plaintiffs have established that Meta intercepted the content of their confidential communications through Conversions API. *See* Ex. L (noting that Conversions API is a server-side tracking method). Plaintiff Kawaminami and the Meta Subclass members can also successfully demonstrate that Meta not only intercepted and received the content of their confidential communications but also successfully associated that information with their Facebook accounts. *See* Exs. M, N.

**B. Plaintiffs Possess Standing to Bring Claims Under CIPA § 631 & CIPA § 632**

Plaintiffs have established that PetMeds "aid[ed]" third parties with "read[ing], or attempt[ing] to read, or to learn" the content of their confidential communications. *See* Cal. Penal Code § 631(a); Good Report ¶ 82 ("[T]he third-party code attempts to read or learn the content of a user's communications with a website across technical conditions."); *id.* ¶ 18 ("[T]ransmissions to third parties contained behavior event data tied to specific products, purchase activity, and transaction timing, revealing what a user viewed, selected, added to cart, and purchased.").

To be sure, "attempted conduct normally does not give rise to an intentional tort because the required element of actual harm does not occur." *See Koeppel v. Speirs*, 808 N.W. 2d 177, 184 (Iowa 2011). But importantly, an attempted interception does not presuppose failure; instead, "[a] successful attempt is a rational concept that is well established in the Penal Code." *See People v. Robins*, 44 Cal. App. 5th 413, 421 (2020). In other words, "[a] person may be convicted of an attempt to commit a crime even though that person may have actually completed the crime." *See United States v. Rivera-Relle*, 333 F. 3d 914, 921 (9th Cir. 2003); *see also* Cal. Penal Code § 663. Against that backdrop, an attempt to intercept a private conversation constitutes an actionable

intrusion because "the full benefits of privacy protected by the tort are diminished when a reasonable person believes someone could have listened." *See Koeppel*, 808 N.W. 2d at 182. Numerous courts and treatises are in accord. *See* Prosser, *The Law of Torts*, p. 807–08 n. 4 (1971) (noting that intrusion upon seclusion "extend[s] to eavesdropping upon private conversations by means of wire tapping and microphones," including where "no one listens"); J. Thomas McCarthy, *The Rights of Publicity and Privacy* (2026) (noting that "[t]he vast majority of courts have held that it is not necessary that the defendant actually obtain embarrassing information—or indeed any information at all—about plaintiff"); *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 295 (2009) (finding "the requisite intrusion in the first place" despite noting that "Hitchcock never viewed or recorded plaintiffs inside their offices by means of the equipment he installed both there and in the storage room"); *Friedman v. Martinez*, 252 N.J. 449, 470 (2020) (joining "the courts in many other jurisdictions that have concluded that a victim does not have to present evidence that she was secretly recorded to bring a cause of action for intrusion upon seclusion") (collecting cases).

The same holds true with respect to "us[ing] an electronic amplifying or recording device" for the purpose of eavesdropping upon or recording a confidential communication. Cal. Penal Code § 632; *see Koeppel*, 808 N.W. 2d at 184 ("The secret use of an electronic listening or recording device is abhorrent to the interests sought to be protected by the tort."); *Harkey v. Abate*, 131 Mich. App. 177, 181 (1983) (finding that "the installation of the hidden viewing devices complained of can itself constitute a sufficient wrongful intrusion"); *Kohler v. City of Wapakoneta*, 381 F. Supp. 2d 692, 704 (N.D. Ohio 2005) (finding that "the use or installation of hidden listening devices or cameras was enough to intrude on the seclusion of another").

## II. PLAINTIFFS ESTABLISH ASCERTAINABILITY

Plaintiffs have adequately established ascertainability for their proposed classes because

objective evidence within PetMeds' possession will define who qualifies as a class member.

"Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F. 3d 1302, 1304 (11th Cir. 2012) (quotations omitted). To satisfy that standard, "a plaintiff must show that class members can be identified by reference to objective criteria." *See In re Takata Airbag Product Liability Litig.*, 677 F. Supp. 3d 1311, 1320 (S.D. Fla. 2023). "Class representatives bear the burden to establish that their proposed class is 'adequately defined and clearly ascertainable,' and they must satisfy this requirement before the district court can consider whether the class satisfies the enumerated prerequisites of Rule 23(a)." *Cherry*, 986 F. 3d at 1302 (quoting *Little*, 691 F. 3d at 1302).

Plaintiffs seek to certify four classes, two of which will rely exclusively on consulting objective information within PetMeds' records, including names and shipping addresses. *See* Ex. X (detailing purchase history for Plaintiffs). With respect to the Meta Subclasses, Plaintiff Kawaminami "proposes to (1) obtain records from both [PetMeds] and Facebook and then (2) analyze these records to ultimately identify the proposed Class[es]." *See Jancik v. WebMD LLC*, 2025 WL 560705, at *4 (N.D. Ga. Feb. 20, 2025); *compare* Ex. X (detailing purchase history) *with* Ex. M, N (Meta records). Plaintiffs have thus established that the proposed classes are "capable of being determined and thus ascertainable." *See Jancik*, 2025 WL 560705, at *4.

## III. PLAINTIFFS ESTABLISH NUMEROSITY

Plaintiffs satisfy the numerosity requirement because records safely indicate that more than 40 individuals comprise of the putative classes.

The "numerosity requirement" under Rule 23(a)(1) asks "whether 'the class is so numerous that joinder of all members is impracticable.'" *See Vega v. T-Mobile USA*, 564 F. 3d 1256, (11th

Cir. 2009) (quoting Fed. R. Civ. P. 23(a)(1)). "This requirement does not demand that joinder would be impossible, but rather that joinder would be extremely difficult or inconvenient." *Leszczynski v. Allianz Ins.*, 176 F.R.D. 659, 669 (S.D. Fla. 1997). "[T]he general rule of thumb in the Eleventh Circuit is that 'less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.'" *Kron v. Grand Bahama Cruise Line, LLC*, 328 F.R.D. 698, 700 (S.D. Fla. 2018) (quoting *Cox v. Am. Cast. Iron Pipe Co.*, 784 F. 2d 1546, 1553 (11th Cir. 1986)). "Although mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class." *Evans v. U.S. Pipe & Foundry Co.*, 696 F. 2d 925, 930 (11th Cir. 1983).

Plaintiffs satisfy the numerosity requirement with ease. In August of 2024, PetMeds estimated that 2,003,129 individuals purchased products through its website within the past three years. *See* Ex. Y. PetMeds has also stated in public filings that California is one of eight states that make up 50% of its customer base. *See* Ex. Z. And PetMeds spends between $35,000 and $40,000 a week to retarget customers through Meta. *See* Ex. S. Using "common sense assumptions," Plaintiffs establish the numerosity requirement. *See Leszczynski*, 176 F.R.D. at 669.

## IV. PLAINTIFFS ESTABLISH THE COMMONALITY REQUIREMENT

Plaintiffs establish the commonality requirement because their claims hinge on establishing that Defendant engaged in a systematic scheme impacting all class members.

"Commonality requires that there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams v. Mohawk Industries, Inc.*, 568 F. 3d 1350, 1355 (11th Cir. 2009) (quotations omitted). In other words, "a class action must involve issues that are susceptible to class-wide proof." *Murray*, 244 F. 3d at 811. "The focus is on the 'capacity of a class-wide proceeding to generate common answers apt to drive the resolution of

the litigation.'" *In re Takata*, 677 F. Supp. 3d at 1322 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Notwithstanding that, "even a single common question will do." *See Dukes*, 564 U.S. at 350 (quotations and brackets omitted). "Allegations of a common course of conduct by a defendant affecting all class members will satisfy the commonality requirement." *Shutler v. Citizens Disability LLC*, 347 F.R.D. 663, 672 (S.D. Fla. 2024).

