**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

KRISTEN COBBS, LYNNE KAWAMINAMI, and LORETTA SCHWEINSBURG, *individually and on behalf of all others similarly situated,*

*Plaintiff*,

v.

PETMED EXPRESS, INC.,

*Defendant.*

Case No. 9:25-CV-80458-AMC

**DEFENDANT PETMED EXPRESS, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Dated: July 6, 2026

Respectfully submitted,

*s/ Jennifer A. McLoone*
Jennifer A. McLoone (FL Bar No.: 029234)
E-Mail: *jmcloone@shb.com*
Melissa N. Madsen (FL Bar. No.: 65416)
E-mail: *mmadsen@shb.com*
SHOOK, HARDY & BACON L.L.P.
Citigroup Center, Suite 3200
201 South Biscayne Blvd.
Miami, FL 33131
Tel: (305) 358-5171

-and-

Ara K. Ayvazian (FL Bar No.: 1004407)
E-Mail: *aayvazian@shb.com*
SHOOK, HARDY & BACON L.L.P.
100 N. Tampa St., Suite 2900
Tampa, Florida 33602
Tel: (813) 202-7100

***Attorneys for Defendant PetMed Express, Inc.***

Defendant PetMed Express, Inc. ("PetMeds") respectfully submits this response in opposition to Plaintiffs' Motion to Certify Class [ECF No. 105].

## INTRODUCTION

As with other pixel cases that have come before it, Plaintiffs' Motion for Class Certification is due to be denied. *See e.g., Ingraham v. Capital One Financial Corp.*, No. 3:24-cv-05985 (N.D. Cal. June 16, 2026) (denying class certification because of individualized proof); *Doe v. Adventist Health*, 2025 WL 1797226 (Super. Ct. Cal. Los Angeles Cnty. Feb. 14, 2025) (denying class certification for failure to establish predominance, superiority, manageability, typicality, or adequacy); *Griffith v. TikTok Inc.*, 2024 WL 4308813 (C.D. Cal. Sept. 9, 2024) (denying class certification); *Doe v. MedStar Health, Inc.*, 2023 WL 4931348 (Cir. Ct. Baltimore City March 10, 2023) (denying class certification for failure to establish ascertainability, typicality, adequacy, predominance, or superiority).

It is Plaintiffs' burden to establish that <u>in fact</u> class certification is appropriate. Notwithstanding this burden of proof (not pleading), Plaintiffs' Motion relies almost entirely on complaint allegations, unexplained documents, and Plaintiffs' rebuttal expert report (which PetMeds has separately moved to strike). This is an insufficient factual record for the Court to find class certification appropriate, and this Opposition demonstrates that Rule 23 is not satisfied.

## BACKGROUND

Plaintiffs Kristen Cobbs and Lynne Kawaminami[1] have brought this action against PetMeds claiming that PetMeds' use of ubiquitous advertising technology on its public website,

[1] Plaintiff Schweinsberg voluntary dismissed her claims. [ECF No. 72] Indeed, Schweinsburg (whose profile picture is her cat) appears satisfied with PetMeds, as she shared a PetMeds' Facebook coupon on her personal Facebook page on January 1, 2026, while serving as a plaintiff in this lawsuit. *See* Facebook post, attached as Exhibit A.

1800petmeds.com, runs afoul of California wiretapping and eavesdropping statutes and the Federal Wiretap Act. Plaintiffs became aware of these violations not on their own, or because they suffered any harm, but because they responded to Instagram/Facebook ads from Levin Law targeting individuals who had made purchases on 1800petmeds.com. (Cobbs Dep. 21:9-24:5, 28:11-13, attached as Exhibit B, Kawaminami Dep. 24:22-28:6, 51:20-23, attached as Exhibit C) Relying exclusively on their lawyers (Cobbs 28:23-29:3, 32:23-34:24; Kawaminami Dep. 30:6-10, 32:23-34:2, 45:8-49:21), both Plaintiffs contend that through the use of the Attentive tag, the Meta Pixel, the Zeta pixel, and Conversions API "confidential" information was shared with third-parties Attentive, Meta, and Zeta.

## I. PetMeds' Website

At various times throughout Plaintiffs' class period, *see* Mot. Ex. Q, PetMeds deployed an Attentive tag, a Meta Pixel, and a Zeta Pixel on public-facing 1800petmeds.com website.[2] PetMeds used Attentive for multifactor authentication. (Sripad Dep. II 27:24-28:9, attached as Exhibit D). PetMeds used Meta pixel for advertising. (Sripad Dep. II 27:11-13)). PetMeds used Zeta for display advertising. (Sripad Dep. II 28:10-19). PetMeds did not use these technologies for any other purpose. (Sripad Dep. II 28:20-29:5).

Pixels and tags are snippets of javascript code added to a website, for example, 1800petmeds.com, which work in conjunction with cookies. *See e.g.* Vint Dep. 6:21-25, attached

[2] The various dates and configurations are set forth in PetMeds' Supplemental Answer to Interrogatory Number 5, attached to Plaintiffs' Motion as Exhibit Q. In full disclosure to this Court, since the time of that Interrogatory answer, counsel for both parties have become aware that a second Meta pixel (referred to by the parties as the Blotout Pixel) began functioning on a subdomain of 1800petmeds.com shortly after the complaint in this matter was filed. Since becoming aware of this, PetMeds has provided (and is continuing to provide) discovery related thereto. However, the BlotOut pixel was not running on 1800petmeds.com or any subdomain as of the date of either Plaintiffs' purchase as alleged in the complaint, nor was it running on the site during the class period identified in Plaintiffs' Motion (i.e., through April 10, 2025).

as Exhibit. E; Vint Report ¶¶ 49-53, attached as Exhibit F.[3] When a website visitor visits 1800petmeds.com and allows cookies (either through 1800petmeds.com's cookie consent options or through the website visitor's own device or browser settings), various first and third party cookies may come into play. This allows for things like saved passwords on websites (*see e.g.,* Vint Dep. 34:8-35:7), or for information to be shared with third-parties to enable things like cart reminders, or advertising.

Just because pixels are running on a website does not mean that they are always firing. Vint Dep. 149:7-150:22; 159:8-161:15, 167:23-168:15; Vint Report, Section VI. Likewise, just because a pixel fires, that does not mean a cookie value is transmitted to a third party. Vint Report Section VII, VIII. A website visitor may opt out of cookies via a cookie consent banner. Vint Report ¶ 96(e). Similarly, there are any number of device and browser settings that may block cookies and/or stop the firing of pixels. *See e.g.* Sripad Dep. II 24:12-19, 24:24-25:23 (discussing browser extensions that stop pixels from firing); Sripad Dep. II 26:6-22 (discussing browser settings that stop pixels from firing); Vint Report ¶ 48; *see also* Vint Dep. 210:10-212:5.

Moreover, just because a cookie value is transmitted to a third-party, does not mean that information shared is identifiable back to an individual. *See* Vint Report Section VII; *see e.g.,* Vint Dep. 178:20-179:15 (Facebook example) 179:25-180:24 (Facebook example); 182:19-183:11; 193:7-194:25. There are also actions an individual may take such as browsing in incognito mode, visiting websites from different devices or different IP addresses, or clearing cookies, which may make them unidentifiable to a website owner or a third-party.[4] "[I]t is not possible to

[3] Because Mr. Vint's deposition testimony refers to his report, this Opposition attaches his report in full and cites to both the testimony and the report as appropriate.

