**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 25-80458-CIV-CANNON/Reinhart**

**KRISTIN COBBS** and **LYNNE KAWAMINAMI**,

*individually and on behalf of all others similarly situated*,

Plaintiffs,

v.

**PETMED EXPRESS, INC.**,

Defendant.
_______________________________________/

**PLAINTIFFS' REPLY IN SUPPORT OF CLASS CERTIFICATION**

## INTRODUCTION

Plaintiffs seek to certify four classes of consumers who purchased prescription medication through 1800petmeds.com while Defendant deployed and activated third-party tracking technologies—the Meta Pixel, Attentive Tag, Zeta Pixel, and Conversions API—that it configured to collect the contents of their communications, including what they added to cart and purchased. None of Defendant's arguments persuasively contest class certification. Instead, Defendant fails to meaningfully challenge standing; misapprehends the ascertainability inquiry; disregards the low bar for numerosity; concedes commonality; challenges typicality through speculation; ignores the elements for adequacy; and relies on inapposite caselaw to support its predominance and superiority arguments. Because Plaintiffs establish each Rule 23 requirement through common, generalized evidence, the Court should grant the motion and certify the proposed classes.-[1]

## ARGUMENT

### I. Standing

Defendant argues that "Plaintiffs lack standing" because "[a] mere statutory violation is not an injury-in-fact." *See* Mtn. Opp. at 16. Plaintiffs neither assert nor imply as much; they contend and prove that "an attempt to intercept a private conversation constitutes an actionable intrusion because 'the full benefits of privacy protected by the tort are diminished when a reasonable person believes someone could have listened.'" *See* Mtn. at 18 (quoting *Koeppel v. Speirs*, 808 N.W. 2d 177, 182 (Iowa 2011)). Defendant declines to distinguish the cited authority, instead choosing to recite some of the analogous facts in those cases while failing to explain how they are distinct from those that Plaintiffs allege and establish here. *See* Mtn. Opp. at 13–14.

[1] As previewed in recent motions to extend, Defendant has produced a trove of documents that have substantially changed the contours of this action and Plaintiffs' motion for class certification. *See* ECF No. 100, 114. Plaintiffs are finishing their review of the supplemental productions, and they intend to seek leave and file a renewed motion for class certification within a few weeks.

Defendant proceeds to assert that "Plaintiffs are estopped from arguing attempted interception." *See id.* at 14–15 (capitalization removed). It is axiomatic, however, "that a complaint need not plead legal theories, which can be learned during discovery." *Alioto v. Town of Lisbon*, 651 F. 3d 715, 721 (7th Cir. 2011); *Webb v. Hiykel*, 713 F. 2d 405, 407–08 (8th Cir. 1983) (noting that "the 'theory of the pleadings' doctrine, under which a plaintiff must succeed on those theories that are pleaded or not at all, has been effectively abolished" under the Federal Rules of Civil Procedure."); *Fitzgerald v. Codex Co.*, 882 F. 2d 586, 589 (1st Cir. 1989) ("The 'theory of the pleadings' doctrine … has been all but abolished under the federal rules.").

**II. Ascertainability**

Defendant argues that "the definitions are improper because they are not appropriately limited to individuals who actually have wiretap claims against PetMeds." *See* Mtn. Opp. at 16. Defendant's argument misapprehends the ascertainability inquiry. As courts have noted, ascertainability refers to whether the proposed classes "can be ascertained by reference to objective criteria and whose members can be identified through a manageable process that does not require much, if any, individual inquiry." *See Legg v. Spirit Airlines, Inc.*, 315 F.R.D. 383, 388 (S.D. Fla. 2015) (quotations omitted). And here, there is no dispute that, as defined, the Court can ascertain the proposed classes through objective methods. Two of the four classes, for example, will rely exclusively on consulting objective information within PetMeds, and the remaining two classes depend on an objective, two-step methodology: "(1) obtain records from both [PetMeds] and Facebook and then (2) analyze these records to ultimately identify the proposed Class[es]." *See Jancik v. WebMD LLC*, 2025 WL 560705, at *4 (N.D. Ga. Feb. 20, 2025). Plaintiffs thus establish

that their proposed classes "are capable of being determined and thus ascertainable." *See id.*[2]