Plaintiffs' claims will hinge on the following common questions of law and fact: 1) whether PetMeds configured the tracking technologies to transmit the content of communications when consumers purchased prescription medicine through PetMeds' website; 2) whether the content of those conversations were confidential; 3) whether PetMeds integrated and activated the tracking technologies on its website during the relevant time period; 4) whether PetMeds assisted the third parties with intercepting their communications for an unlawful and tortious purpose; 5) whether PetMeds contracted with the third parties to run advertising and marketing campaigns that targeted consumers using the content of class members' communications; and 5) whether class members consented to PetMeds assisting third parties with intercepting the content of their communications. Because these questions individually and collectively concern "a standardized course of conduct that affects all class members," Plaintiffs adequately establish commonality. *See Bacon v. Stiefel Laboratories, Inc.*, 275 F.R.D. 681, 691 (S.D. Fla. 2011) (quotations omitted).

## V. PLAINTIFFS ESTABLISH THE TYPICALITY REQUIREMENT

Plaintiffs satisfy the typicality because they will rely on the same evidence and the same legal theories that will also support class members' claims.

"Typicality requires that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Justice v. Rheem Manufacturing Co.*, 318 F.R.D. 687, 694 (S.D. Fla. 2016) (quoting Fed. R. Civ. P. 23(a)(3)). "A class representative must possess the same

interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3)." *Vega*, 564 F. 3d at 1275 (quotations omitted). "Typicality, however, does not require identical claims or defenses." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F. 2d 1332, 1337 (11th Cir. 1984). Instead, "[t]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Busby v. JRHBW Realty, Inc.* 513 F. 3d 1314, 1322 (11th Cir. 2008) (cleaned up). "This nexus exists if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Ault v. Walt Disney World Co.*, 692 F. 3d 1212, 1217 (11th Cir. 2012) (quotations omitted). "A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Kornberg*, 741 F. 2d at 1337. Put differently, "[t]he typicality requirement may be satisfied despite substantial factual differences when there is a strong similarity of legal theories." *Williams v. Mohawk Industries, Inc.*, 568 F. 3d 1350, 1357 (11th Cir. 2009) (quotations and ellipses omitted).

Just like the other class members, Plaintiffs: 1) visited PetMeds' website and purchased veterinary medicine; 2) entered identifying information, including their full name and address; 3) reasonably expected that their communications would remain confidential; and 4) never provided PetMeds with consent to transmit their protected and confidential communications. *See* FAC ¶¶ 7–8; Ex. X (detailing purchase history). And just like every other class member, Plaintiffs have alleged and established that PetMeds "systematically disclose[d] such information to numerous third parties," including Zeta, Attentive, and Meta. FAC ¶ 32. Because class members used the same website and were subject to the same systemic practices, Plaintiffs' claims "are typical of the class[es]." *See Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 574 (N.D. Cal. 2025) (holding that "the proposed class representatives' claims are typical of the class" because "all plaintiffs and class

members used the Flo App and were subject to the same app and SDK practices").

## VI. PLAINTIFFS ESTABLISH ADEQUACY OF REPRESENTATION

Plaintiffs establish the adequacy-of-representation requirement because they have no conflicts and they have demonstrated their ability to vigorously represent class members.

"To satisfy the adequacy of representation requirement of Rule 23(a)(4), a movant must show that 'the representative parties will fairly and adequately protect the interests of the class.'" *Aranaz v. Catalyst Pharmaceutical Partners Inc.*, 302 F. R. D. 657, 666 (S.D. Fla. 2014) (quoting Fed. R. Civ. P. 23(a)(4)). "This 'adequacy of representation' analysis encompasses two separate inquiries: (1) whether any substantial conflict exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co.*, 350 F. 3d at 1189 (quotations omitted). "Adequacy exists where the named plaintiffs share common interests with the class members and seek the same type of relief for themselves as for the class." *In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 672 (S.D. Fla. 2015). "As to the adequacy of counsel for the class representative, absent specific proof to the contrary, the adequacy of class counsel is presumed." *Justice*, 318 F.R.D. at 695 (quotations omitted).