[4] Even if a pixel fires, information is shared with a third party, and the third party is able to identify that information to a particular individual, that does not mean a wiretapping or eavesdropping violation has occurred, unless the conduct fits the specific criteria of CIPA 631, CIPA 632 or the

determine on an aggregated basis whether a user's page visit information was sent to Facebook and/or Zeta or Attentive while on the Website because of the many variables which can only be known after an individualized inquiry into each user's devices, browsers, and circumstances." Vint Report ¶ 159; *see also id.* ¶¶ 95-97, 154-157, 160; Vint Dep. 138:18-140:8, 140:24-141:7; 155:17-158:2, 158:10-25.

PetMeds also used Conversions API on the 1800petmeds.com website but Meta Conversions API functions differently than other three technologies. (Sripad Dep. I 121:4-22, attached as Exhibit G) Whereas the Attentive tag, Meta pixel, and Zeta pixel are browser-side, Conversions API is a server-side technology. *See* ECF No. 66-1. This means that information first reaches PetMeds's server (i.e., its intended destination) and then is batched and sent to Meta. *Id.*; Vint Dep. 190:14-17. Moreover, no c_user values are included (Vint Dep. 192:4-15).

## II. <u>Kristen Cobbs</u>

On October 29, 2024, Plaintiff Kristen Cobbs visited 1800petmeds.com via a Google search for Simparica Trio, a flea, tick and heartworm preventative that she sought to purchase for her chihuahua Kona. Cobbs visited the website using a Google Chrome browser on her Macbook pro. (Cobbs Dep. 60:15-24) She does not remember specifically how she got to the website (*Id.* 62:12-63:13), does not know which page or pages of the website she visited, nor does she know her browser settings at the time of her visit (*Id.* 61:8-10). Prior to visiting 1800petmeds.com, Cobbs did not do anything to research whether PetMeds had advertising technology running on its site (*Id.* 35:6-9, 88:13-89:3). She did not do anything to protect the privacy of her Google search for Simparica Trio (*Id.* 64:14-22); to the contrary, Cobbs regularly uses browser shopping extensions which track her across websites to offer her cashback or coupon codes (*Id.* 67:18-68:22).

---

ECPA. PetMeds will explain why it does not in merits-based briefing at the appropriate time in this litigation. *See e.g.,* Vint Dep. 148:3-11; Vint Report Section IV(B); IV(C).

Despite filing this lawsuit, Cobbs admits that she does not believe that an actual person at Meta, Attentive or Zeta reviewed Kona's prescription, nor does she believe that an actual person is able to identify her based on her interaction with the PetMeds' website (*Id.* 35:10-14). Cobbs is unsure whether PetMeds shared Kona's prescription information with Meta, Attentive or Zeta (*Id.* 21:20-22:17; 26:1-10; 157:15-18), but believes that, if PetMeds did, it is a statutory violation (*Id.* 22:18-20).

Cobbs admits that, other than the statutory violation, there have been no negative consequences to either her or Kona associated with the conduct at issue in this lawsuit. (*Id.* 145:15-148:6) She has not received any advertising as a result of the conduct at issue. (Ans. to Interrog. No. 21, attached as Exhibit H) Cobbs further admits that she does not have any concern with people knowing that Kona is on the preventative Simparica Trio (Cobbs Dep. 96:21-24). It is just the statutory violation itself that Cobbs is concerned with. (*Id.* 145:15-148:11; *see also id.*. 26:11-27:12; 29:10-22). Despite filing this lawsuit, Cobbs has not changed her practices as it relates to website privacy policies, advertising technology or online shopping. (Cobbs Dep. 89:4-15)

## III. <u>Lynne Kawaminami</u>

On February 6, 2025, Plaintiff Kawaminami purchased prescription hydration items (lactated ringers, IVs and needles) for her Savannah cat Jabari on 1800petmeds.com (Kawaminami Dep. 38:17-25). Although Plaintiff Kawaminami had made purchases on 1800petmeds.com previously (*Id.* 66:18-22), only her February 6, 2025 purchase is at issue in this lawsuit (*Id.* 66:4-16, 70:12-19, 169:23-170:6)

Kawaminami uses her Firefox browser on her home HP desktop computer to visit 1800petmeds.com. (*Id.* 71:6-76:12) She navigates to the website by typing in "PetMeds" into her Firefox browser search bar. (*Id.*) She then selects the website and logs in using her saved

information. (*Id.*; *id. at* 81:7-23) Kawaminami does not know her Firefox security settings (*Id.* 84:7-20), does not clear cookies (*Id.* 86:16-17), does not clear her browsing history (*Id.* 87:2-4) and did not do anything to research the adtech on 1800petmeds.com at the time of her February 6, 2025 purchase (or at any other time) (*Id.* 96:6-22).

Like Cobbs, Kawaminami admits that she has not incurred any financial harm as a result of the conduct at issue (*Id.* 35:25-36:4, 37:4-13) and has not received any advertising as a result (Ans. to Interrog. No. 21, attached as Exhibit I). And while Kawaminami claims that "its very disturbing to think that [her] protected information is out there and being used by third parties" (Kawaminami Dep. 36:5-9), Kawaminami herself has shared information about Jabari's kidney disease publicly on Facebook, how she provides him with fluids (using the prescription products purchased on 1800petmeds.com), and has even posted pictures showing her using those products. (*Id.* 126:14-135:1)

After filing this lawsuit, Kawaminami continues to make purchases on 1800petmeds.com using the same browser and browser settings. (*Id.* 76:13-20, 83:2-13, 87:5-17) She continues shopping on 1800petmeds.com because it is cheaper (*Id.* 181:4-16) She still has not reviewed PetMeds' privacy policy and she has not asked PetMeds to delete any of her information because then she "would have to re-enter all my information"(*Id.* 178:4-179:10).

## IV. <u>PetMeds' Privacy Policy</u>

PetMeds' privacy policy, attached as Exhibit J, discloses the use of cookies on 1800petmeds.com and discloses that information may be shared with third parties for marketing purposes. PetMeds' privacy policy provides that Florida law governs any privacy related disputes.

Cobbs is generally familiar with website privacy policies (Cobbs Dep. 85:20-22) but does not typically look for them on websites (*id.* 86:5-10) and did not review PetMeds' privacy policy

at the time of her October 29, 2024 purchase (*id.* 87:13-16) (despite assuming that there was one (*id.* 87:7-12)). That is because she finds privacy policies "inconsequential" and does not differentiate between websites (or make her shopping decisions) based on privacy policies. (*id.* 86:8-22).