## III. Numerosity

Defendant asserts that Plaintiffs fail to establish numerosity because they cite to evidence that "does not correlate to any of Plaintiffs' proposed class definitions." *See* Mtn. Opp. at 21. That is wrong. Plaintiffs introduce evidence that collectively demonstrates that: 1) more than 2 million individuals purchased products through PetMeds' website over a three-year period; 2) California is one of eight states that makes up 50 percent of that figure; and 3) PetMeds paid Meta between $35,000 and $40,000 each month to retarget these purchasers with advertisements. *See* Exs. S, Y, Z. Taken together, this evidence proves by a preponderance of the evidence that the classes "exceed[] 40 people." *Fifth Moorings Condo., Inc. v. Shere*, 71 F.R.D. 712, 715 (S.D. Fla. 1979).

## IV. Commonality

To contest commonality, "PetMeds submits that, for the reasons explained throughout other sections of this Opposition, Questions 1, 2, 3, and 6 are inherently individualized inquiries." *See* Mtn. Opp. at 22. Defendant leaves entirely unexplained, however, the "reasons" that support such a conclusion, *id.*, and "[i]t is not the obligation of the Court to construct legal arguments to support that party's position." *Strauss v. CBE Group, Inc.*, 2016 WL 4402270, at *2 (S.D. Fla. June 8, 2016). Indeed, "[t]he law is well-settled that perfunctory, underdeveloped arguments without discussion or citation to pertinent legal authority are waived." *See Michaels v. Sasser's Glass Works Inc.*, 662 F. Supp. 3d 1223, 1243 (S.D. Fla. 2023) (quotations and brackets omitted). As a corollary, by making only "passing references" to the reasons that purportedly support its position, PetMeds waived its arguments disputing commonality for Questions 1, 2, 3, and 6.

[2] The remaining arguments in this section suffer from the same defect: None of them touch on the ascertainability requirement. To the extent the Court considers these arguments with respect to other elements of class certification, Plaintiffs respectfully request supplemental briefing.

In any event, Defendant concedes that "Question 4 could conceivably be answered on a class-wide basis." *See* Mtn. Opp. at 22. Because "even a single common question will do," Defendant likewise concedes that Plaintiffs satisfy commonality. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quotations and brackets omitted). To be sure, Defendant also maintains that this common question will ultimately disprove Plaintiffs' claims once "evidence" establishes "how the various technologies were being used." *See* Mtn. Opp. at 22. But that argument is not only wrong but also irrelevant because common questions include those in which "generalized evidence … disproves the element on a simultaneous, class-wide basis." *See Bailey v. Rocky Mountain Holdings, LLC*, 309 F.R.D. 675, 689 (S.D. Fla. 2015) (quotations omitted). Accordingly, Plaintiffs satisfy the commonality requirement by demonstrating that there exists "at least one issue whose resolution will affect all or a significant number of the putative class members." *See Williams v. Mohawk Industries, Inc.*, 568 F. 3d 1350, 1355 (11th Cir. 2009).

## V. Typicality

Defendant advances seven reasons that collectively assert that Plaintiffs failed to show "their claims are typical of those in the class." *See* Mtn. Opp. at 23. None of them persuade.

*First*, Defendant asserts that "neither Plaintiff has standing." *See* Mtn. Opp. at 23. As previously explained, however, Plaintiffs establish Article III standing because their injury rests on allegations and evidence that support two of the three elements for intrusion upon seclusion.

*Second*, Defendant argues that Plaintiffs fail to establish typicality because "PetMeds' privacy policy includes a choice of law provision which provides that Florida law applies." *See* Mtn. Opp. at 23. Like its arguments concerning commonality, Defendant leaves this argument entirely underdeveloped, offering only "bare assertions" and "[u]nsupported speculation" that cannot defeat class certification. *See Mohamed v. American Motor Co.*, 320 F.R.D. 301, 316 (S.D.