Here, "[t]here is no evidence that the named plaintiffs are inadequate or are situated so differently from the class that they may be subject to a conflict." *Frasco*, 349 F.R.D. at 574 (quotations omitted). Instead, Plaintiffs have extensively engaged in the discovery process, including by sitting for depositions and responding to requests for production. Plaintiffs have thus established that they "will fairly and adequately protect the interests of the class." *See Legg v. Spirit Airlines, Inc.*, 315 F.R.D. 383, 390 (S.D. Fla. 2015) (quoting Fed. R. Civ. P. 23(a)(4)).

## VII. PLAINTIFFS ESTABLISH PREDOMINANCE

Plaintiffs establish predominance because PetMeds engaged in a systemic effort to

eavesdrop on confidential communications that applies equally to class members' claims.

"Rule 23 permits a class action when 'the court finds that the question of law or fact common to the class members predominate over any questions affecting only individual members.'" *Carriuolo v. General Motors*, 823 F. 3d 977, 988 (11th Cir. 2016) (quoting Fed. R. Civ. P. 23(b)(3)). "Rule 23(b)(3)'s predominance requirement is far more demanding than Rule 23(a)'s commonality requirement." *Sellers v. Rushmore Loan Mngmt Services, LLC*, 941 F. 3d 1031, 1039 (11th Cir. 2019). "Common questions 'predominate' within the meaning of Rule 23(b)(3) when the substance and quantity of evidence necessary to prove the class claims won't vary significantly from one plaintiff to another." *Tershakovec v. Ford Motor Co.*, 79 F. 4th 1299, 1307 (11th Cir. 2023). Put differently, "[t]he predominance inquiry is satisfied 'when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis.'" *In re Takata.*, 348 F.R.D. at 516 (quoting *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F. 3d 1248, 1260 (11th Cir. 2003)). "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." *Rutstein v. Aris Rent-A-Car Systems, Inc.*, 211 F. 3d 1228 (11th Cir. 2000).

"The predominance inquiry begins with the elements of the underlying cause of action." *In re Takata*, 348 F.R.D. at 518. To establish their claims under the Wiretap Act, Plaintiffs must demonstrate that PetMeds assisted the third parties with "(1) intentionally (2) intercept[ing] (3) the contents of (4) plaintiffs' electronic communications (5) using a device." *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 794–95 (N.D. Cal. 2022). To establish their claims under CIPA § 631, Plaintiffs must demonstrate that PetMeds 1) "aid[ed], agree[d] with, employ[ed], or conspire[d] with" the third parties 2) for the purpose of "read[ing], or attempt[ing] to read, or to learn" 3) the "content or meaning" of their communications 4) while "the same [was]

in transit … or [was] being sent from, or received at any place within [California]." *See* Cal. Penal Code § 631(a). And to establish their claims under CIPA § 632, Plaintiffs must demonstrate that PetMeds aided and abetted the third parties with 1) "us[ing]" 2) an "electronic amplifying or recording device" 3) to "eavesdrop upon or record" 4) a "confidential communication." *See* Cal. Penal Code § 632; *see also Smith v. YETI Coolers, LLC*, 754 F. Supp. 3d 933, (N.D. Cal. 2024) (noting that "courts have imputed the civil liability standard for aiding and abetting to determine the scope of derivative liability" for claims brought under CIPA § 632).

For the Nationwide Meta Subclass and the California Meta Subclass, Plaintiff Kawaminami will rely on the same information within the same spreadsheets for other class members when demonstrate that Meta not only intercepted the content of their communications but also associated that information with their Facebook accounts. *See* Exs. M, N; *see also Jancik*, 2025 WL 560705, at *9 (reviewing analogous claims and nearly identical evidence and holding that "the Court agrees that [the plaintiff] will use 'common evidence that will not differ in the slightest from one class member to another' in proving each element of the VPPA claim").