Kawaminami is also generally familiar with website privacy policies and "sometimes" "ha[s] a look" if they pop up; she does not look for them and does not know where to look for them. (Kawaminami Dep. 91:25-93:21) Otherwise, she "just doe[sn't] feel necessarily the need to." *Id.* Kawaminami has never decided against making a purchase online because of a website privacy policy. (*Id.* 177:10-13)

PetMeds' website was redesigned in November 2024. (Sripad Dep. I 70:10-16, 72:18-21) PetMeds' privacy policy is available via a hyperlink in the website footer available on every page of the website. (*Id.* 170:5-6, 170:14-171:5) Links to the privacy policy were also displayed at various points during checkout. *Id.* And during at least some portion of the class period, purchases made on the Website required affirmative consent to the Website privacy policy. *See e.g.* Vint Report ¶¶ 78-80, Good Report (Mot. Ex. B. ¶ 118). Neither Plaintiff recalls the checkout flow at the time of their respective purchases. (Cobbs Resp to RFA Nos. 4-8, 12, 13, 17, attached as Exhibit K; Kawaminami Resp to RFA Nos. 4-8, 12, 13, 17, attached as Exhibit L). Variability in checkout flow, privacy policy and cookie consent are individualized issues. *See* Vint Dep. 173:24-175:23.

## V. <u>PetMeds' Cookie Banner</u>

In states where two-party consent is required, 1800petmeds.com also displays what is commonly referred to as a cookie consent banner. (Sripad Dep. II p. 17:22-18:1, 63:6-25) Cobbs does not recall if she was presented with a cookie consent banner at the time of her October 29,

2024 purchase. (Cobbs Dep. 92:4-13, 17-19; *see also* Cobbs Resp to Req. to Admit Nos. 1-2) But, her common practice (which she believes she followed) is to simply "X" out (or close) any website cookie consent banner. (Cobbs Dep. 92:20-93:3) She does not know the significance of closing out the cookie consent banner (Cobbs Dep. 92:25-93:20); however, ignoring the banner is treated as auto-consent to cookies (Sripad Dep. II 63:6-25).

Kawaminami, on the other hand, claims that her regular practice is to opt-out or decline cookies, although she does not recall whether she was presented with a cookie consent banner when she visited 1800petmeds.com. (Kawaminami Dep. 94:15-95:14; *see also* Kawaminami Resp to Req. to Admit Nos. 1-2)

## VI. Plaintiffs' Claims

In Count I, Plaintiffs' Complaint [ECF No. 21] alleges that PetMeds violated the ECPA (Federal Wiretap Act) because PetMeds "intentionally caused . . . Meta, Attentive, and Zeta – to intercept electronic communications" [ECF No. 21, ¶ 135], and that the interception was done for criminal or tortious purposes [ECF No. 21, ¶ 140]; *see also* ECF No. 59 (describing Plaintiffs' allegations of interception).[5]

In Count II, Plaintiffs' Complaint alleges that PetMeds violated section 631 of CIPA by aiding, agreeing with and conspiring with Meta, Attentive and Zeta to track and intercept Plaintiffs' and Class members' internet communications exchanged with [PetMeds] while accessing [PetMeds'] website." ECF No. 21, ¶ 148. Plaintiffs' Complaint further alleges that Meta, Attentive and Zeta "intercepted these communications without consent from all parties to the communications" [ECF No. 21, ¶ 149] and that "Meta, Attentive and Zeta intended to learn, and

[5] As this Court has already recognized [ECF No. 59], under the ECPA, "intercept" "means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

did learn, some meaning in the content of the communications." ECF No. 21, ¶ 150 (emphasis added); *see also* ECF No. 59 (denying motion to dismiss Count II because "Plaintiffs have sufficiently alleged that the third parties' software intercepted their content-based searches and web-based activity"). Finally, in Count III, Plaintiffs Complaint alleges that PetMeds violated section 632 of CIPA by "aiding and abetting violations" by Meta, Attentive, and Zeta [ECF No. 21, ¶ 157] "to eavesdrop upon or record [a] confidential communication" [ECF No. 59]. Consent is a defense to claims under both section 631 and 632.

## VII. Information at Issue

Plaintiffs' Complaint focuses on the purported sharing of pet prescription information with third parties. However, both Plaintiffs admitted that they did not submit their pets' respective prescriptions through 1800petmeds.com. (Cobbs Dep. 80:1-15; Kawaminami Dep. 79:4-80:4) Instead, Plaintiffs' complaint alleges that prescription information was revealed through full-string URLs captured as Page Views or Content IDs captured with ViewContent or AddToCart events, either along with identifying information or which third parties match to individuals.

Despite these allegations, Plaintiff Cobbs testified that she does not know whether the third parties received her pet's prescription information. Plaintiff Kawaminami testified that the information at issue in this case was "personal information like address, phone number, email, any other information, billing information, cat's medical information." (Kawaminami Dep. 29:18-30:5; *but see* 55:24-56:9 (unsure about billing information)). Plaintiff Kawaminami alternatively believes a data breach occurred and her information was sold to third parties. (Kawaminami Dep. 23:20-25:10)

Plaintiffs' Motion is unclear as to the information intercepted in the Nationwide Class and California Class. Plaintiffs' Meta Class and California Meta Class appear to be limited to

"Purchase" events with ContentIDs associated with prescription medicine (*see e.g.* Mot. Ex. B, ¶¶ 55, 56) despite "Purchase" events not being mentioned in Plaintiffs' Complaint.

### VIII. <u>No Information Received By Third-Parties</u>

As Plaintiffs' Motion acknowledges, third-party discovery served on Attentive and Zeta has failed to substantiate Plaintiffs' allegations that an interception of their information occurred. (Mot. p. 10) As for Meta, Plaintiff Cobbs' own production shows only that Meta received a "Page View" on the day of her 1800petmeds.com purchase. Meta's non-party production contains no information related to Plaintiff Cobbs, however. *See* Mot. Ex. M, N. Plaintiff Kawaminami's production indicates that Meta received no information related to her February 6, 2025 1800petmeds.com purchase (Kawaminami Dep. 158:6-23, 161:9-15). Meta's non-party production seemingly confirms this.[6]

## LEGAL STANDARD

To establish the propriety of class certification, a plaintiff must demonstrate that the proposed class is "adequately defined and clearly ascertainable." *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014). In addition, "the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a) [*i.e.*, numerosity, commonality, typicality, and adequacy], as well as at least one of the requirements set forth in Rule 23(b)." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004). As relevant here, Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

---

[6] Plaintiffs' Exhibit M contains dates in Column I. Plaintiffs' Exhibit N does not contain any dates.

"The burden of proof to establish the propriety of class certification rests with the advocate of the class." *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *5 (M.D. Fla. Apr. 3, 2014). "Failure to establish any of the required elements of Rule 23(a) or 23(b)(3) precludes class certification." *Id.* To determine whether a plaintiff has met his or her burden, the Court's evaluation "must be 'rigorous' and based on findings supported by the factual record." *Id.* Rule 23 "does not set forth a mere pleading standard:" a "party seeking class certification must affirmatively demonstrate his compliance with the Rule," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), using "evidentiary proof," *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Complaint allegations alone are insufficient, and there is no deference provided to a plaintiff seeking class certification. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233–34 (11th Cir. 2016). "All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation. A district court that has doubts about whether the requirements of Rule 23 have been met should refuse certification until they have been met." *Id.*

## ARGUMENT

### I. <u>Standing</u>

In order to succeed on a motion for class certification, at least one class representative must have standing to represent each class as to each claim for which class certification is sought.