Fla. 2017) (brackets and quotations omitted). Defendant fails to proffer any evidence, for example, that "indicate[s] whether customers are ever directed to that policy before clicking links on Defendant's site that are transmitted to the third parties; when (or how often) Defendant's alleged 'consent banner' pops up; what the font size or the format is pertaining to the advisal; whether Defendant's users need to create an account to make purchases; or whether users are provided with the privacy policy during checkout." *See Cobbs v. PetMed Express, Inc.*, 824 F. Supp. 3d 1257, 1277 (S.D. Fla. 2026). Instead, Defendant at most submits an expert declaration with screenshots from January 2026, but those screenshots cannot extrapolate to putative class members, especially because screenshots from March 2025—i.e., right before the class period cuts off—demonstrate that the representations differed. *Compare* Ex. F to the Mtn. Opp. ("Vint Report") ¶¶ 76–81 *with* Ex. B to the Motion for Class Certification ("Good Report") ¶¶ 118–19; *see also* Ex. A, B. (showing the checkout flow from March 2025); Ex. B at 212–13 (confirming that he cannot "opine with complete reliability on whether the checkout [page] and the consent options were the same prior to conducting [his] analysis" because he "took the screenshots after the class period ends").

*Third*, Defendant asserts that "Plaintiff Cobbs admits that she consented to cookies." *See* Mtn. Opp. at 24. Nothing within the record supports that conclusion. *See* Ex. B to Mtn. Opp. at 92:4–25 (stating "I don't recall" when asked "whether [she] encountered a cookie banner").

*Fourth*, Defendant contends that "Plaintiff Cobbs admits that she is not actually concerned about the disclosure of her pet's preventative medication." *See* Mtn. Opp. at 24. Ms. Cobbs stated the opposite during her deposition, testifying that because "it's a website that uses, like medical information, yeah, I would expect a little more privacy." *See* Ex. B to Mtn. Opp. at 138:15–25.

*Fifth*, Defendant argues that that Plaintiff Kawaminami's claims are atypical because she "shared that very same information publicly on Facebook." *See* Mtn. Opp. at 24. But as Ms.

Kawaminami testified, it was her understanding that it was "not just out there, hanging out there for whoever," and that "my posting in a group specifically for cats with the same disease is a far cry from my posting on my wall personal information about my cat where anyone and everyone can see it." *See* Ex. C to the Mtn. Opp. ("Kawaminami Deposition") at 132:6–33-24. Because "[a] right to privacy encompasses the individual's control of information concerning his or her person," there is nothing atypical about Ms. Kawaminami posting about her pet's liver failure in a support group on Facebook that she believed was private and restricted. *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litig.*, 956 F. 3d 589, 598 (9th Cir. 2020) (cleaned up).

*Sixth*, Defendant asserts that "Plaintiff Kawaminami continues to make the same prescription purchase on 1800petmeds.com using the same device and browser, rendering her atypical." *See* Mtn. Opp. at 24. As courts have noted, there is nothing "peculiar" or "atypical" about named representatives continuing to use a website or service after filing suit. *See In re Yahoo Mail Litigation*, 308 F.R.D. 577, 594 (N.D. Cal. 2015) (rejecting argument "that Plaintiffs' continued emailing of Yahoo Mail subscribers after discovering the nature of Yahoo's scanning practices is 'peculiar' or atypical"); *cf. Rodriguez v. Google*, 2024 WL 38302, at *7 (N.D. Cal. Jan. 3, 2024) (noting that plaintiffs "need not show they unilaterally stopped using Google's services after learning about sWAA's alleged privacy violations to be able to aver they suffered harm").

*Seventh*, Defendant contends that "both Plaintiffs are atypical class representatives given the variability … as it relates to pixel deployments, pixel configurations, device settings, browser settings, and consent." *See* Mtn. Opp. at 24. This "variability" is all but illusory. The first two variables—"pixel deployments" and "pixel configurations"—make little sense here because Plaintiffs purchased medication throughout the class period, meaning they will necessarily have to address the impact of changes to the "deployments" and "configurations" when supporting their