For the Nationwide Class and California Subclass, Plaintiffs will establish their claims using the same body of circumstantial evidence: 1) PetMeds configured the tracking technologies to collect the content of their communications; 2) PetMeds deployed and activated the tracking technologies during the relevant time period; and 3) Plaintiffs and class members objectively believed that their communications would remain confidential. *See, e.g.*, Good Report ¶ 107. Defendant's affirmative defenses are also subject to common proof. To the extent Defendant raises the issue of consent, "the evidence of [its] privacy disclosures is common to the class." *See Frasco*, 349 F.R.D. at 569; *see also Torres v. Prudential Fin., Inc.*, 2024 WL 4894289, at *7 (N.D. Cal. Nov. 26, 2024). To the extent Defendant raises the statute of limitations, "the doctrines used by

[P]laintiffs for tolling the statute of limitations, such as the doctrine of fraudulent concealment, involve proof common to [PetMeds], namely, the act of concealing [PetMed's] wrong." *See In re Checking Account Overdraft Litig.*, 307 F.R.D. at 680. Plaintiffs have thus "shown predominance." *See, e.g.*, *Jancik*, 2025 WL 560705, at *9; *see also Frasco*, 349 F.R.D. at 577 (rejecting that statute of limitations defeated predominance where "Flo's representations to each class member were the same, which permits the question of fraudulent concealment to be answered on a classwide basis").

## VIII. PLAINTIFFS ESTABLISH SUPERIORITY

Plaintiffs have established the superiority requirement because a certified class action will serve as the most efficient and effective vehicle for vindicating class members' claims.

"Rule 23(b) requires a class action to be 'superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Kurkever v. TD Ameritrade, Futures & Forex LLC*, 328 F.R.D. 649, 662 (S.D. Fla. 2018) (quoting Fed. R. Civ. P. 23(b)(3)). "This requirement 'turns on whether a class action is better than other available methods of adjudication.'" *Simmons v. Ford Motor Co.*, 592 F. Supp. 3d 1262, 1298 (S.D. Fla. 2022) (quoting *Cherry*, 986 F. 3d at 1304). "[T]here are four factors courts should take into account in making a superiority determination: (A) the interests of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." *Bowe v. Public Storage*, 318 F.R.D. 160, 184 (S.D. Fla. 2015) (brackets omitted). "These factors 'are important and generally should inform courts' analysis,' but analysis of all four is not strictly mandatory in every case." *County of Monroe, Fla. v. Priceline.com, Inc.*, 265 F.R.D. 659, 670 (S.D. Fla. 2010) (quoting *Vega*, 564 F. 3d at 1278, n. 19).

Given the size of the class, "[t]here is no doubt that a class action is the superior method of adjudicating [class members'] claims." *See Frasco*, 349 F.R.D. at 557. Moreover, "[t]hus far, no class members have expressed interest in litigating this case through separate actions; no other pending cases appear to address the current controversy; no one has suggested that [Florida], being where [PetMeds] is located, is an inappropriate forum; and no significant manageability concerns appear to outweigh the manageability concerns that would exist if this case was litigated through separate actions." *See Jancik*, 2025 WL 560705, at *9. Accordingly, "[s]uperiority is satisfied." *See Frasco*, 349 F.R.D. at 557 ("Resolution of the common questions discussed in this order on a classwide basis will promote efficiency by (1) bypassing the need to relitigate identical questions and conduct nearly identical discovery in parallel litigations and (2) avoiding the strain on scare judicial resources that suits by individual Flo App users would impose.").

## CONCLUSION

Plaintiffs' motion for class certification should be granted in full.

Dated: June 22, 2026

Respectfully submitted,

MARCUS RASHBAUM PINEIRO & MEYER LLP
By: ***Christopher R. Reilly***
Christopher R. Reilly, Esq.
Florida Bar No. 1025097
creilly@mrpfirm.com
Michael A. Pineiro, Esq.
Florida Bar No. 41897
mpineiro@mrpfirm.com
One Biscayne Tower
2 S. Biscayne Blvd., Ste. 2530
Miami, Florida 33131
Telephone: (305) 400-4260

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 22, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which caused a copy to be served upon all counsel of record.

*/s/ Christopher R. Reilly*
Christopher R. Reilly