#### A. Statutory Violations Do Not Establish Standing

Plaintiffs' Motion first argues that Plaintiffs (and class members) have established "through direct evidence" (Mot. p. 13) standing to pursue a Federal Wiretap claim because they "have established through circumstantial evidence that PetMeds engaged in violation of the Wiretap Act by closely assisting third parties with intercepting their communications'" and that "no more is

required."[7] (Mot. p. 15) As to Plaintiffs' CIPA claims, Plaintiffs argue that they "possess standing" because "Plaintiffs have established that PetMeds aided third parties with reading or attempting to read, or to learn, the content of their confidential communications."[8] (Mot. p. 32) However, it is well-settled that a statutory violation alone does not give rise to standing. *See e.g., TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021).Thus, Plaintiffs' Motion fails to affirmatively prove standing and class certification must be denied for this reason alone.

**B. Plaintiffs Do Not Have Standing As a Factual Matter**

This Court has recognized that statutory violations are insufficient and already engaged in a facial standing analysis in this case. In doing so, this Court found that Plaintiffs' allegations, taken as true, sufficiently alleged standing (facially) because they were analogous to the common law tort of intrusion upon seclusion:

> Plaintiffs allege that Defendant, by knowingly installing third-party tracker software on its website, caused the disclosure to third parties of Plaintiffs' confidential data transmitted via Defendant's website, such as Plaintiffs' 'form inputs', search queries, content-based URLs and button clicks [*see, e.g.,* ECF No. 21 ¶¶ 7-9, 48, 52, 92, 102, 133, 135, 148, 156-67, 161, 170].
>
> [ECF No. 59, p.8].

However, as a factual matter, discovery has not born out Plaintiffs' allegations. Plaintiffs' Motion does not contain any evidence that Plaintiffs' "confidential data" was disclosed to Attentive and Zeta; to the contrary, Attentive and Zeta have been unable to identify any data (much less confidential data) associated with Plaintiffs that they received via 1800petmeds.com. Likewise, Meta's records do not reflect that Meta received any data related to Kristen Cobbs, nor

---

[7] Plaintiffs' "evidence" is not actually evidence but rather hearsay documents and complaint allegations. Moreover, to the extent Plaintiffs rely on their rebuttal expert to meet their affirmative burden (and they do, *see* Mot. p. 13-15), this Court should not consider that testimony for the reasons set forth in PetMeds' Motion to Strike.

[8] Again, PetMeds refers the Court to its Motion to Strike Plaintiffs' Rebuttal Expert.

any data associated with Kawaminami's February 6, 2025 purchase. This too is fatal to the standing inquiry.

**C. Attempted Interception Is Not Enough**

Plaintiffs' Motion attempts to sidestep the lack of factual evidentiary support by arguing that an attempted interception (i.e., simply having the technology on 1800petmeds.com) creates Article III standing. But Plaintiffs fail to cite to a single Article III standing case to support the unprecedented conclusion that they ask this Court to reach.[9]

Though unclear, Plaintiffs' Motion seemingly suggests that this Court infer that because intrusion upon seclusion claims are recognized where intrusion is simply attempted, Article III standing exists for attempted interceptions regardless of whether there is proof that a third party received the information.[10] The case law Plaintiffs cite is not as clear-cut though and is ill-suited to both the class action and the website adtech landscape. For example, in *Koeppel*, the Iowa Supreme Court concluded that an intrusion upon seclusion claim existed for a hidden camera in a bathroom that, although not recording at the time the plaintiff discovered it, was capable of recording. *Koeppel v. Speirs*, 808 N.W.2d 177, 185 (Iowa 2011). Critical to the Iowa Supreme Court's analysis was the fact that direct evidence may not always be available (particularly from the intruder) and "harm from intrusion arises when the plaintiff reasonably believes an intrusion has occurred." Nonetheless, the *Koeppel* court was careful to explain that "the standard we establish to satisfy the intrusion element does not create a claim for attempted invasion of privacy."

---

[9] Although Plaintiffs' Motion commingles Article III standing and what Plaintiffs argue are the common elements of their claims, PetMeds addresses these separately.

[10] For Article III purposes, whether a statute creates liability for an attempted interception (which Plaintiff argues CIPA does, but concedes that ECPA does not) is not the relevant inquiry. The relevant inquiry is whether the no-injury statutory violation is akin to a harm traditionally protected at common law.

Likewise, in *Hernandez v. Hillsides*, the California Supreme Court concluded that a camera hidden to record activity in an office constituted an intrusion upon seclusion, even where it did not record the plaintiff. 47 Cal. 4th 272, 294 (2009) There, like in *Koeppel*, the specific facts were important to the court: 1) "Defendants secretly installed a hidden video camera that was both operable and operating (electricity-wise), and that could be made to monitor and record activities inside plaintiffs' office, at will, by anyone who plugged in the receptors, and who had access to the remote location in which both the receptors and recording equipment were located" and 2) defendants' written policies did not cover the possibility of such recording.

Neither of these cases are similar to the facts presented in the instant case making them inept analogies to support Article III standing.[11] Indeed, here, the very variability in functionality is largely controlled by the plaintiff/class members, not the alleged intruder. Moreover, the conduct is not highly offensive, but rather ordinary and common place (Vint Report ¶¶ 49-50), and PetMeds privacy policy discloses the conduct. As such, Plaintiffs' analogy fails, and so too does their standing.

**D. Plaintiffs Are Estopped From Arguing Attempted Interception**

---

[11] In ruling on PetMeds' Motion to Dismiss, this Court found that the harm alleged by Plaintiff was analogous to that traditionally protected by the common law tort of intrusion upon seclusion. Nonetheless, this Court dismissed Plaintiffs' intrusion upon seclusion claim finding that Plaintiffs failed to plead that conduct was "highly offensive." However, California law recognizes the highly offensive prong as a common law element and the Ninth Circuit has rejected Article III standing based on analogizing to intrusion upon seclusion where the conduct at issue is not highly offensive. *Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025) ("Popa does not explain how the tracking of her interactions with the PSP website caused her to experience any kind of harm that is remotely similar to the 'highly offensive' interferences or disclosures that were actionable at common law."); *Greenstein v. Noblr Reciprocal Exchange*, 2024 WL 3886977, at *3 (9th Cir. 2024) (finding no Article III standing and explaining "Plaintiffs seek to analogize their claims under the DPPA to the common law tort of intrusion upon seclusion . . . [b]ut the disclosure of driver's license numbers is [not] 'highly offensive'"). Because this Court has already concluded that PetMeds' conduct was not highly offensive, this is yet another reason why this Court should find Plaintiffs do not have standing. *See also Butler v. U.S. Bancorp*, 2026 WL 883904 (D. Minn. Mar. 31, 2026) (collecting cases and holding "Butler has not plausibly alleged sufficient facts to establish a concrete injury for intangible harms because the allegations concerning Butler's PIFI do not implicate specific 'highly offensive' information.")

Even if Plaintiffs were correct that an attempted intrusion could give rise to Article III standing in the absence of an actual injury or proof of an actual interception, Plaintiffs failed to plead such a theory in their Complaint. Indeed, Plaintiffs' argument is inconsistent with the theory alleged in Plaintiffs' Complaint – that the third parties actually received Plaintiffs' information, not simply that PetMeds attempted to share it. [ECF No. 105, ¶¶ 133, 145, 149, 150, 156] The very crux of Plaintiffs' complaint is not only that information was actually shared, but that it was able to be used, including but not limited to because it was identified to and associated with an individual. [ECF No. 105, ¶¶ 45-62, 68, 88-93, 96-105, 112] And, Plaintiffs have already argued to this Court that their allegations "that Defendant assisted third parties with intercepting 'sensitive and confidential communications'" "plainly establish Article III standing" because "'the disclosure of private information constitutes an intangible harm 'traditionally recognized as providing a basis for lawsuits in American courts.'" [ECF No. 34, p. 5 (emphasis added)]. It was on this basis that the Court made the standing ruling it did and denied PetMeds' motion to dismiss.