individual claims. *Compare* ECF No. 105-24 *with* ECF No. 105-17. The next two variables—"device settings" and "browser settings"—have no bearing on their CIPA claims because "the third-party code attempts to read or learn the content of a user's communications with a website across technical conditions." *See* Good Report ¶ 82. Those variables similarly have no bearing on their claims under the Wiretap Act because the 11th Circuit has expressly held that "[t]he violation of section 2511(1)(b) is the intercepting itself, not the interception of particular material." *See Watkins v. L.M. Berry & Co.*, 704 F. 2d 577, 584 (11th Cir. 1983). The last variable—"consent" to the actual or attempted interception—is unavailing because Defendant fails to introduce evidence demonstrating that its website put Plaintiffs or putative class members on notice of the privacy policy. Defendant has thus "offered only bare assertions of consent, without identifying a single instance in which consent was in fact obtained." *See Cabrera v. Gov't Employees Ins. Co.*, 2014 WL 11894430, at *5, n. 4 (S.D. Fla. Sept. 29, 2014). Under those circumstances, "[s]uch bare assertions cannot defeat certification under Rule 23." *Mohamed, LLC*, 320 F.R.D. at 316.

**VI. Adequacy of Representation**

Defendant challenges Plaintiffs' adequacy by first confirming that they have substantially assisted with document production—including through the collection of "emails," "Off-Facebook Activity Reports," and "device imaging reports"—and that they have both sat for depositions. *See* Mtn. Opp. at 25. Defendant then follows up with a scattershot approach intended to illustrate "additional reasons why Plaintiffs are inadequate class representatives." *See* Mtn. Opp. at 25. Defendant not only mischaracterizes the record to support these purported reasons but also fails to explain how these reasons relate to the "two separate inquiries" that animate the adequacy-of-representation requirement: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the

action." *Busby v. JRHBW Realty, Inc.*, 513 F. 3d 1314, 1323 (11th Cir. 2008). Such an omission demonstrates why "the Court can conclude that Plaintiff[s] … will adequately represent the interests of the class." *See Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, n. 14 (S.D. Fla. 2014).

Defendant then asserts that "Plaintiffs' Motion likewise fails to identify any class counsel, request appointment as class counsel, or attempt to satisfy the adequacy requirements set forth in Rule 23(g)." *See* Mtn. Opp. at 26. As an initial matter, Plaintiffs explicitly request that the Court "appoint their attorneys as class counsel," which would necessarily refer to their attorneys of record at Marcus Rashbaum Pineiro & Meyers and Levin Law. *See* Mtn. at 1. To the extent there is any question concerning adequacy, class counsel's resumes further underscore that they "regularly engage[] in consumer class action litigation and other complex litigation similar to the present action." *See Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 518 (S.D. Fla. 2013); *see also* Ex. C. The record in this action also evinces that "they have diligently represented their clients and the absent members." *See In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 672 (S.D. Fla. 2015). Accordingly, Plaintiffs demonstrate that they "ha[ve] common interests with unnamed class members and will vigorously prosecute the interests of the class through qualified counsel." *See Piazza v. Ebsco Industries, Inc.*, 274 F. 3d 1341, 1346 (11th Cir. 2001).

**VII. Predominance**

Defendant contests the predominance requirement by citing to four cases—*Ingraham v. Capital One Fin. Corp.*, 2026 WL 1759155 (N.D. Cal. June 16, 2026), *Griffith v. TikTok, Inc.*, 2024 WL 4308813, at *10 (C.D. Cal. Sept. 9, 2024), *Doe v. Adventist Health*, 2025 WL 1797226 (Super. Ct. Cal. Los Angeles Cnty. Feb. 14, 2025), and *Doe v. Medstar Health, Inc.*, 2023 WL 4931348 (Cir. Ct. Baltimore City Mar. 19, 2023)—for the proposition that "[c]ourts addressing pixel litigation such as this have regularly concluded that the individualized issues … predominate so