Likewise, in briefing related to Plaintiffs' non-party subpoenas (which discovery Plaintiff was allowed ECF No. 78), Plaintiffs argued that the information sought from Attentive, Meta, and Zeta about putative class members was "integral and necessary to class certification." [ECF No. 75, p.2]; ECF No. 65, ¶1 (requested information "highly relevant to predominance, typicality, and manageability"] Plaintiffs cannot now be allowed to change their theory simply because the evidence they claimed would establish their case has not materialized.[12] *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180-81 (11th Cir. 2017) (explaining that judicial estoppel "prevent[s]

[12] This is especially true where, because the theory is not pled, PetMeds has not had the opportunity to challenge whether the theory properly states a claim. Likewise, PetMeds disclosed its class certification expert in January without any notice that Plaintiffs would now rely on this erroneous theory. Yet, Plaintiffs' counsel faulted PetMeds' expert for not addressing the theory in his report, despite failing to plead the theory and failing to disclose an affirmative class certification expert (either prior to PetMeds' expert report, or at all). *See* Vint Dep. 169:25-170:5.

the perversion of the judicial process" and "protect[s its] integrity by prohibiting parties from deliberately changing positions according to the exigencies of the moment.")

In sum, Plaintiffs lack standing because they suffered no concrete injury requiring redress. A mere statutory violation is not an injury-in-fact. Cobbs admits that she was not harmed by any alleged disclosure and seeks only statutory damages, precisely what *TransUnion* prohibits. Kawaminami's claimed privacy injury is undermined by her own public disclosure of the same information on Facebook and her continued use of 1800petmeds.com with the same device and same browser settings. Moreover, a speculative risk of interception does not establish standing absent evidence that the interception actually could occur. Finally, PetMeds disclosed the challenged practices in its privacy policy, which neither Plaintiff chose to read or investigate. Because the alleged harms have no cognizable common law analogue, Plaintiffs lack standing.

## II. Argument – Ascertainability

"[A] proposed class is ascertainable if it is adequately defined such that its membership is capable of determination." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021)

### A. Nationwide Class and California Subclass – Inadequate Definition

Plaintiffs' Nationwide Class and California Subclass suffer from multiple defects. First, it is unclear whether they include alleged disclosures to Meta outside of the Meta classes, or are limited to Attentive and Zeta. Second, regardless of the technology encompassed therein, the class definitions are improper because they are not appropriately limited to individuals who actually have wiretap claims against PetMeds. Simply making a purchase of prescription medicine on 1800petmeds.com does not satisfy the elements of any of Plaintiffs' three claims. *See e.g., Stalley v. ADS All. Data Sys., Inc.*, 296 F.R.D. 670, 688 (M.D. Fla. 2013) ("Certifying as a class individuals who were merely the *intended* recipients of telephone calls from ADS would

inappropriately include individuals whose calls were never intercepted and recorded and who, therefore, have no valid claim under the FSCA."); *see also Walewski v. Zenimax Media, Inc.,* 502 Fed.Appx. 857, 861 (11th Cir. 2012) (affirming district court's denial of certification where the proposed class definition "impermissibly includes members who have no cause of action").

To defend these class definitions, Plaintiffs presumably will rely on their "circumstantial evidence" theory for their ECPA claim and their "attempted interception" theory for their CIPA claims. Neither helps Plaintiffs.

For the ECPA claim, Plaintiffs cite *Awbrey v. Great Atlantic & Pac. Tea Co.*, 505 So. 2d 604 (N.D. Ga. 1980), where the court found circumstantial evidence sufficient to defeat summary judgment despite the absence of proof that any particular plaintiff's personal call was recorded. But *Awbry* is inapposite. It was not a class action, and the court was not asked to determine whether a class could be defined through. Moreover, *Awbry* involved a single consistent wiretap method (recording of phone conversations in a workplace where plaintiffs were likely to make personal calls). This case involves website pixels that were added, paused removed, and reconfigured over time, and whose functionality can be affected by a number of variables, most critically some that were in the control of plaintiffs. Too, *Awbry* did not involve individual website visitors navigating to a website (redesigned in the middle of the class period) from different devices and different browsers and with different privacy and security settings, a privacy policy, and a cookie consent – with one Plaintiff testifying she consented to cookies, and one Plaintiff testifying she may not have.

Nor do Plainitffs' CIPA theories solve the problem. Courts have rejected the notion that merely deploying tracking technology is enough to establish interception. *See Doe v. Eating Recovery Centers*, 806 F. Supp. 3d 1109, 1117-8 (N.D. Cal. Oct. 17, 2025) (concluding that a

defendant must do something more than simply attempt to learn information while in transit in order for an interception to occur); *see also Lewis v. Magnite, Inc.*, 2025 WL 3687546, at *12 (C.D. Cal. Dec. 4, 2025).

The undisputed evidence shows substantial variation in PetMeds' adtech throughout the proposed class period.[13] Zeta pixels were paused, deleted, re-added, and re-configured, including periods when no Zeta pixel was on the site at all. *See* Mot. Ex Q. PetMeds Supp. Ans. To Interrog. No. 5.; *see also* Sripad Dep. II 82:16-18 (confirming it is possible to pause a pixel).[14] Similarly, the Attentive tag was only present for half of the class period. *Id.* Meta pixel configurations also changed over time, yet Plaintiffs never identify which specific configuration allegedly caused the challenged disclosures. Plaintiffs' class definitions ignore all these variations.

In addition to the foregoing, a host of individualized issues affect whether a pixel (assuming one was functioning on the site) will cause information to be shared with third parties. And even then the shared information may not be identifiable back to a specific individual, as Plaintiffs' Complaint alleges. Additionally, a consumer may not expect information to be private and may consent to the transmission in various ways. Thus, class definitions of nationwide prescription purchasers and California prescription purchasers are overbroad. *See* Vint Dep. 102:16-103:21.

**B. California Class and Meta California Class – Inadequate Definition**

Plaintiffs' California Class and California Meta Class also fail for an independent reason. In both class definitions, Plaintiffs propose to define the classes using California shipping

[13] Plaintiffs' Nationwide class uses the time period of October 25, 2021 through April 10, 2025. Plaintiffs' other three class definitions use October 21, 2021 as the starting date. PetMeds assumes Plaintiffs intended October 25, 2021 for all classes. Otherwise Plaintiffs' class definitions further fail because the Meta pixel was not added until October 25, 2021. *See* Mot. Ex. Q.