as to defeat class certification." *See* Mtn. Opp. at 27. All four cases are inapposite. Starting with *Ingraham*, the plaintiffs sought to certify classes based on theories of liability that hinged on establishing "that the type and substance of the information entered and tracked were consistent among class members." *See Ingraham*, 2026 WL 1759155, at *6. Similarly, in *Griffith*, the court likewise noted that "the viability of each member's claims turns on the contents of the information collected from his or her browsing activity." *See Griffith*, 2024 WL 4308813, at *10. By contrast, Plaintiffs' claims generally depend on one of two approaches—either marshalling "circumstantial evidence" for their claim under the Wiretap Act or demonstrating "an attempt to intercept a private conversation" for their claims under CIPA—neither of which require establishing "the contents of specific conversations allegedly intercepted." *See* Mtn. at 8–17. What is more, unlike in *Ingraham* or *Griffith*, Plaintiffs possess "records from both PetMeds and Facebook" that uniquely allow them to gain class certification for the Meta Subclasses. *See id.* at 19 (quotations and brackets omitted). Accordingly, neither *Ingraham* nor *Griffith* rely on reasoning that has applicability here.

Defendant also cites to an unpublished decision from a state court in Los Angeles, *Doe v. Adventist Health*, in which the court found that "different types of information raise different legal issues because search terms could be content, while webpage or event information could be record information." *Adventist Health*, 2025 WL 1797226, at *5. But with respect to the Meta classes, the court neither considered nor addressed a motion to certify involving subpoenaed records. And with respect to the purchaser classes, Defendant leaves undisputed that class members communicated their assent to contractual terms when checking out and that Defendant deployed eavesdropping devices that it configured to collect "purchase event data." *See* Good Report ¶¶ 99–100. Because Plaintiffs need not show "the contents of specific conversations allegedly intercepted," nothing more is needed. *Walker v. Darby*, 911 F. 2d 1573, 1577 (11th Cir. 1990).

The final case that Defendant relies upon, *Doe v. Medstar Health, Inc.*, fatally undermines Defendant's argument. There, the court reviewed a claim under the Wiretap Act and found that "there are essentially no individual issues of law and fact as to this claim: once it is established that a patient is a member of the class (that is, the patient 'visited' one of the Defendants' websites), all other factual issues are limited to whether the Defendant attempted to intercept or disclose any of the patient's communications." *See Medstar*, 2023 WL 4931348, at *8. The court then reached the same conclusion that should be found here: "Having classified the issues relating to this claim, the Court agrees that, if the Plaintiffs have stated a valid cause of action under the Wiretap Act, the common issues of law and fact would predominate over individual issues for this claim." *See id.*

**VIII. Superiority**

Defendant asserts that the subpoenaed records will "need to be reviewed individually to cross-reference the date of prescription purchase on 1800petmeds.com and determine whether information was sent to Meta for a prescription purchase." *See* Mtn. Opp. at 29. But as one court has already noted, "a class action administrator can take care of any further quality assurance checks … and claims process verifications." *See Jancik*, 2025 WL 560705, at *9.

Defendant ends by contending that "superiority is absent for classes involving an 'immature tort' because any efficiency gains are speculative and outweighed by the risks of certifying an undeveloped cause of action." *See* Mtn. Opp. at 29. Defendant's argument disregards the many courts that have already certified classes under analogous circumstances. *See, e.g.*, *Jancik*, 2025 WL 560705, at *9 (reviewing analogous evidence and granting class certification); *Torres v. Prudential Fin., Inc.*, 2024 WL 4894289, at *9 (N.D. Cal. Nov. 26, 2024) (granting class certification where "Plaintiffs have shown that Defendants' records are capable of showing which individuals filled out the Prudential form and had their communication intercepted").

Dated: July 20, 2026

Respectfully submitted,

MARCUS RASHBAUM PINEIRO & MEYERS LLP
By: ***Christopher R. Reilly***
Christopher R. Reilly, Esq.
Florida Bar No. 1025097
creilly@mrpfirm.com
Michael A. Pineiro, Esq.
Florida Bar No. 41897
mpineiro@mrpfirm.com

One Biscayne Tower
2 S. Biscayne Blvd., Ste. 2530
Miami, Florida 33131
Telephone: (305) 400-4260

LEVIN LAW, P.A.
Brian Levin
Florida Bar No. 26392
brian@levinlawpa.com
Jacob Polin*
jpolin@levinlawpa.com
2665 S Bayshore Dr., Ph. 2B
Miami, Florida 33133
Telephone: (305) 402-9050

*Attorneys for Plaintiffs*
**Pro Hac Vice Forthcoming*