[14] Plaintiffs' Motion strangely cites Exhibit Q generally (no specific portion is referenced for the Court) for the proposition that "PetMeds never deleted, paused, or removed, the Meta Pixel, Attentive Tag or Zeta Pixel during the applicable class periods" when in fact it shows the opposite.

addresses. But, in order to invoke CIPA, Plaintiffs must establish that an interception alleged in California. *DellaSala v. SambaTV, Inc.*, 2025 WL 3034069, at *3 (N.D. Cal. Oct. 30, 2025) (dismissing complaint where plaintiffs allegations demonstrated that conduct occurred outside of California). The fact that a prescription product was sent to a California shipping address does not establish that the website visit originated from California, that any alleged interception occurred in California, or even that the purchase was made by a California resident so as to implicate CIPA. For that additional reason, Plaintiffs' California Class and California Meta Class definitions are inadequate

**C. All Classes – Include Time-Barred Claims**

Finally, Plaintiffs' proposed class definitions include class members whose claims are barred by the statute of limitations. Plaintiffs' CIPA claims are governed by a one-year statute of limitations. *See* Cal. Civ. Proc. Code § 340(a). Likewise, Plaintiffs' ECPA claim is governed by a two-year statute of limitations (i.e., April 10, 2023 through April 10, 2025). *See* 18 U.S.C. § 1850(e) ("A civil action under this section may not be commenced later than two years after the date upon which the claimant first has a reasonable opportunity to discover the violation."). All of Plaintiffs' proposed classes therefore include individuals whose claims are time-barred.[15]

**D. Classes are Not Ascertainable**

As for ascertainability, Plaintiffs' Motion first states that "Plaintiffs have adequately established ascertainability for their proposed classes because objective evidence within PetMeds' possession will define who qualifies as a class member." (Mot. p. 18-19). Plaintiffs' own Motion then admits that statement is not true as to two of the four classes. (Mot. p. 19-20). PetMeds submits that statement is not true as to any of the four proposed classes.

---

[15] To the extent that Plaintiffs intend to argue tolling (Mot. pp. 25-26), tolling is an inherently individualized issue.

PetMeds does not dispute that its records can be used to ascertain prescription medicine purchases through its website for a defined time period. However, Plaintiffs' Motion fails to show that PetMeds' records indicate whether those individuals had information related to their prescription medicine purchase shared with third parties without their consent, which is the very crux of this case. As explained above, there are any number of browser or device configurations that can interfere with the functionality of the cookies necessary for the third party technology at issue in this case to function. PetMeds has no visibility into that, much less any record of it as to a particular consumer or prescription medicine purchase. *See* Sripad Dep. II 13:3-9 (agreeing that PetMeds cannot determine a website visitors' browser settings to know if information is being shared with third-parties via pixels); *id.* 13:8-9 ("We are unable to, you know, determine what the user's unique browser settings are."); *id.* II 24:16-17 (relating to browser extensions, "[t]hat would be on the customer's end"); *id.* II 26:23-25 (relating to browser settings "[t]hat's on the browser side, not on the PetMeds's side."); Vint Report ¶ 112. Thus, PetMeds' records cannot determine which prescription medicine purchasers had information shared with third-parties, much less what that information is (or which purchasers were subject to a purported attempted interception).

Plaintiffs' Nationwide Meta Class and California Meta Class fare no better. To ascertain those classes, Kawaminami (only?) proposes to cross-reference PetMeds' prescription purchaser records with Meta's records, thereby requiring Meta, a non-party to this lawsuit, to engage in individual searches for each of the prescription purchasers identified in PetMeds' records. Kawaminami does not explain how the records will be analyzed or who will analyze them (especially considering that Plaintiffs do not have an affirmative class certification expert, and Plaintiffs' rebuttal expert has not disclosed any reliance on Exhibits M and N). Nor does she explain what information within Meta's records indicates whether a "purchase event with a

Content ID associated with a prescription medication" was shared with Meta. Indeed, Plaintiffs provide no explanation to the Court as to the significance of the Columns in Exhibits M and N, nor demonstrate which ones are relevant to ascertain the class members here.

In any event, the method that Plaintiff Kawaminami proposes to ascertain the Meta Nationwide Class and Meta California Subclass is not reliable. As an example of this, the Court need look no further than Plaintiff Cobbs. Cobbs produced an Off-Facebook Activity report (relied on by Plaintiffs' rebuttal expert) which indicates that Meta associated a 1800petmeds.com "Page View" to her on the date of her October 29, 2024 purchase. *See* ECF No. 75, p.9 Figure 1 (Plaintiffs relying on this information in Cobb's OFA report). But Meta made no production for Kristen Cobbs. *See* Mot. Ex. M, N. As such, Meta's records are not a reliable source from which to identify individuals whose information was shared with Meta and defining a class of individuals simply by who appears in Meta's records is underinclusive as to who may actually have a claim. *See e.g.* Vint Dep. 196:22-197:5. For all these reasons, Plaintiffs' various class definitions fail.

## III. <u>Numerosity</u>

To establish numerosity, the party seeking class certification must either present some evidence in support of the number of purported class members or a reasonable estimate of the same. *Kuehn v. Cadle Co., Inc.*, 245 F.R.D. 545, 548 (M.D. Fla. 2007) (citation omitted). Plaintiffs do neither.

Plaintiffs' Motion states that PetMeds has publicly reported 2 million individuals have purchased products through its website in the past three years. This number does not correlate to any of Plaintiffs' proposed class definitions, much less adequately defined classes – it is not limited to prescription medicine purchasers; it is not limited to prescription medicine purchasers whose information was shared with third parties Attentive, Meta or Zeta; it is not limited to prescription

medicine purchasers in California; it is not limited to prescription medicine purchasers whose information was shared with third parties Attentive, Meta or Zeta; it is not limited to prescription medicine purchasers who appear in Meta's records with a Content ID associated with a prescription purchase, and it is not limited to prescription medicine purchasers with a California shipping address who appear in Meta's records with a Content ID associated with a prescription purchase. *Id.* at 549-50 ("In sum, none of this evidence is relevant in identifying other members of the putative class . . . The evidence is simply too broad and would require the Court to engage in route speculation in order to presume that a sufficiently large enough class exists.")

While Plaintiffs ask for this Court to use "common sense" to conclude that there are more than 40 class members in Plaintiffs' proposed classes, Plaintiffs fail to actually present evidence in support thereof. *Id*. at 550 ("While the Court may 'make common sense assumptions in order to find support for numerosity,' the Court will not just accept a number pulled out of thin air."). On this record, Plaintiffs do not establish numerosity.

## IV. <u>Commonality</u>

Plaintiffs' Motion claims that there are six common questions that can be answered on a class-wide basis. PetMeds submits that, for the reasons explained throughout other sections of this Opposition, Questions 1, 2, 3, and 6 are inherently individualized inquiries. Likewise Question 5 is irrelevant to Plaintiffs' claims. And while Question 4 could conceivably be answered on a class-wide basis, Plaintiffs' Motion ignores the evidence that establishes how the various technologies were being used.[16] Regardless, any common issues are dominated by the individualized inquiries inherent therein, as discussed throughout. Two additional points are worth noting though.

[16] The undisputed deposition testimony is that PetMeds used the technology for legitimate business reasons. *See Progin v. UMass Memorial Health Care, Inc.*, 2026 WL 632770, at *5 (D. Mass. 2026) (dismissing ECPA claim where complaint did not establish that defendant had the purpose of committing a crime or tort, even if a crime or tort may have been a side effect of that use).

**A. Conversions API**

Plaintiffs seek to include within their class definitions individuals whose information was allegedly shared with Meta via Conversions API. This presents yet another individualized issue as Conversions API functions differently than the browser-side Meta Pixel, Attentive tag, or Zeta Pixel. *See* ECF No. 66-1; *see also Smith v. Rack Room Shoes, Inc.*, 2026 WL 183852, at *3 (N.D. Cal. Jan. 23, 2026) (dismissing server-side technology section 631 claim because contemporaneous interception was not sufficiently alleged). Although Plaintiffs' Motion describes this different functionality, Plaintiffs fail to address this difference as it relates to commonality.

**B. Plaintiffs Cannot Prove Damages On A Classwide Basis.**

To satisfy Rule 23(b)(3), Plaintiffs must show that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. Plaintiffs' Motion fails to meet this burden; it does not even mention damages within the Commonality section (or any other).[17]

**V. <u>Typicality</u>**

Typicality "may be defeated if factual differences dominate" or "if the class representatives are subject to unique defenses that could be central to the litigation." *Hively v. Northlake Foods, Inc.*, 191 F.R.D. 661, 668 (M.D. Fla. 2000). Plaintiffs do not satisfy their burden of proving that their clams are typical of those in the class. For starters, neither Plaintiff has standing. Second, PetMeds' privacy policy includes a choice of law provision which provides that Florida law

[17] Plaintiffs' Reply may argue that damages are common because the statutes at issue allow for statutory damages. Notwithstanding the impropriety of Plaintiffs meeting their affirmative burden in Reply, Plaintiffs would be incorrect. Both ECPA and CIPA require an individualized inquiry to determine statutory damages. The ECPA authorizes statutory damages "for each day of violation". *See* 18 U.S.C. §2520(c)(2)(B). Likewise, CIPA authorizes statutory damages of $5,000 "for each violation." *See* CIPA § 637.2. Yet, Plaintiffs' Motion fails to explain to the Court how a "day of violation" or "each violation" can be identified for each class member. Indeed, both Plaintiffs' interrogatory answers indicated that damages would be a topic of expert testimony and both stated that they had "no responsive information they could disclosure [sic] at this time." *See* Ans. to Interrogatory No. 22 (Cobbs and Kawaminami). But Plaintiffs have disclosed no such expert.

applies. As such, Plaintiffs' CIPA and ECPA claims are not typical of claims brought by class members who are bound by PetMeds' privacy policy. Third, Plaintiff Cobbs admits that she consented to cookies, thereby dooming her CIPA claims, and making her an atypical class representative. Fourth, Plaintiff Cobbs admits that she is not actually concerned about the disclosure of her pet's preventative medication, likewise making her an atypical representative. Fifth, Plaintiff Kawaminami claims she is concerned about the disclosure of her pet's prescription information (among other pieces of information not actually at issue in this lawsuit), yet she herself shared that very same information publicly on Facebook. Sixth, despite her purported concern, Plaintiff Kawaminami continues to make the same prescription purchase on 1800petmeds.com using the same device and browser, rendering her atypical. And finally, both Plaintiffs are atypical class representatives given the variability described above as it relates to pixel deployments, pixel configurations, device settings, browser settings, and consent. *Griffith v. TikTok, Inc.*, 2024 WL 4308813, at *8 (C.D. Cal. Sept. 9, 2024) (denying class certification).

## VI. Adequacy

As with the other Rule 23 requirements, Plaintiffs fail to meet their burden of establishing adequacy. Adequacy refers to both the named plaintiffs and the lawyers who intend to serve as class counsel. *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003). Plaintiffs' Motion curiously fails to request appointment of either or both plaintiffs as class representatives and fails to specify which classes or subclasses either or both Plaintiffs seek to represent;[18] regardless neither Plaintiff is an adequate class representative.

[18] Plaintiffs (Mot p.19, 25) seem to suggest that only Kawaminami will represent the Meta classes.

Plaintiffs' Motion argues, with no evidentiary support, that Plaintiffs are adequate class representatives because they have "extensively engaged in the discovery process including sitting for deposition and responding to requests for production." (Mot. p. 23)

In reality prior to moving for class certification, Plaintiffs Cobbs and Kawaminami each produced the same 3 categories of documents: 1) incomplete emails between each of them and PetMeds (Cobbs 79:11-25), with Plaintiff Kawaminami simply taking screenshots of her inbox rather than actually producing the emails (Kawaminami 106:1-107:19); 2) their Off-Facebook Activity Reports, which neither Plaintiff knew how to interpret (Cobbs Dep. 126:6-138:11; Kawaminami Dep. 139:23-141:4) and which Cobbs complained was "annoying" to download (Cobbs Dep. 125:7-12); and 3) their device imaging reports, which neither Plaintiff was knowledgeable about (Cobbs Dep. 104:12-105:19; Kawaminami Dep. 113:11-118:23). As for depositions, while Cobbs sat for her deposition in person in this District where she chose to file suit, Kawaminami did not (Kawaminami Dep. 7:3-8).

There are additional reasons why Plaintiffs are inadequate class representatives too. Despite this lawsuit being about internet privacy, Cobbs claims that privacy policies are inconsequential and Kawaminami admits that she is comfortable browsing and purchasing on websites without knowing whether those websites share her information (Kawaminami Dep. 96:10-97:2); indeed she continues to shop on 1800petmeds.com. Neither Plaintiff is familiar with their browser or device settings; Cobbs consents to cookies; and neither Plaintiff was clear as to the information at issue in this case. *Doe v. MedStar Health, Inc.*, 2023 WL 4931348, at *7 (Md. Cir. Ct. Mar. 10, 2023) (finding lack of adequacy partially "because none of the class representatives understands the true nature of this case"). Instead, it is abundantly clear that this

lawsuit was manufactured by lawyers, who searched for class representatives who themselves have not actually sustained any harm.[19]

As for class counsel, Plaintiffs' Motion likewise fails to identify any class counsel, request appointment as class counsel, or attempt to satisfy the adequacy requirements set forth in Rule 23(g). Indeed, Rule 23(g) requires that any order certifying a class appoint class counsel and identifies the criteria that a court must consider in appointing class counsel. Fed. R. Civ. P. 23(g)(1)(A); *see also DeFord v. Koutoulas*, 348 F.R.D. 724, 739 (M.D. Fla. 2025)

Here, Plaintiff has made no showing as to any of these required factors; instead, Plaintiffs' Motion simply states that the adequacy of class counsel, unidentified for the Court, is presumed.[20] On the record presently before this Court, which includes no specific naming of class counsel, no resumes/CVs, no declarations, and no evidence as to adequacy, Rule 23(g) and the adequacy requirement are simply not satisfied.

**VII. Rule 23(b)(3)**

Rule 23(b)(3) requires findings *both* (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the

[19] U.S. Chamber Institute for Legal Reform, Unstable Foundation, Our Broken Class Action System and How to Fix It, p.6 (October 2017) ("Most class actions today are created not by injured consumers seeking redress but by opportunistic plaintiffs' lawyers looking to recover substantial amounts in attorneys' fees.") *available at* https://instituteforlegalreform.com/wp-content/uploads/2020/10/UnstableFoundation_Web.pdf (last accessed July 5, 2026)

[20] Even if such a presumption did not run afoul of Rule 23(g), PetMeds respectfully suggests that such a presumption is inappropriate here. With the utmost respect to Plaintiffs' counsel, Plaintiffs have been plagued with difficulty in complying with deadlines, and even in filing this motion. While Mr. Reilly appears to be lead counsel, to the best of PetMeds' knowledge, Mr. Reilly has never been appointed class counsel; Plaintiff Kawaminami testified that she does not know Mr. Pineiro (Kawaminami Dep. 53:17-54:1), Mr. Marcus only appeared in this litigation after Plaintiffs originally moved for class certification [ECF No. 99]; and the current involvement of the Levin Law attorneys is unknown. Moreover, PetMeds notes the hypocrisy of Plaintiffs complaining about PetMeds' use of advertising technology (including related to Meta) while their counsel advertised on Meta platforms to recruit plaintiffs for this lawsuit.

controversy." *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1278–79 (11th Cir. 2009) (quoting Fed. R. Civ. P. 23(b)(3)).

**A. Predominance**

"To satisfy Rule 23(b)(3), the questions in a class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over questions that are subject only to individualized proof." *In re Photochromic Lens Antitrust Litig.*, 2014 WL 1338605, at *16 (citations omitted). "Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009).

Courts addressing pixel litigation such as this have regularly concluded that the individualized issues highlighted in this Opposition predominate so as to defeat class certification. In *Ingraham v. CapitalOne Fin. Corp.*, the Northern District of California recently denied class certification, finding that individualized issues predominated, citing individualized issues related to as to standing, consent, and what information was transmitted. Case No. 24-cv-05985 (D.E. No. 314) (N.D. Cal. June 16, 2026). Indeed, there the Court noted:

> The parties dispute which information was shared regarding even the named Plaintiffs in this action; individualized inquiries would be needed to determine whether, and, if so, what information was sent for any particular individual through a particular technology. Unlike claims that would apply to all prospective plaintiffs on a classwide basis, Plaintiff's privacy claims here depend on an individualized assessment of each prospective plaintiffs' interactions with the tracking technology and the amount and type of information included on their credit card application.

*Id.* Similarly, in *Griffith v. TikTok, Inc.*, class certification was inappropriate because "the viability of each class member's claims turns on the contents of the information collected from his or her

browsing activity, which in turn depends on [individualized factors]" and "questions affecting individual class members would predominate over other questions. 2024 WL 4308813, at *10 (C.D. Cal. Sept. 9, 2024). Likewise, in *Adventist*, 2025 WL 1797226, at *5, class certification of a CIPA 631 class was inappropriate because:

> the class definition raises issues that cannot be determined by common proof - whether a particular patient's transmitted information contained the patient's search terms or only the title of a webpage the patient clicked on without entering search terms or only an "event" such as "Adventist Health All Virtual Visit Pageview." These different types of information raise different legal issues because search terms could be content, while webpage or event information could be record information. Plaintiffs did not show the common issues predominate regarding these elements of proof.

Plaintiffs' Motion fails to compel this Court to reach a different conclusion. The variability here is highlighted in the report and testimony of PetMeds' expert Mr. Vint, cited throughout.

**B. A Class Action Is Not A Superior Means Of Adjudication.**

To obtain certification under Rule 23(b)(3), Plaintiffs must establish that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). They have not done so.

**1. The Proposed Classes Are Unmanageable.**

The key factor in the superiority inquiry is "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). Plaintiffs proposed classes cannot be ascertained, much less in an administratively feasible way. *Cherry v. Domestic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021) ("If a district court reaches Rule 23(b), and the action involves a proposed Rule 23(b)(3) class, it may consider administrative feasibility as part of the manageability criterion of Rule 23(b)(3)(D).").

The proposed method for identifying members of the Meta classes is particularly unworkable. It would require Meta, a non-party to search potentially millions of prescription

purchasers by name or email; identify associated Facebook accounts; and generate individualized reports Assuming Meta is willing or able to do this,[21] each such report will then need to be reviewed individually to cross-reference the date of prescription purchase on 1800petmeds.com and determine whether information was sent to Meta for a prescription purchase (assuming this can be determined from the report – another fact for which there is no evidentiary support). A further step would then need to be taken to determine if the "ContentID" sent to Meta corresponds to a prescription medication. Plaintiffs offer no evidence that this process is feasible and no plan for managing it at scale. *See e.g., Adventist*, 2025 WL 1797226, at *9 ("There may be other ways to manage the individual issues, but Plaintiffs did not provide them."); *Coleman v. Burger King Corp.*, 2025 WL 3280900, at *16 (S.D. Fla. Nov. 25, 2025) ("And we agree that the Plaintiffs' proposed class would create an administrative nightmare.")

Nor do manageability problems end with class member identification. Plaintiffs' offer no trial plan addressing the individualized issues related to website redesign, pixel deployments, pixel settings, device/browser settings, identifiability, privacy policy consent, and cookie consent, much less how class members can satisfy the elements of their claims. *See Vega*, 564 F.3d at 1278–79.

**2. This Case Involves An "Immature Tort."**

Courts routinely find that superiority is absent for classes involving an "immature tort" because any efficiency gains are speculative and outweighed by the risks of certifying an undeveloped cause of action. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 747 (5th Cir. 1996); *see also Medstar*, 2023 WL 4931348, at *10. "That concern is especially acute here, where courts continue to grapple with application of wiretap statutes to evolving online technologies." *Medstar*, 2023 WL 4931348, at *10 ("the novelty and immaturity of the Plaintiffs' claims compels the Court

[21] There is no evidence before the Court to establish either point.

to hold that class certification is not the superior method for adjudication"); *see also Eating Recovery Ctr.*, 806 F. Supp. 3d at 1112 ("The language of CIPA is a total mess. It was a mess from the get-go, but the mess gets bigger and bigger as the world continues to change and as courts are called upon to apply CIPA's already-obtuse language to new technologies. Indeed, we have reached the point where it's often borderline impossible to determine whether a defendant's online conduct fits within the language of the statute.") The novelty of these theories weighs heavily against certification.

### 3. Other Adequate Remedies Exist

Class treatment is unnecessary because both the ECPA and CIPA provide for statutory damages and the ECPA provides for attorneys' fees. *See* 18 U.S.C. § 2520(b)(3), (c)(2)(B); CA Penal Code § 637.2. There is, therefore, no impediment to putative class members bringing individual claims should they so desire. *See e.g., Cohen v. Implant Innovations, Inc.*, 259 F.R.D. 617, 644 (S.D. Fla. 2008) (class action "not the superior or only mechanism for resolving this claim" because FDUTPA allows recovery of attorney's fees).

Additionally, California residents, like Plaintiffs, have statutory rights to request disclosure of third-parties with whom their information is shared, and seek deletion of their data. CA Civ. Code §§ 1798.105, 1798.110, 1798.115; *see also* PetMeds' Privacy Policy. Neither Plaintiff has chosen to avail herself of those rights (*see* Resps. to RFA Nos. 18-21). For all these reasons, a class action is not a superior method of adjudication.

## CONCLUSION

"[W]ith great power comes great responsibility; the awesome power of a district court must be exercised within the framework of rule 23." *Vega,* 564 F.3d at 1264 (internal quotations omitted). Because the requirements of Rule 23 are not met, Plaintiffs' Motion should be denied.